**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WHITEBOX RELATIVE VALUE PARTNERS, LP,
WHITEBOX GT FUND, LP, WHITEBOX MULTI-
STRATEGY PARTNERS, LP, PANDORA SELECT
PARTNERS, LP,

<em>Plaintiffs,</em>

v.

TRANSOCEAN LTD., TRANSOCEAN INC.,

<em>Defendants.</em>

Civil Action No. _____

**COMPLAINT**

Plaintiffs Whitebox Relative Value Partners, LP, Whitebox GT Fund, LP, Whitebox Multi-Strategy Partners, LP, and Pandora Select Partners, LP (collectively, "Plaintiffs" or "Whitebox") bring this Complaint against Defendants Transocean Ltd. ("Transocean Parent"), and Transocean Inc. ("TINC", collectively, the "Defendants", and, together with all of their affiliates, "Transocean"), and allege as follows:

<strong><u>NATURE OF THE ACTION</u></strong>

1.      Plaintiffs bring this action for injunctive relief in respect of a fraudulent and coercive exchange offer and consent solicitation by TINC (the "Exchange Offer") that was announced on August 10, 2020 and is currently set to expire on September 4, 2020.  In a series of partially disclosed transactions, starting with a private transaction involving an interested director and culminating in the Exchange Offer, Transocean seeks to subordinate three series of its existing structurally senior notes totaling $2.25 billion ("Existing Guaranteed Notes") to potentially more than $750 million in newly created notes ("New Senior Guaranteed Notes"), in breach of the terms of the indentures governing two of the three series of Existing Guaranteed Notes.  The combined outstanding principal amount of these two series of notes is $1.5 billion.

2.      Defendants have deliberately misstated and withheld material facts concerning the Exchange Offer in an Exchange Offer Memorandum and Consent Solicitation Statement (the "Offering Memorandum" or "OM"), in violation of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").   In particular, the Offering Memorandum contains material misstatements and omissions as to (1) Transocean's breach of the two aforementioned indentures, (2) its ability to structurally subordinate two of the three series of Existing Guaranteed Notes, and (3) the purported structural seniority of the New Senior Guaranteed Notes upon completion of the Exchange Offer.  Plaintiffs file this action to obtain injunctive relief that would immediately enjoin the Exchange Offer, require Transocean to correct the misstatements and omissions in the Offering Memorandum, permit Plaintiffs and any other noteholder that has already tendered its notes into the Exchange Offer to withdraw its tender, and restore to the noteholders their previously issued notes.

3.      Transocean is an international provider of offshore contract drilling services for oil and gas wells.  Transocean owns or has partial ownership interests in, and operates, a fleet of 39 mobile offshore drilling units.  Transocean's primary business is to contract out its drilling rigs, related equipment and work crews to drill oil and gas wells.

4.      The offshore drilling industry is in historic distress, due in part to volatile and generally weak commodity prices, and exacerbated in recent months as the COVID-19 pandemic has further roiled oil markets and created significant challenges for offshore drillers.  Several of Transocean's largest competitors in the offshore drilling industry have filed for bankruptcy in recent months.  As of June 30, 2020, Transocean had approximately $9 billion in outstanding debt obligations.

5.      TINC issued the Existing Guaranteed Notes in 2017, 2018, and 2020.  Specifically, on October 17, 2017, TINC issued $750 million in principal amount of 7.50% Senior Notes due 2026 (the "2026 Existing Guaranteed Notes"); on October 25, 2018, TINC issued $750 million of principal amount of 7.25% Senior Notes due 2025 (the "2025 Existing Guaranteed Notes"); and on January 17, 2020, TINC issued $750 million of principal amount of 8.0% Senior Notes due 2027 (the "2027 Existing Guaranteed Notes").  Plaintiffs hold approximately $13 million in principal amount of the 2026 Existing Guaranteed Notes, $27.0 million in principal amount of the 2025 Existing Guaranteed Notes, and $42.64 million in principal amount of the 2027 Existing Guaranteed Notes.

6.      As of June 30, 2020, the Existing Guaranteed Notes were "structurally senior" to nearly $3 billion of 9 series of general unsecured debt of TINC.  It was a material feature of the Existing Guaranteed Notes—one advertised on the cover of their indentures—that the notes were guaranteed not just by Transocean Parent, which owns all of the equity interests in TINC, but also by three wholly owned subsidiaries of TINC, namely Transocean Holdings 1 Ltd., Transocean Holdings 2 Ltd. and Transocean Holdings 3 Ltd. (collectively referred to in the OM as "Upper Tier Notes Guarantors"). The Upper Tier Notes Guarantors owned, directly or indirectly, all of the outstanding equity interests of the other subsidiaries of TINC, which, in turn, owned substantially all of Transocean's operating assets.  These guarantees ensure that in the event of a Transocean bankruptcy, holders of the Existing Guaranteed Notes would be able to recover on account of Transocean's operating assets *before* holders of any of the other unsecured notes issued by TINC that were not also guaranteed by the Upper Tier Notes Guarantors.  It was because of these guarantees from the Upper Tier Notes Guarantors that the holders of the Existing Guaranteed Notes were structurally senior to other unsecured notes issued by TINC.

