**WHITE & CASE**

September 3, 2020

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
T +1 212 819 8200

VIA ECF

whitecase.com

The Honorable George B. Daniels
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

Re: Whitebox Relative Value Partners, LP, et al. v. Transocean Ltd., et al (No. 20-cv-07143) (GBD) – Defendants' Preliminary Response to Plaintiffs' Application for Emergency Relief

Dear Judge Daniels:

We represent Defendants Transocean Ltd. and Transocean Inc. (together, "Transocean" or the "Company"), and write to provide the Court with a preliminary response to the Order to Show Cause for Preliminary Injunction and Temporary Restraining Notice filed by Plaintiffs Whitebox Relative Value Partners, LP, Whitebox GT Fund, LP, Whitebox Multi-Strategy Partners, LP, and Pandora Select Partners, LP (collectively, "Plaintiffs" or "Whitebox").

Transocean is the world's leading offshore drilling contractor. The current economic environment presents significant challenges, but unlike many other operating businesses Transocean is well positioned to weather the storm and to fulfill all of its contractual and other obligations. To that end, the Company is pursuing a liability management transaction, including an internal corporate reorganization, designed to strengthen the Company's balance sheet by reducing overall debt and extending debt maturities at a time when the offshore drilling industry is distressed. The transactions are important to the Company and its stakeholders, and will drastically improve the Company's capital structure and provide it with much needed flexibility to manage its liabilities through the current market volatility spurred by the COVID pandemic, fluctuations in oil prices, and other factors affecting the offshore drilling industry.

Plaintiffs are distressed debt investors that are engaged in a campaign to impede the Company's liability management efforts. They are pushing for a "comprehensive restructuring" to obtain an oversized recovery for themselves at the expense of the Company and other stakeholders. To date, Plaintiffs' strategy has been marked by (1) the assertion of incorrect claims in correspondence to the Company and then leaking it to the press, (2) the eleventh hour commencement of this litigation in violation of the documents that create and control their rights, and (3) the improper assertion of non-existent contractual defaults. Plaintiffs' strategy puts at risk jobs, revenues and enterprise value. There is no need for the Company to file a bankruptcy petition at this time or to elevate the parochial interests of a few noteholders over the interests of other stakeholders.

The Honorable George B. Daniels
September 3, 2020

**WHITE & CASE**

Plaintiffs' application is too late and lacks merit. The Company is implementing a transaction that is explicitly allowed by the parties' agreements, which permit the Company to incur up to $2.4 billion in debt that is structurally senior to the existing notes held by Plaintiffs. Plaintiffs have no basis to enjoin the implementation of that important and clear contractual right. Nor is there any basis for Plaintiffs' alleged securities claims. Plaintiffs challenge statements regarding the structure of the transactions that are entirely accurate, and Plaintiffs are not being misled.

## 1. Plaintiffs Have Unreasonably Delayed In Seeking Injunctive Relief

It is well established that a plaintiff cannot create its own exigencies to support emergency relief. *See, e.g., Emmet & Co. v. Catholic Health E.*, 2011 U.S. Dist. LEXIS 54935, at *10-11 (S.D.N.Y. May 18, 2011) ("Plaintiff's lengthy delay in requesting injunctive relief — i.e., waiting 45 days to file its complaint such that only 3 work days remained before the scheduled closing — imposes unnecessary hardship on Defendants and precludes a grant of equitable relief in Plaintiff's favor."); *Hornig v. Tr. of Columbia Univ.,* 2018 U.S. Dist. LEXIS 189268, *18 (S.D.N.Y. Nov. 5, 2018) ("A delay may, standing alone, preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.").