7.     The indentures governing the two later issued series of the Existing Guaranteed Notes—the 2025 Existing Guaranteed Notes and the 2027 Existing Guaranteed Notes (together, the "Senior Existing Guaranteed Notes")—contain a covenant in Section 11.03 that specifically preserves their structural seniority in the event of an internal reorganization whereby the Upper Tier Notes Guarantors transfer or dispose of all or substantially all of their assets to other subsidiaries. Referred to herein as the "Successor Obligor Provision," this covenant prohibits the very action undertaken by Transocean as part of a multi-step scheme intended to improperly remove the structural seniority of the Senior Existing Guaranteed Notes, starting with a private exchange transaction involving an interested director and culminating in the fraudulent Exchange Offer.

8.     In connection with the private exchange transaction, which was executed shortly before the Exchange Offer with a Transocean board member who happens to have a significant equity stake in the company, Transocean appears to have created three new, wholly owned subsidiaries of the Upper Tier Notes Guarantors, referred to in the Offering Memorandum as Mid Holdings 1 Ltd., Mid Holdings 2 Ltd. and Mid Holdings 3 Ltd. (collectively referred to in the OM as "Lower Tier Notes Guarantors"). Next, Transocean caused the Upper Tier Notes Guarantors to transfer all of their assets into the Lower Tier Notes Guarantors, but did not, as required by the terms of the Senior Existing Guaranteed Notes' indentures, cause the Lower Tier Notes Guarantors to issue guarantees to the Senior Existing Guaranteed Notes. Third, TINC commenced the Exchange Offer by which holders of more than $2 billion of the existing unsecured notes issued by TINC were invited to tender their notes in exchange for a significantly lesser amount of the New Senior Guaranteed Notes. The New Senior Guaranteed Notes to be issued by TINC in the Exchange Offer are guaranteed by Transocean Parent *and* by the Lower Tier Notes Guarantors.

9.      The Offering Memorandum contains numerous misstatements and omissions regarding this series of transactions.  First, the Offering Memorandum falsely claims that, unless the Senior Existing Guaranteed Notes tender their notes in the Exchange Offer, the New Senior Guaranteed Notes will be "structurally senior" to the $1.5 billion in principal amount of the Senior Existing Guaranteed Notes because those notes do not and will not otherwise benefit from guarantees from the Lower Tier Notes Guarantors.  The Offering Memorandum misleadingly refers in numerous places to the structural subordination of the Existing Guaranteed Notes but omits the fact that the proposed structural subordination of the Senior Existing Guaranteed Notes constitutes a breach of the covenants in the indentures for those notes, and would therefore have to be cured by the Lower Tier Notes Guarantors later issuing a guarantee in favor of the Senior Existing Guaranteed Notes in the amount of $1.5 billion.  Put another way, the Offering Memorandum fails to disclose that the Lower Tier Notes Guarantors are already expressly *required* to assume the guarantees of the Upper Tier Notes Guarantors owed to the holders of the Senior Existing Guaranteed Notes with an outstanding principal amount of $1.5 billion.

10.      Transocean's deliberate false statements and omissions have materially misled and harmed all of the noteholders who have been invited to tender—and improperly coerced into tendering—their notes in exchange for the New Senior Guaranteed Notes.  *First*, the holders of the Existing Senior Guaranteed Notes have been misled because they have been invited to tender their existing notes at a discount of up to approximately 55% of their par value in order to purportedly receive a guarantee from the Lower Tier Notes Guarantors, but the OM fails to inform these holders that they already are entitled to a guarantee from the Lower Tier Notes Guarantors. Specifically, the OM, as amended on August 24, 2020, states that TINC is offering the holders of the Senior Existing Guaranteed Notes an opportunity to exchange their notes at a rate of $475 per

$1,000 principal amount of the 2025 Existing Guaranteed Notes and a rate of $455 per $1,000 principal amount of 2027 Existing Guaranteed Notes in order to obtain this guarantee and rank *pari passu* with other noteholders who similarly tender their notes in the Exchange Offer.[1] Presumably no holder of these Senior Existing Guaranteed Notes would surrender half the value of their notes to receive a guarantee to which they are *already* entitled.