Plaintiffs application is untimely. On August 5, 2020—almost a month ago—the Company publicly announced the initial exchange transaction and the structure that is being challenged by the Plaintiffs. On August 10, 2020, Plaintiffs asserted baseless claims regarding the transactions in a letter that the Company responded to the next day.[1] More than three weeks passed before Plaintiffs commenced this litigation on September 2, 2020, only two days before the exchange offers are scheduled to expire on September 4, 2020. Plaintiffs have offered no explanation for the 28-day delay in seeking relief.

## 2. Plaintiffs Have Not Proven Likelihood Of Success On The Merits Of A Breach Claim

### a. Plaintiffs Lack Standing To Sue For A Breach Of Contract

Plaintiffs' application is premised on an alleged breach of the 2025 and 2027 Indentures. *See* Plaintiffs' Memorandum of Law in Support of Motion for a Temporary Restraining Order and Preliminary Injunction ("TRO MOL") at 1 (alleging Company has engaged in a restructuring program in violation of the indentures); *id*. at 11 ("The gravamen of Whitebox's claim is that Defendants engaged in a series of transactions culminating in the Exchange Offer that *violated the terms of the indentures* governing the Senior Existing Guaranteed Notes and then made material misstatement and omissions in the Offering Memorandum which concealed the fact that the transactions violated the indentures."). But Plaintiffs have filed no such claim.

---

[1] Plaintiffs also sent the Company another letter on August 29, 2020 to which the Company also immediately responded. A copy of the parties' correspondence is attached hereto as Exhibit A. The August 10 and August 29 letters were sent by Plaintiffs' current counsel on behalf of a purported group of holders of Existing Guaranteed Notes, including Plaintiffs. Significantly, of that purported group of holders, only Whitebox elected to bring this action.

WHITE & CASE

The Honorable George B. Daniels
September 3, 2020

Plaintiffs also lack standing to do so. The plain terms of the 2025 and 2027 Indentures are unambiguous in providing that noteholders cannot initiate any action under the indentures or their notes absent the satisfaction of certain conditions precedent that have not occurred here. No action may be brought except by the indenture trustee unless at least 25% of the holders support bringing an action. Even then, such holders can only bring a claim after a 90 day cure period, and then only if the indenture trustee declines to bring such claim after a 60 day period. Thus, Plaintiffs lack standing and their claims are unripe.[2]

### b. Plaintiffs Cannot Prove A Breach

In addition to their lack of standing to sue, Plaintiffs have not proven a likelihood of success on the merits. Plaintiffs complain that the issuance of the new notes in the exchange transaction will place Plaintiffs' notes in a structurally junior position to the new notes, but Plaintiffs ignore the plain language of the 2025 and 2027 Indentures expressly permits the Company to issue new debt that is structurally senior to the notes held by Plaintiffs. Specifically, the indentures provide that the Company can raise up to $2.4 billion in debt that is structurally senior to the Plaintiffs' notes. Section 4.04 of the indentures provide in relevant part:

> Limitation on Subsidiary Indebtedness. (a) The Company shall not permit any of its Subsidiaries to Incur, directly or indirectly, any Indebtedness other than:
>
> …
>
> (12) Indebtedness Incurred pursuant to Credit Facilities in an aggregate amount at any one time outstanding under this clause (12) not to exceed the greater of (i) $2.4 billion and (ii) 10.0% of Consolidated Net Tangible Assets, *less* the total Aggregate Debt outstanding at the time of such Incurrence (without double counting for Aggregate Debt Incurred under this clause (12)), measured at the time of Incurrence of any such Indebtedness and after giving effect to such Incurrence; and

Plaintiffs acknowledge that this provision allows the Company to incur additional debt that is senior to the notes owned by Plaintiffs. TRO MOL at 14. The exchange transactions simply effectuate this contract right. In fact, the exchange transactions use the exact same structure that was previously used to provide a level of structural seniority for the notes that Plaintiffs are suing on. So, not only does the structure facilitate the implementation of the Company's contract rights to incur structurally senior debt, it is the same structure used to implement the structural seniority of the notes Plaintiffs own.