11.     Not only does the OM contain the material omission regarding the Existing Senior Guaranteed Notes' rights to that guarantee, but it further falsely claims that if the holders of the Existing Guaranteed Notes do not surrender their notes pursuant to the Exchange Offer, they will be structurally junior to any noteholder (whether previously guaranteed or not) that does tender its notes because only the New Senior Guaranteed Notes will be guaranteed by the Lower Tier Notes Guarantors. This Hobson's choice, based on false and misleading statements in the OM, materially harms these holders, particularly if they are unfamiliar with the Successor Obligor Provision and its import in their indentures, who will be falsely lulled into tendering their notes when it is in truth economically irrational to do so.

12.     *Second*, the holders of the general unsecured notes invited to participate in the Exchange Offer and the holders of the 2026 Existing Guaranteed Notes (whose indentures do not contain the Successor Obligor Provision) have been harmed because they have made or will make an investment decision based on a false picture as to the total liabilities owed by the Lower Tier Notes Guarantors. The Offering Memorandum falsely claims that TINC can subordinate the Senior Existing Guaranteed Notes and that those notes will only participate *pari passu* in the assets of the Lower Tier Notes Guarantors if the holders of the Senior Existing Guaranteed Notes

---

[1] The Existing Guaranteed Notes, as is generally the case with notes, are issued based on par value of $1,000. Accordingly, an exchange price of $455 is an offer that is approximately a 55% discount to par.

surrender their notes at a deep discount to par.  If, unbeknownst to these holders, the Senior Existing Guaranteed Notes are later given a $1.5 billion guarantee by the assets in the Lower Tier Notes Guarantors because TINC decides to cure its violation of their indentures, the holders of the unsecured notes who tendered their notes in the Exchange Offer will have been misled as to the number and amount of noteholders who will have *pari passu* access to the assets of the Lower Tier Notes Guarantors.  In effect, the holders of the unsecured notes who have tendered will be diluted by the $1.5 billion guarantee already owed by the Lower Tier Notes Guarantors to the Senior Existing Guaranteed Notes, which was not disclosed to them in the OM (and which falsely states that the Senior Existing Guaranteed Notes will be subordinated to the new notes if they do not tender).  As a result, these unsecured holders may not have tendered their notes—at least, not at the prices proposed in the Exchange Offer—if they had known the truth regarding the right of the Senior Existing Guaranteed Notes to their guarantee from the Lower Tier Notes Guarantors.

13.    In that way, the holders of the Senior Existing Guaranteed Notes are also harmed by the Offering Memorandum even if they are not misled by the OM's disclosures as to their indentures, because holders of *other* notes will be misled into tendering their notes when they otherwise would not have done so.  The more holders of other notes that tender their notes for New Senior Guaranteed Notes, the greater the number of creditors who will be *pari passu* with the Senior Existing Guaranteed Notes after the Exchange Offer is completed, which will reduce the recovery in bankruptcy by the Senior Existing Guaranteed Notes more than would otherwise have been the case if those holders had not tendered.

14.    Transocean is fully aware of its unlawful attempt to deprive the Senior Existing Guaranteed Notes of their rightful guarantees and the materially false statements in the Offering Memorandum.  Indeed, it is apparent from the sequence of the transactions that the purpose of

creating the Lower Tier Notes Guarantors was to implement the improper stripping of structural seniority from the Senior Existing Guaranteed Notes.  Further, on August 29, 2020, counsel for Whitebox and other holders of notes issued by TINC specifically informed counsel for Transocean in writing that its transactions violated the indentures for the Senior Existing Guaranteed Notes and that its Offering Memorandum contained materially false and misleading statements and omissions.

15.     In light of the foregoing, Plaintiffs request that the Court require TINC to issue a corrective disclosure, allow noteholders who have already surrendered notes in the Exchange Offer to withdraw their tenders and have their original notes restored, and hold open the Exchange Offer for two weeks in order to enable noteholders to make an investment decision on whether or not to tender their notes based on truthful and complete disclosures in the OM.

16.     Plaintiffs face immediate irreparable harm with no adequate remedy at law.  Unless the injunctive relief sought herein is granted, Defendants' fraudulent Exchange Offer will cause noteholders to exchange notes for consideration they otherwise would not have accepted had the truth been disclosed.  Further, as set forth more fully below, if the Exchange Offer closes and noteholders cannot rescind their tenders, once holders and the market become aware of TINC's violation of its indentures, which will in turn require TINC to cause its subsidiaries to issue a $1.5 billion guarantee  or result in TINC redeeming the Existing Senior Guaranteed Notes in full upon an acceleration of the debt, Transocean could be forced into bankruptcy or a full out-of-court restructuring in the near term, which would deprive Plaintiffs of their monetary damages remedy.

## PARTIES

17.     Plaintiff Whitebox Relative Value Partners, LP is organized as a Cayman Islands limited partnership with its registered office at the offices of Mourant Governance Services

(Cayman) Limited, 94 Solaris Avenue, Camana Bay, PO Box 1348, Grand Cayman KY1-1108, Cayman Islands.