Plaintiffs' assertion that the Company is selling or transferring "all or substantially all" of the assets held by the entities that guarantee Plaintiffs' notes is incorrect. The transactions are part of an internal company reorganization, and there is no sale or disposition of all or substantially

---

[2] A purported group of holders that includes Plaintiffs delivered a notice of default under the 2027 Indenture yesterday, premised on an alleged breach of the same provision in the 2027 Indenture (section 11.03) underlying Plaintiffs application. It is unclear whether the requisite number of holders with standing issued the default notice. In any case, there is no default and the Company would have 90 days to cure even if there was a default.



The Honorable George B. Daniels
September 3, 2020

all of the assets held by the entities that guarantee Plaintiffs' notes.  Prior to the exchange transactions, the guarantor entities were holding companies that held an indirect ownership in the Company's operating entities through the holding company subsidiaries below them.  Today, those entities continue to hold indirect ownership in the Company's same operating entities through the holding company subsidiaries below them.  Thus, the assets held by those entitles are substantially the same both before and after the internal reorganization and exchange transactions.  *See, e.g., Roseton OL, LLC v. Dynegy Holdings, Inc.*, No. 6689-VCP, 2011 Del. Ch. LEXIS 113, at *52-53 (Del. Ch. 2011) (applying New York law, denying preliminary injunction and finding that company did not transfer all or substantially all of its assets where pre-transaction it was a holding company holding indirect interests in operating companies and after the transaction it was still a holding company that owns interests in different companies under the same corporate umbrella that own the same operating companies).  There is no change, except that the Company is incurring structurally senior debt that is explicitly permitted by the indentures at issue.

Additionally, the Company is issuing only up to approximately $1 billion in structurally senior debt.  The guarantor entities have consolidated assets of approximately $22 billion.  Thus, the supposed loss in value—i.e., the permitted incurrence of structurally senior debt—is less than 5% of the guarantors' consolidated assets.  The "transfer" is not even close to all or substantially all of the guarantors' assets.

### 3. Plaintiffs Have Not Proven A Likelihood Of Success On The Merits Of Their Securities Law Claims

Plaintiffs also fail to establish a likelihood of success on the merits of their securities claims, the only claims they have actually brought.  Plaintiffs challenge the Company's statement that the notes held by Plaintiffs will be structurally subordinated to the new senior debt issued by the Company.  But that is an entirely accurate statement.  In fact, Plaintiffs agree that the transactions have been setup so the new debt is structurally senior to Plaintiffs' notes.  In fact, that is why they are suing.  In claiming that the accurate description of the priority of the new notes is false, Plaintiffs are assuming that someone with standing has brought and successfully litigated a breach claim and eliminated the existing structural seniority of the new notes.  That has not happened, and the law does not require the Company to accuse itself (incorrectly) of a breach.  See, e.g., *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 464 (2d Cir. 2010) (holding that failure to disclose uncharged, unadjudicated charges of mismanagement or a breach of fiduciary duty cannot support an alleged proxy violation); *In re Marsh & McLennan Cos. Sec. Litig.*, 536 F. Supp. 2d 313, 315 (S.D.N.Y. 2007) (holding that disclosure of unproven allegations is not required in proxy solicitations).  Making the requested statement that the new notes are not senior would be a false statement and would violate the securities laws.

Nor do Plaintiffs sufficiently allege any of the other necessary elements for their securities claims.  Plaintiffs' allegations of scienter are wholly conclusory and do not come close to being pled with the requisite particularity necessary to sustain Plaintiffs' securities claim.  The Company's decision to not modify its disclosures to adopt Plaintiffs' incorrect position does not establish scienter.  Plaintiffs similarly have not been harmed or misled by any purported misleading disclosure

**WHITE & CASE**

The Honorable George B. Daniels
September 3, 2020

because they acknowledge they are not misled (*see, e.g.,* TRO MOL at 9). *See, e.g., In Re Ambac Fin. Group, Inc.*, 693 F. Supp. 2d 241, 279 (S.D.N.Y. 2010) (holding that plaintiffs did not sufficiently plead material misstatements when they admitted that they were not misled).