18.     Plaintiff Whitebox GT Fund is organized as a Delaware limited partnership with its registered office c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808 at the offices of Mourant Governance Services (Cayman) Limited, 94 Solaris Avenue, Camana Bay, PO Box 1348, Grand Cayman KY1-1108, Cayman Islands.

19.     Plaintiff Whitebox Multi-Strategy Partners, LP is organized as a Cayman Islands limited partnership with its registered office at the offices of Mourant Governance Services (Cayman) Limited, 94 Solaris Avenue, Camana Bay, PO Box 1348, Grand Cayman KY1-1108, Cayman Islands.

20.     Plaintiff Pandora Select Partners, LP is organized as a Cayman Islands limited partnership with its registered office at the offices of Mourant Governance Services (Cayman) Limited, 94 Solaris Avenue, Camana Bay, PO Box 1348, Grand Cayman Ky1-1108, Cayman Islands.

21.     Plaintiffs are advised by Whitebox Advisors LLC, which is a multi-strategy alternative asset manager organized under the laws of Delaware with its principal place of business located at 3033 Excelsior Blvd, Minneapolis, MN 55416, and an office located at 280 Park Avenue, New York, NY 10017.  Whitebox owns various forms of indebtedness of Transocean, including $13 million in principal amount of the 2026 Existing Guaranteed Notes, $27.0 million principal amount of the 2025 Existing Guaranteed Notes, and [$42.64 million] in principal amount of the 2027 Existing Guaranteed Notes.  Additionally, prior to August 21, 2020, Whitebox owned $22.656 million in principal amount of the 6.8% Senior Notes due 2038 (the "2038 Notes"), which

it tendered to TINC pursuant to the Exchange Offer.  On August 21, 2020, Whitebox tendered their 2038 Notes pursuant to the Exchange Offer.

22.     Defendant Transocean Ltd., defined above as Transocean Parent, is a Swiss stock corporation (*Aktiengesellschaft*) with its registered office in Steinhausen, Canton of Zug and with its principal place of business located at Turmstrasse 30, 6312 Steinhausen, Switzerland.

23.     Defendant Transocean Inc., defined above as TINC, is a wholly owned subsidiary of Transocean Parent and is organized under the laws of the Cayman Islands with its principal place of business located at 36C Dr. Roy's Drive, Grand Cayman, Cayman Islands KY1 1003.

## JURISDICTION AND VENUE

24.     This action arises under Sections 14(e) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(e), 78t.  Subject matter jurisdiction is conferred by Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and by the provisions of 28 U.S.C. §§ 1331 and 1337.

25.     Venue is proper in this district pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391.  In addition, the indentures pursuant to which the Senior Existing Guaranteed Notes were issued provide that any action arising out of or relating to the Senior Existing Guaranteed Notes may be instituted in any federal court or in New York state court.

## FACTUAL BACKGROUND

### Transocean Issues Guaranteed Notes And Creates The Upper Tier Notes Guarantors

26.     In 2016, Transocean formed the Upper Tier Notes Guarantors in order to issue new unsecured notes that would be structurally senior to its existing unsecured notes as a result of guarantees that would be given to the new notes from the Upper Tier Notes Guarantors (as well as the parent guarantee from Transocean Parent).  Specifically, the offering memorandum used to market the new notes, which were due in 2023 (the "2023 Notes"), provided, in relevant part, that the notes would be "fully and unconditionally guaranteed by the Parent and Transocean Holdings

1 Limited, Transocean Holdings 2 Limited and Transocean Holdings 3 Limited, each a newly-formed, wholly-owned direct holding company subsidiary of the Company fully," and that they would "rank senior in right of payment to all of our and the Guarantors' future subordinated obligations, if any."

27.     Based on these disclosures, it appears that the three Upper Tier Notes Guarantors were created for the sole purpose of enabling the 2023 Notes issued by TINC to be guaranteed by the Upper Tier Notes Guarantors and thereby have structural seniority (i.e., priority of recoveries in the event of a Transocean bankruptcy) over the unsecured notes issued by TINC that were not (and would not in the future be) guaranteed and/or only guaranteed by Transocean Parent.

28.     Subsequently, TINC issued three more series of notes, each guaranteed by the Upper Tier Notes Guarantors, to rank equally with the 2023 Notes, namely the 2026 Existing Guaranteed Notes, the 2025 Existing Guaranteed Notes, and the 2027 Existing Guaranteed Notes.[2] Each series had the same guarantees from the Upper Tier Notes Guarantors, and were similarly intended to be (and advertised to be) structurally senior to the remainder of TINC's existing unsecured notes.  The offering memoranda for these issuances similarly touted that the new Senior Guaranteed Notes would "rank senior in right of payment to" TINC's existing indebtedness.