### 4. Plaintiffs Have Not Demonstrated Irreparable Harm

Plaintiffs have also failed to prove irreparable harm. Initially, the supposed transfer of all or substantially all of the assets has already occurred. The TRO seeks to enjoin the exchange offers for two weeks, but that would do nothing to remedy the supposed breach.

Additionally, any potential harm to Plaintiffs can be measured in money damages. Plaintiffs' suggestion that they will not be able to collect money damages is baseless. Plaintiffs posit a scenario in which someone with standing successfully litigates a claim, the Company elects not to cure, allowing the default to cause an acceleration of the Company's debt at some point in the future, and the Company cannot then pay the accelerated debt. Such a hypothetical set of unsupported assumptions—premised on someone with standing suing the Company for default and assuming any such action would be successful and that years from now the Company would allow acceleration but not be able to satisfy the debt—does not establish irreparable harm. And Plaintiffs own only $70 million of the notes under 2025 and 2027 Indentures (i.e., less than 5% of the total $1.5 billion 2025 and 2027 notes outstanding). Plaintiffs have no basis for any assumptions about the ability of the Company to pay their holdings or anyone else's holdings years from now.

### 5. The Balance of the Equities Favors The Company

The balance of equities weighs decisively in favor of the Company. Plaintiffs have no injury at all. In contrast, Defendants will be substantially harmed by a TRO. The Defendants are in the process of deleveraging their balance sheets and extending their debt maturities in a market and time period that Plaintiffs acknowledge is very challenging. Enjoining the transactions would hurt the Company and other stakeholders, including other noteholders. A significant number of holders of the Company's debt securities have already tendered or committed to tender approximately $1.13 billion dollars in aggregate principal amount of holdings as of August 24, 2020, with incremental participation expected prior to the currently scheduled expiration on September 4, 2020.

### 6. The Public Interest Weighs Against A TRO

The public interest is served by open markets where sophisticated investors can determine whether to participate in an exchange offer. It would be harmful to such public interests if a very small noteholder can usurp investors that have already committed more than $1 billion in support of the transactions.

### 7. The Requested Relief Is Unrelated To The Alleged Violations and Reveals Plaintiffs True Motive

The requested relief also bears no relation to the alleged claims and is not designed to remedy the

5

WHITE & CASE

The Honorable George B. Daniels
September 3, 2020

supposed transfers which have already occurred.  In seeking to delay the exchange transactions and obtain a mechanism for holders to withdraw their tenders, Plaintiffs seek more time to attempt to dissuade other holders from participating in the exchange.  Likewise, a request to allow holders to withdraw their elections to exchange has nothing to do with the underlying claims, or remedying any alleged violation, but rather is plainly designed to provide a mechanism to undo the exchange.  And Plaintiffs lack standing to seek relief on behalf of non-party holders that have tendered.

### 8. Any TRO Would Require A Substantial Bond

To obtain a TRO, and Plaintiffs have no grounds for one, Plaintiffs must post security in an amount that approximates the significant damages the Company would suffer if it is later determined that a TRO should not have been issued.  Fed. R. Civ. P. 65(c); *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011).  If Plaintiffs enjoin the transactions, the Company will not be able to take advantage of historically low market terms to significantly decrease its debt and extend certain maturities to 2027.  The damages would be more than $1 billion.  Plaintiffs should be required to post a bond in at least that amount to cover the losses they would be causing.

***

We look forward to discussing these issues further with the Court at today's hearing.


Respectfully submitted,

*/s/ Glenn Kurtz*

Glenn Kurtz
Partner

T +1 212 819 8252
E gkurtz@whitecase.com



cc:     Antonia Apps, Esq.