29.     Importantly, the indentures pursuant to which the 2025 and 2027 Existing Guaranteed Notes were issued both contain a provision—the Successor Obligor Provision—prohibiting the Upper Tier Notes Guarantors from transferring their assets to any other entity (other than Transocean Parent, TINC and any other subsidiary of TINC that is obligated to guarantee the Senior Existing Guaranteed Notes) without such entity assuming the guarantee obligations of the

---

[2]     The 2023 Notes have since been redeemed.  The Existing Guaranteed Notes remain outstanding in full.

Upper Tier Notes Guarantors under the respective indentures.  Specifically, in Article 11 of both of the indentures governing the Senior Existing Guaranteed Notes, entitled "Guarantees," Section 11.03, entitled "Successors and Assigns," provides as follows:[3]

> *A Subsidiary Guarantor may* consolidate, merge or enter into a scheme of arrangement qualifying as an amalgamation with any Person or sell, lease, convey, *transfer or otherwise dispose of all or substantially all of its assets to any Person* and the capital stock of a Subsidiary Guarantor may be sold or otherwise disposed of to another Person; *provided, however, that in the case of the* consolidation, merger or scheme or arrangement qualifying as an amalgamation or sale, lease, conveyance, *transfer or disposal of all or substantially all of the assets of such Subsidiary Guarantor* or the sale or other disposition of the capital stock of a Subsidiary Guarantor, *if such other Person is not the Parent, the Issuer or another Subsidiary Guarantor, such Subsidiary Guarantor's obligations under its Securities Guarantee must be expressly assumed by such other Person*, except in connection with a transaction in which the Securities Guarantee of such Subsidiary Guarantor would be released as provided in Section 11.06.[4] This Article 11 shall be binding upon each Guarantor and its successors and assigns and shall enure to the benefit of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Securities shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

30.     As of June 30, 2020, Transocean had a number of outstanding series of unsecured notes that were not guaranteed by the Upper Tier Notes Guarantors (the "General Unsecured Notes").  As relevant here, these notes include: (i) $184 million in principal amount of 6.375% Senior Notes due 2021, (ii) $182 million in principal amount of 3.80% Senior Notes due 2022, (iii) $57 million in principal amount of 8.00% Debentures due 2027, (iv) $88 million in principal amount of 7.45% Notes due 2027, (v) $300 million in principal amount of 7.00% Notes due 2028,

---

[3]      The indenture for the 2026 Existing Guaranteed Notes does not contain this provision.

[4]      Section 11.06 governs the release of a Subsidiary Guarantor from its obligations under Article 11 of the indenture under certain circumstances, such as the sale or disposition of all or substantially all of the assets of such Subsidiary Guarantor to "a Person other than [TINC] or an Affiliate of [TINC] and such sale or disposition is otherwise permitted by this Indenture."  None of these circumstances is applicable here.

(vi) $588 million in principal amount of 7.50% Notes due 2031, (vii) $1 billion in principal amount of 6.80% Senior Notes due 2038, and (viii) $300 million in principal amount of 7.35% Senior Notes due 2041.   Because the holders of the General Unsecured Notes only have an indirect claim to the assets of the Upper Tier Notes Guarantors via their direct claim to the assets of TINC (which owns the equity in the Upper Tier Notes Guarantors), they are structurally junior to the Existing Guaranteed Notes.  This means that, prior to the transactions at issue in this action, in the event of a bankruptcy, the Existing Guaranteed Notes would be paid first, and potentially in full, before the structurally subordinate General Unsecured Notes would be entitled to recover anything with respect to any Transocean entities at which the Existing Guaranteed Notes have structural seniority.

### The Private Exchange Transaction

31.     According to a press release issued by Transocean on August 5, 2020, Transocean Parent and TINC entered into a privately negotiated agreement pursuant to which TINC agreed to exchange approximately $356 million aggregate principal amount of its outstanding 0.5% Exchangeable Senior Bonds due 2023 (the "Existing Exchangeable Bonds") for approximately $213 million aggregate principal amount of new 2.5% Senior Guaranteed Exchangeable Bonds due 2027 to be issued by TINC and guaranteed by Transocean Parent *and three holding entities that are owned by the Upper Tier Notes Guarantors* (the "2.5% Exchangeable Notes").  Upon information and belief, this private exchange transaction was entered into for the benefit of a director of Transocean who owned the Existing Exchangeable Bonds.  Prior to the transaction, this director's debt holdings had the most junior position in Transocean's capital structure.  Although it was not fully apparent from the press release, it now appears from statements in the Offering Memorandum that TINC contemporaneously created the newly formed Lower Tier Notes Guarantors in connection with this private exchange for the purpose of giving a director structural

priority in front of billions of dollars of debt guaranteed by the Upper Tier Notes Guarantors, and as part of a plan to proceed with an exchange offer that would subordinate the Senior Existing Guaranteed Notes to newly issued notes. Upon information and belief, TINC sought to achieve this goal by transferring all or substantially all of the assets of the Upper Tier Notes Guarantors to the Lower Tier Notes Guarantors without causing the latter entities to issue a guarantee in favor of the Senior Existing Guaranteed Notes. Such transfer is referred to herein as the "Asset Transfer."

### The Exchange Offer

32.     On August 10, 2020, TINC announced the terms of the Exchange Offer pursuant to which holders of certain existing unsecured notes, including the General Unsecured Notes and the Existing Guaranteed Notes, could tender their notes in exchange for newly issued 10.00% Senior Guaranteed Notes due 2025 (the "New 2025 Senior Guaranteed Notes") or 11.50% Senior Guaranteed Notes due 2027 (the "New 2027 Senior Guaranteed Notes," together with the New 2025 Senior Guaranteed Notes, the "New Senior Guaranteed Notes"). Critically, the Offering Memorandum stated that each of the New Senior Guaranteed Notes would be guaranteed by the assets of the Lower Tier Notes Guarantors.

33.     The Exchange Offer presented different "Exchange Consideration" to the noteholders depending on which notes are being tendered. For example, holders of the Existing Guaranteed Notes, of which there is a combined principal amount outstanding of $2.25 billion, were offered an Exchange Consideration of $375.00 (per $1,000 principal amount of their existing notes) to surrender their notes and receive the New 2027 Senior Guaranteed Notes. Holders of various series of the General Unsecured Notes (those with maturity dates further out than 2022), of which there is a combined principal amount outstanding of more than $2.3 billion, were offered an Exchange Consideration of $325.00 (per $1,000 principal amount of their existing notes) to surrender their notes and receive the New 2027 Senior Guaranteed Notes.

34.     The Offering Memorandum provided that the Exchange Offer would expire at 11:59 p.m. on September 4, 2020.  However, holders would be eligible to receive an additional $50 of consideration if they tendered their notes (and did not withdraw them) prior to 5:00 p.m., New York City time, on August 21, 2020 (the "Early Tender Deadline").  After that deadline, noteholders could no longer withdraw notes they had tendered.

35.     The Exchange Offer also included a consent solicitation designed to allow Transocean to amend the existing indentures and remove restrictive covenants in the even that not all noteholders tendered their notes. Among the covenants in the Existing Guaranteed Notes' indentures that the Offering Memorandum expressly sought to excise in the event not all noteholders tendered their notes was Section 11.03, which for the Senior Existing Guaranteed Notes' indentures included the Successor Obligor Provision.

36.     According to a press release issued by Transocean on August 24, 2020, only $1.13 billion of the nearly $5 billion aggregate principal amount of the outstanding notes had tendered or committed to tender their notes in the Exchange Offer.  That same day, TINC issued a Supplement to the Exchange Offer and Consent Solicitation Statement Dated August 10, 2020 (the "August 24 Supplement"), which extended the Early Tender Deadline to 11:59 p.m. on September 4, 2020.  Significantly, the August 24 Supplement also amended the various prices for each of the noteholders to exchange their notes into the New Senior Guaranteed Notes.[5]  Thus, the total Exchange Consideration for the 2025 Existing Guaranteed Notes and 2027 Existing Guaranteed Notes under the August 24 Supplement was increased to $475.00 and $455.00, respectively.  The

---

[5]     TINC also eliminated one of the series of the New Senior Guaranteed Notes being offered as part of the Exchange Offer.  Pursuant to the August 24 Supplement, the only New Senior Guaranteed Notes that can be received upon tending of the noteholders' existing notes are the New 2027 Senior Guaranteed Notes.

August 24 Supplement also terminated the consent solicitations contained in the Offering Memorandum.

**TINC's Materially False Statements And Omissions In The Offering Memorandum**

37.     The Offering Memorandum makes numerous false statements and omissions regarding the structural seniority of the New Senior Guaranteed Notes over the Senior Existing Guaranteed Notes. For example, in the Offering Memorandum, TINC falsely states:



The Offering Memorandum also states:



38.     TINC admits in the Offering Memorandum that the impact of stripping the Senior Existing Guaranteed Notes of their rightful guarantee will be to negatively impact the market price of those notes. The Offering Memorandum states (emphasis added):

## TINC's Knowledge That Its Offering Memorandum Contains Materially False Statements and Omissions

39.     It is clear from the sequence of transactions culminating in the Exchange Offer that Transocean intentionally and knowingly orchestrated a scheme designed to subordinate the Senior Existing Guaranteed Notes and deliberately misstated and omitted material facts in the Offering Memorandum in an effort to conceal the fact that this scheme was prohibited by terms of the indentures of the Senior Existing Guaranteed Notes. TINC was plainly aware of the existence of the Successor Obligor Provision in Section 11.03 at the time it issued the Offering Memorandum, because the section was specifically identified as a covenant that TINC would seek to revoke if it received the requisite consents from the holders who tendered their notes as part of the Exchange Offer. Given that Transocean was advised on the transactions by sophisticated and experienced restructuring lawyers and financial advisors, it defies belief that TINC was unaware that the Successor Obligor Provision prohibited TINC from transferring all or substantially all of the assets of the Upper Tier Notes Guarantors to the Lower Tier Notes Guarantors without also providing the Senior Existing Guaranteed Notes with a guarantee from the Lower Tier Notes Guarantors. It follows that TINC was therefore aware that the OM's statements that the Existing Guaranteed Notes would be subordinated to the New Senior Guaranteed Notes if they did not tender their notes were materially false and misleading, and that the Offering Memorandum deceptively omitted the fact that TINC was in violation of those notes' indentures in structuring the transactions in that way.

40.     Additionally, on August 29, 2020, counsel for Plaintiffs and various other noteholders sent a letter to Transocean counsel and its financial advisor alerting them to fact that

17

the Exchange Offer and related transactions violated Section 11.03 of the indentures governing the Senior Existing Guaranteed Notes and that the Offering Memorandum contained materially false and misleading statements and omissions concerning the obligation of TINC to cause the Lower Tier Notes Guarantors to provide the requisite guarantee.   On August 31, 2020, counsel for Transocean responded to the letter, contending that Section 11.03 did not prohibit the internal reorganization because the Upper Tier Notes Guarantors hold equity interests in the Lower Tier Notes Guarantors which now own the equity interests in the operating assets that were previously held by the Upper Tier Notes Guarantors.   However, Transocean did not address the economic impact of the Asset Transfer which, as the Offering Memorandum proclaims, will subordinate the Senior Existing Guaranteed Notes to the New Senior Guaranteed Notes because their bargained-for guarantee did not follow the assets to the Lower Tier Guarantor Notes as expressly required by Section 11.03.   Nor did Transocean deny that the Upper Tier Notes Guarantors had transferred or otherwise disposed of the entirety of the capital stock of their subsidiaries in the Asset Transfer. In short, Transocean did not refute that the effect of the series of transactions described herein was to deprive the Senior Existing Guaranteed Notes of the protections afforded by the plain language of Section 11.03.

41.   As of this filing, TINC has filed no amendments or supplement to the Offering Memorandum to correct the material misstatements and omissions contained therein.

### The Exchange Offer Will Result In Irreparable Harm To All Noteholders

42.   As an initial matter, allowing the Exchange Offer to proceed in its current form will irreparably harm the holders of the Existing Guaranteed Notes, the General Unsecured Notes and the New Senior Guaranteed Notes (to the extent holders tender in the Exchange Offer).   Unless the injunctive relief requested herein is granted, noteholders will be deprived of their ability to

make investment decisions with respect to their notes with full and fair disclosure of all material facts relevant to their decision, and are either being (1) invited to tender at a particular price (or exchange consideration) based on false representations as to the quantity of assets that will ultimately serve as the guarantee on their new notes, or (2) coerced into tendering notes on the unfounded and false threat of losing their existing structural seniority.

43.     Plaintiffs, as holders of all three series of the Existing Guaranteed Notes and having already tendered their General Unsecured Notes in the Exchange Offer, have suffered irreparable harm in each of the ways described above.

44.     The threatened injury is both imminent—the Exchange Offer is currently scheduled to close at 11:59 p.m. on September 4, 2020—and one for which a monetary award cannot be adequate compensation because of the very real possibility that Transocean will be forced into bankruptcy in the near term.  Like its peer firms, Transocean is facing severe liquidity constraints in this historic downtown in the offshore drilling industry.  Offshore drilling companies such as Transocean typically require hundreds of millions of dollars in cash to support their operations. Upon information and belief, Transocean currently has a credit facility of approximately $1.3 billion.  However, if Transocean were to cure its default of the Senior Existing  Guaranteed Notes indentures by issuing a $1.5 billion guarantee to those notes, which would severely limit if not entirely restrain access to its $1.3 billion credit facility, or if Transocean were simply to redeem those notes in full, Transocean would likely exhaust or soon exhaust its available cash and run out of funds to continue its operations.  Alternatively, the issuance of the additional $1.5 billion guarantee to the Senior Existing Guaranteed Notes after the expiration of the Exchange Offer could cause a default under the terms of the Existing Guaranteed Notes and/or the New Senior Guaranteed Notes, which in turn could accelerate the debt due under those notes, creating a further

liquidity squeeze on Transocean.  In any of these scenarios, Transocean could be forced into bankruptcy, and monetary damages would no longer be an adequate remedy to compensate the noteholders, including Plaintiffs.

### FIRST CAUSE OF ACTION
**Against TINC for**
**Violation of Section 14(e) of the Exchange Act**

45.     Plaintiffs repeat and reallege paragraphs 1 through 44 as if fully set forth herein.

46.     Section 14(e) of the Exchange Act, 15 U.S.C. § 78(e) states, in pertinent part, that:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

47.     As set forth above, TINC made multiple material misstatements and omissions in the Offering Memorandum in connection with the Exchange Offer, which is a "tender offer" within the meaning of Section 14(e) of the Exchange Act.

48.     Given the gross disparity between the actual economics of the Exchange Offer and the economics that are falsely presented by TINC in the Offering Memorandum, it is likely that many participants in the Exchange Offer would not have exchanged their unsecured notes, much less hundreds of millions of dollars in principal amount of unsecured notes, had they been made aware of TINC's material misstatements and omissions.  To date, none of these misstatements and omissions have been corrected.

49.     TINC made these misstatements and omissions with actual knowledge as to their falsity or reckless disregard to their truth or falsity given that, among other things, (i) the Successor

Obligor Provision in the Senior Existing Guaranteed Notes indentures clearly provides that, in the event of the transfer of all of the assets of the Upper Tier Notes Guarantors to an entity such as the Lower Tier Notes Guarantors, the Lower Tier Notes Guarantors are obligated to provide the requisite guarantee to the Senior Existing Guaranteed Notes, yet no such guarantee was issued; (ii) no reference to the Successor Obligor Provision and TINC's failure to comply with that provision was identified in the Offering Memorandum despite the fact that TINC specifically referenced the section containing that provision as a covenant it intended to revoke through the consent solicitation; (iii) TINC is represented by experienced advisors who would have thoroughly reviewed all the relevant indentures before embarking on the series of transactions that culminated in the Exchange Offer; and (iv) Transocean has been expressly advised by letter (dated August 29, 2020) that the failure to issue the guarantee from the Lower Tier Notes Guarantors to the Senior Existing Guaranteed Notes constitutes a breach and event of default and that the OM contains material misstatements and omissions regarding the same, and responded to that letter, but no corrective disclosure has been issued to date.

50.     Moreover, TINC had both the motive and opportunity to commit securities fraud. By deceiving holders of existing unsecured notes into exchanging their notes for lesser amounts of new unsecured notes that were not as structurally senior as solicited, and thus not worth nearly as much as TINC represented them to be, TINC realized a concrete benefit for its shareholders at the expense of its creditors in the event of a future bankruptcy filing.  In other words, TINC's securities fraud will enable it to further dissipate assets that could otherwise be used to repay creditors while it attempts to provide perceived short-term value to its shareholders.

51.     As a direct and proximate result of this wrongful conduct, unless Defendants correct all material misstatements and omissions contained in the Offering Memorandum, allow

noteholders the opportunity to withdraw their respective tenders in the Exchange Offer after being put on notice of the misstatements and omissions in the current Exchange Offer, Plaintiffs will be irreparably harmed or in the alternative suffer damages in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
**Against Transocean Parent for
Violation of Section 20(a) of the Exchange Act**

52.     Plaintiffs repeat and reallege paragraphs 1 through 44 as if fully set forth herein.

53.     Transocean Parent is and has acted as a control person of TINC within the meaning of Section 20(a) of the Exchange Act.  By reason of its position as TINC's sole shareholder, Transocean Parent caused TINC to engage in the wrongful conduct complained of herein and has culpably participated in that wrongful conduct.

54.     By reason of such wrongful conduct, Transocean Parent is jointly and severally liable to Plaintiffs for all damages caused by TINC's violation of Section 14(e) of the Exchange Act, in an amount to be proven at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that:

A.     The Court order Defendants to (1) correct all material misstatements and omissions contained in the Offering Memorandum, (2) allow participants in the Exchange Offer the opportunity to withdraw their respective tenders and restore their previous notes to the holders, and (3) and hold open the Exchange Offer for two weeks until 11:59 p.m. on September 25, 2020;

B.     In the alternative, the Court award Plaintiffs damages against Defendants for actual damages suffered as a result of Defendants' unlawful and improper conduct, in an amount to be proven at trial; and

C.     The Court award Plaintiffs the costs and disbursements of this proceeding, together with reasonable attorneys' fees, and such further relief that the Court may consider just and proper.

Plaintiffs demand a trial by jury on all issues triable by jury.

Dated: September 2, 2020
New York, New York

MILBANK LLP

By: _____

Antonia M. Apps
Dennis F. Dunne
Tyson M. Lomazow
Paul Denaro (*pro hac vice* forthcoming)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Andrew M. Leblanc
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 263-7586

*Counsel to the Plaintiffs*