K93AAWHIC                    Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   WHITEBOX RELATIVE VALUE
    PARTNERS, LP, ET AL.,
4
                    Plaintiffs,
5
             v.                          20 CV 7143 (GBD)
6
    TRANSOCEAN LIMITED, ET AL.,
7
                    Defendants.
8
    ------------------------------x
9                                        New York, N.Y.
                                         September 3, 2020
10                                       2:00 p.m.

11  Before:

12                  HON. GEORGE B. DANIELS,

13                                       District Judge

14                         APPEARANCES

15  MILBANK LLP
         Attorneys for Plaintiffs
16  BY:  ANTONIA APPS

17  WHITE & CASE LLP
         Attorneys for Defendants
18  BY:  GLENN KURTZ

19

20

21

22

23

24

25

K93AAWHIC                          Conference

1          (Case called)

2          THE COURT:  This is Judge Daniels on the line.

3          MS. APPS:  Judge Daniels, this is Antonia Apps, of

4     Milbank, on behalf of Suns Advised by Wyckoff Advisers LLC.

5          Good afternoon, your Honor.

6          THE COURT:  Good afternoon.

7          MR. KURTZ:  Good afternoon, your Honor.

8          Glenn Kurtz, from White & Case, and I am representing

9     the Transocean defendants in the matter.

10          THE COURT:  Let me hear first from the plaintiff with

11     regard to the preliminary injunction and temporary restraining

12     order that they're requesting.

13          MS. APPS:  Yes, your Honor.

14          The defendant companies have an open (inaudible) of

15     outstanding notes set to close tomorrow at midnight.  The

16     offering memorandum pursuant to which these notes have been

17     offered contains material misstatements and admissions in

18     violation of the securities laws.

19          Our core claim is the defendants have engaged in a

20     series of transactions culminating in this exchange offer which

21     constitute breaches of outstanding indentures and then lied

22     about that in their offering memorandum.

23          Now, plaintiffs have actually also filed –– note

24     holders I should say –– accounting for approximately 25 percent

25     of one of the bonds have already filed a notice of default with

K93AAWHIC                    Conference

1   the company but that's a breach of contract claim that will

2   take months to resolve.  That is not, I emphasize, the nature

3   of the claim that we are bringing now.  We are bringing a

4   securities claim.  Regardless of whether or not we prevail down

5   the road on the contract claim, the problem now is that there

6   is a false offering memorandum that will cause harm to the

7   plaintiffs' interests if it is allowed to close without the

8   relief sought.

9           And I want to emphasize the economic impact of the

10  misstatements, your Honor, is in the realm of $1.5 million.  It

11  alters materially the economics of the deal that the defendants

12  have put forward.  I want to emphasize, your Honor, the

13  extremely limited relief that we are seeking on an emergency

14  basis.  We're asking no more that the company issue a

15  corrective disclosure, that they keep the offer open for a

16  reasonable amount of time we've proposed two weeks but

17  naturally we would defer to the Court so that an appropriate

18  amount of time and allow holders who have already tendered to

19  withdraw their notes.  In doing that it will give all investors

20  full and truthful disclosure in the offering memorandum and an

21  opportunity to make the right investment decision based on that

22  full and truthful disclosure.

23          On the other hand, keeping an exchange for offer open

24  for an additional few weeks will not cause any harm to the

25  company defendants.  And I don't hear the company defendants

1     saying so in the letter that they've submitted a few hours

2     before this hearing.

3          THE COURT:  Well, what is it that you want them to do?

4     What do you want them to say in this corrective disclosure?

5          MS. APPS:  Well, your Honor, our position is that the

6     underlying, the provisions in the indentures that requires them

7     to issue a guarantee when they've engaged in an active transfer

8     as they have, entitles us, as I said, engages in the guarantee.

9     That provision in the indenture is unambiguous.  It requires on

10    its face that one and a half billion dollars guarantee given to

11    us over a certain group of subsidiaries.  We think the company

12    should come clean and say that they owe us that guarantee and

13    that will mean that an additional $1.5 billion guarantee

14    attaches to assets of certain subsidiaries.

15         THE COURT:  Well, I don't understand what you are

16    trying to protect in terms of injury to the plaintiff other

17    than your guarantee.

18         MS. APPS:  Well, here's a difference, your Honor, the

19    current situation is holders of these particular notes.  We've

20    called them in the papers senior existing guaranteed notes but

21    I'll just call them for the moment the existing notes.  Holders

22    of the exist notes are structurally senior to billions of

23    dollars of other debt which doesn't have (inaudible) of this

24    guarantee and --

25         THE COURT:  So, what is that?  Why do you have

K93AAWHIC                    Conference

1    standing to ask for instructive relief on their behalf?

2              MS. APPS:  Because we own portion of those bonds.

3              THE COURT:  OK.

4              MS. APPS:  Here is the problem.  If the false --

5    here's the thing.  All of the other bond holders are reading

6    this false offering memorandum and getting the wrong picture of

7    the economic --

8              THE COURT:  OK.  How does that affect what you claim

9    is the defendant's legal obligations to you?

10             MS. APPS:  Yes.  Let she explain that, your Honor.

11   It's really important and you are asking exactly the right

12   question.  If those other holders go through and give their

13   bonds up in the exchange and in the exchange the deal proposed

14   is that they would then become pari-passu with us on the

15   assets.

16             THE COURT:  And your position is that can't happen.

17   Your position is that you have a contract that says that that

18   can't happen.

19             MS. APPS:  No, no, no.  Our position is we -- let's

20   say a series of I am going to call it lower tear guarantors.

21   We have a guarantee on, we ought to have a guarantee on those

22   lower period guarantees to the tune of 1.5 billion.

23             THE COURT:  Either do you or you don't regardless of

24   how the deal goes forward.

25             MS. APPS:  Right.  But no, no, judge --

1          THE COURT:  Your position is even if this deal goes

2     forward you still, you claim that you have priority.

3          MS. APPS:  Yes.  No, no, no.  That's not right.

4          THE COURT:  OK.  Well, explain to me how that -- I

5     don't know what you're asking me to protect and why your

6     plaintiffs need an injunction.

7          MS. APPS:  Let me explain that, your Honor.  It's just

8     two steps of explanation.  Other holders, billions of holders

9     who are being duped into getting the new bonds, by getting the

10     new bonds they became pari-passu with us.  And so what happens

11     is we have a guarantee then over --

12          THE COURT:  You're not here to protect their

13     interests.  You're here to protect your interests.  I am trying

14     to figure out how your interests is being prejudiced.

15          MS. APPS:  Here is how.  Let me look.  It's a two step

16     process, Judge Daniels.  May I just say, there's a couple steps

17     to understand this.  Other bonds holders, if they wouldn't go

18     through the exchange if they knew the truth.

19          THE COURT:  OK.

20          MS. APPS:  If they do they become, they get access in

21     the bankruptcy to the very assets over our one and a half

22     billion dollars guarantee has.

23          THE COURT:  But you say that they don't.  You say that

24     you would have rights that are superior to those --

25          MS. APPS:  Before the exchange offer we have rights to

K93AAWHIC                      Conference

1    superior.

2                THE COURT:  OK.  But you are not saying the company

3    doesn't have the right to do the exchange offer.

4                MS. APPS:  No.  That's correct.  I am not saying the

5    company can't do an exchange offer.  They need to do an change

6    offer on a correct offering memorandum.  When they do that at

7    most they can do is have new note holders come in and be

8    pari-passu with us.  So, they can come in and be the same level

9    with us.

10               THE COURT:  I don't understand why you can't get

11   relief short of a preliminary injunction and temporary

12   restraining order.  You're a bond holder.  They owe you money.

13   They owe you cash.  Is there some reason why they wouldn't owe

14   you the same cash at the end of this deal if the deal was done

15   properly or improperly?

16               MS. APPS:  There is, your Honor, because --

17               THE COURT:  OK.  I don't understand.  I don't

18   understand the deal.

19               MS. APPS:  Of course this is all about levels of

20   seniority in bankruptcy.

21               THE COURT:  Right now it's only about your level of

22   seniority.

23               MS. APPS:  Yes.

24               THE COURT:  And whether or not you say you have

25   seniority and you want to protect your seniority.  That part I

1  understand, but I don't understand how injunctive relief is

2  required to protect your seniority or to affect the obligation

3  that they have, the monetary obligation that they have to you

4  with regard to the bond.

5      MS. APPS:  Because by what they're doing with their

6  false offer is inducing other bond holders to tender, to bring

7  up, to get the same level of guarantee that we have.  And in so

8  doing, diluting our, the value of our guarantee.  So, today our

9  guarantee of one and a half billion over "X" billion of assets

10  is worth something.  Tomorrow other bond holders falsely induce

11  to submit to go through the exchange offer which the promise of

12  which is, the promise of the exchange offer is to get the same

13  level guarantee that we have.  We then have instead of just

14  having our own one and a half billion dollars guarantee, more

15  bond holders are going to be on the same level with us with

16  access to those same assets.  We have to share our pie with

17  more people than we would have otherwise --

18      THE COURT:  But I understand you say that they have

19  the right to do that.  All I hear you saying right now is they

20  don't have the right to do that based on false information.  If

21  they do that based on false information, how is it that you're

22  irreparably injured if there is a preliminary injunction prior

23  to a declaration that that deal was no good and you are still

24  entitled to the $1.6 billion that you were entitled to before

25  the deal was done.

K93AAWHIC                    Conference

1      MS. APPS:  Right.  Look.  On irreparable harm -- by

2    the way, we also had some of these unsecured notes and which we

3    tendered.  So, I'm also asking for withdrawal rights.  But the

4    irreparable harm points, your Honor, is all of these bond

5    holders who are coming in under this new exchange in order to

6    be brought up to our level are being deceived by the offering

7    memorandum.

8      THE COURT:  But that's not irreparable harm to you.

9    You are not being deceived because you know the true fact.  You

10    can't say that the irreparable harm is that other people are

11    going to suffer.  I am trying to understand what the

12    irreparable harm is to you.

13      MS. APPS:  No, it's not their suffering which is that

14    they are suddenly getting a new note under the exchange offer

15    not worth what they were told it was worth.  They're suffering

16    is not what I am complaining about per se.  What I am

17    complaining about is through the exchange offer what the

18    company has done is fraudulently induced them to come into my

19    level, my pari-passu level.  If they wouldn't have done so,

20    they would not have done so -- I don't think -- if the truth

21    had been known.  Those other bond holders --

22      THE COURT:  And if you prove that case, how is that

23    you can't recover the same amount of money that you say you

24    were entitled to prior to the fall?

25      MS. APPS:  A number of points, your Honor.  First of

K93AAWHIC                    Conference

1   all, it is an ongoing securities law obligation with a false

2   offering memorandum.  While that may not be per se irreparable

3   harm --

4        THE COURT:  Right.  It's not irreparable harm to you.

5   It's only irreparable harm if you tell me that you cannot be

6   compensated if you prove that that's the case that you cannot

7   be compensated.  And you say that you're owed, you don't say

8   you are owed anything else other than that?  That's what I

9   don't understand.  You said your bond holders to the extent of

10   1.6 million dollar; is that correct?

11        MS. APPS:  Yes.  Let me address that, your Honor, on

12   irreparable harm.

13        THE COURT:  I want to make sure I understand the

14   facts.

15        MS. APPS:  I understand.

16        THE COURT:  Your plaintiffs are bond holders and

17   they're bond holders that are owed on outstanding obligation of

18   approximately $1.6 million.

19        MS. APPS:  "Billion".

20        THE COURT:  I am sorry.  "Billion dollars".

21        And you are afraid that you're not going to get paid?

22        MS. APPS:  Right.  No, it's two things.  Yes, we're

23   afraid we are not going to get paid and a money judgment won't

24   be any good, yes.

25        THE COURT:  That's what I'm trying to understand

1   because obviously you don't suffer irreparable injury if you

2   can be compensated in money damages.  And if you tell me that

3   you are simply bond holders that are owed an amount certain,

4   that amount certain is still going to be owed to you after this

5   deal is done whether the deal is set aside or not set aside.

6          MS. APPS:  Yes.  OK.  So, let me address that, your

7   Honor.  So, look.  As a result of this action, first of all,

8   the company is going to have to cure the defaults in the

9   action.  That's one and a half billion dollars.  There is still

10  an outstanding securities claim through our action, your Honor,

11  through this action that we represent, these plaintiffs

12  represent only $80 million of the outstanding one and a half

13  billion.  But the company will be on the hook for their claims

14  and any other similarly situated plaintiffs because all these

15  class note holders are the same class.

16         THE COURT:  So, you are telling me that the plaintiffs

17  who are not seeking a preliminary injunction are now owed $80

18  million?

19         MS. APPS:  Correct.

20         THE COURT:  So, why do they need a preliminary

21  injunction in order to preserve their right to the $80 million.

22         MS. APPS:  So, look.  I'm just getting to the

23  financial condition of the company point, your Honor, which

24  will I believe satisfy your question on irreparable harm and

25  why (inaudible).  A damages claim for 80 million or whether

1   it's "X" billions with all other plaintiffs joining down the

2   road won't be satisfied.  Why?  Because this company is in, we

3   would say, sufficiently precarious financial condition for that

4   to be a real issue.  Let me explain what that means.

5          This company, Transocean, is I think in their letter

6   they say one of the worlds or the world's leading offshore

7   drilling on tractor.  Many of the peer firms of this company in

8   given the oil industry is in historic distress have already

9   filed for bankruptcy.

10          THE COURT:  OK.  But you can't rely simply on the fact

11  that they're in a distressed industry.  That doesn't -- and I'm

12  not sure that you are -- I am not sure that you say that you're

13  entitled to being in any greater standing whether or not

14  they're in bankruptcy and you have a priority or that they're

15  not in bankruptcy and you have a priority.  You're just talking

16  about whether or not you get to preserve the priority

17  obligation, financial obligation that they owe you under the

18  appropriate circumstances if they do what they're supposed to

19  do.  I don't see how making a corrective disclosure is somehow

20  putting you in a better position to prevent them from going

21  into bankruptcy.

22          MS. APPS:  Because, your Honor -- look, they may end

23  up in bankruptcy down the road in any event.  Our point is

24  this, your Honor, if they have to do the guarantee of one and a

25  half billion, it uses up their outstanding indebtedness, OK?

1   And they are basically running out of cash liquidity in about

2   nine to 12 months so, in about nine to 12 months they would

3   have to declare bankruptcy.

4           THE COURT:  Are you telling me they are going to have

5   to do that -- probably, they are not going to have to do that

6   if they make a corrective disclosure because I am not sure I

7   understand how you say that they are going to declare

8   bankruptcy without a corrective disclosure in the next two days

9   or they are not going to declare bankruptcy if there is a

10  corrective disclosure in the next two days.

11          MS. APPS:  My point is slightly different, which is

12  without a corrective disclosure we are going to be harmed if

13  they go into bankruptcy because other note holders are

14  tendering and becoming, we'll have to sit at the table with our

15  note holders who wouldn't --

16          THE COURT:  The same priority you would otherwise

17  have.

18          MS. APPS:  I beg your pardon.

19          THE COURT:  You are still going to have the same

20  priority you would otherwise have when you are not saying that

21  they don't have the right to declare bankruptcy.

22          MS. APPS:  In bankruptcy, what will happen in

23  bankruptcy is there will be more, the result of this exchange

24  transaction, there will be more people at the table with us

25  solely because of this exchange in the transaction which is

1    pursuant to a self offering memorandum.

2              THE COURT:  But you say they have the right do this

3    deal.  You don't say that they can stop the deal.  You are just

4    saying that the deal that they're putting out false

5    information.  You don't have the right to stop this deal, do

6    you?

7              MS. APPS:  I am not asking to stop a deal.

8              THE COURT:  OK.  If you're not asking to the stop the

9    deal, I don't understand how you claim that somehow the deal is

10   going forward is going put them in bankruptcy or not put them

11   in bankruptcy that affects your priority rights.  That, I don't

12   understand.

13             MS. APPS:  My point is not that the deal is going to

14   put them in bankruptcy per se, your Honor.  My claim is if they

15   do the right thing and give us our guaranty (inaudible) not

16   short in cash and they declare bankruptcy in nine to 12 months,

17   any money damages claim that we have won't be collectable at a

18   hundred percent on the dollar.

19             THE COURT:  Is it collectable now?  It's not

20   collectable now, is it?  And it wouldn't be collectable if they

21   made a corrective disclosure, right?

22             MS. APPS:  No.  It's not about whether -- I mean,

23   look --

24             THE COURT:  I am just trying to understand what it is

25   you say they owe you and what it is you say that you cannot

1    recover in a judgment if you prove what you say you can prove

2    and why it requires that this deal be ordered stopped in order

3    to protect your right to the -- at this point you are saying

4    the $80 million that the plaintiffs in this case would be

5    entitled to.

6              MS. APPS:  Right.  The issue is what they're doing is

7    improperly subordinating our position through this deal which

8    cannot be unscrambled after the fact.

9              THE COURT:  That's the part I don't understand.  Tell

10   me why it can't be unscrambled.

11             MS. APPS:  So, what happens is what this deal says --

12             THE COURT:  You're talking about a priority.  If it's

13   determined that they did a deal that affected your priority and

14   that it was some sort of fraud involved or lack of disclosure

15   on their part and you can prove that and set that aside, why

16   are you not back right in the same situation that you would

17   have been in had you not had a preliminary injunction?  I'm not

18   sure what the preliminary injunction accomplishes.

19             MS. APPS:  It accomplishes if the preliminary

20   injunction which is a pause on the exchange offer, a routine

21   matter in these kinds of deals asks for corrective disclosure

22   so that bond holders and anybody who's already tendered a

23   withdrawal, so bond holders make the right economic choice.

24   Currently, bond holders are saying give us the existing bonds

25   you have, for example 50 cents on the dollar.  Why would you

give up 50 cents on the dollar?  Why?  The company says because

we're offering the enticement of being (inaudible) on assets

pari-passu with my senior bond holders.

THE COURT:  I know.  But that doesn't benefit -- your

argument may benefit those bond holders but that argument

doesn't benefit your bond holders.  That's an argument to be

made by the other bond holders.  They aren't here asking me to

do this.  You are here asking me to do this not to protect

their rights but to protect your rights.

MS. APPS:  Right.  But let's say, your Honor, there's

three billion in assets that I have one and half billion

dollars guarantee over.  As a result of those other bond

holders being duped, fraudulently induced to surrender their

bond holders there is an -- I'm going to make the numbers up as

an example -- there is an additional one and a half billion

dollars that has access to that three billion.  Now, say in

bankruptcy, right, that the assets are no longer worth three

billion.  They're only worth one billion.  So, you only get --

at the beginning of that I have three billion dollars in claims

on one billion, I get much less than if there's one and a half

billion dollars claims on that one billion.  So, the more

people at the table the less, the smaller the size of my piece

of the pie.

THE COURT:  Well, but they're only at the table if you

can prove that a deal was done that affected your rights that

1    should not have affected your rights.  That hasn't happened.  I

2    mean, you can't keep merging what's in the best interests of

3    others with what's in the best interests of your client.  The

4    only issue before me right now is other than considering it a

5    public interest, the only interest that is before me right now

6    in terms of irreparable injury that's required is what is the

7    irreparable injury to you?  And you say to me now that, you say

8    that you're afraid that if you've determined that they still

9    owe your client who are presently your client here, the

10   plaintiffs, $80 million, that you're afraid that you won't get

11   to obtain that $80 million, well, there's not a whole lot I can

12   do about that.  The bonds aren't due.  You say yourself they

13   could do this deal --

14            MS. APPS:  No.

15            THE COURT:  -- as long as they did a corrective kiss

16   closure.

17            MS. APPS:  Yes.  That's the key, your Honor.  That's

18   the key.  The point is, your Honor, the point is the corrective

19   disclosure -- which by the way, can fix the problem right now

20   so that may clients are not harmed is what's critical.  I am

21   not saying they can do the deal on the operating memorandum.

22   They can't do the deal on a (inaudible).  They can do a deal on

23   a correct truthful memorandum so that all investors have the

24   accurate information.

25            And here I need to explain why I'm harmed.  I'm

K93AAWHIC                    Conference

1   harmed, your Honor, because the more people that come to the

2   party and share with my assets, people who are now right today

3   junior to me, people who wouldn't get an invitation to sit at

4   the table because they wouldn't get access to that money, those

5   people are being invited in under false presentences to share

6   in the pie and I have to give out more of my pie to them in a

7   bankruptcy.  And that's harm to me by other bond holders

8   tendering their notes.

9          THE COURT:  Why would you have to give up more of the

10  pie to them if you're able to prove that this offering was

11  based on false numbers given to the potential bond holders?

12          (Inaudible due to background noise)

13          THE COURT:  The other issue that I have questions

14  about is you're asking for this two days before this deal was

15  supposed to close.  This deal was an outstanding tendering

16  their shares for almost a month now.  Why is this a timely

17  application?  Why is this application being made today, one day

18  before it's to be closed as opposed to it being made 28 days

19  ago?

20          MS. APPS:  Well, because, your Honor, what caused the

21  violation of the indentured is a transaction in respect to

22  which there having an incredible opaque disclosure.  It's a

23  little complicated but bear with me for one second.  What the

24  company did behind closed doors without disclosing was in full

25  measure, let me explain.  They transferred assets from the

1   entity, the subsidiary over which my clients have a guarantee.

2   They transferred them to a lower subsidiary.  I am going to

3   call it a lower guarantor.  They transferred down without

4   giving us the guarantee over the assets to follow the assets

5   over the lower guarantor.  They did that.  There is no where

6   disclosed explicitly that there's no guarantee given.  You have

7   to derive that fact from the language of the offering

8   memorandum and in part because of the opaque nature and the

9   complicated nature of these transactions which were not really

10  fully opaque to us.  It took us some time to identified what

11  they had done which is in my judgment a clear violation of one

12  of the provisions of the indentures.

13          THE COURT:  When did that occur?

14          MS. APPS:  Then on last Saturday we wrote to the

15  defendants.

16          THE COURT:  OK.

17          MS. APPS:  And said to them, here is the problem, to

18  give them an opportunity for a corrective disclosure.  They

19  wrote back to us Monday night.  We filed this Wednesday

20  morning.

21          THE COURT:  So, when did you determine that they had

22  put out false information and needed to make a corrective

23  disclosure?

24          MS. APPS:  We didn't actually work that out until I

25  want to say it may have been time, maybe last week.  But it

K93AAWHIC                    Conference

1    took us some time to figure it out, exactly the sequence of

2    transactions and that it's a violation.  But the company in our

3    judgment must have known what it was doing.

4          What's interesting, your Honor, the provision at

5    issue, Section 11.03, one of the aspects of the exchange offer

6    was to seek consent from bond holders to remove restrictive

7    covenants, remove restrictions on their ability to do the

8    transaction.  This was a section listed.  They knew about the

9    section.  They knew that it was a violation.  They wanted to

10   ask bond holders to consent to waive that violation.  They've

11   since dropped that request they've amended their exchange offer

12   partway through the exchange offer because I guess because they

13   didn't get enough consent to do that.  So, they knew about it.

14   We were the ones who were trying to figure what they were doing

15   and deciphering it.

16         Judge, I don't relish coming to the Court for

17   emergency relief the Wednesday before a Labor Day weekend.  But

18   nor should the company have issued a fraudulent exchange offer

19   set to expire at midnight on a Friday before a Labor Day

20   weekend and then being opaque about the manner in which they've

21   breached indentures.

22         THE COURT:  You are saying it's opaque.  I don't

23   understand why it wasn't clear to you that the exchange offer,

24   you've also tendered your share based on the same exchange

25   offer you say.  You knew what was being represented when you

1   tendered your shares.  So, I don't understand when the

2   lightbulb went off and you decided that you tendered your

3   shares based on false information that you should have known it

4   was false when you read it the first time and you should have

5   read it before you tendered any of your shares.

6           Am I correct?

7           MS. APPS:  Your Honor, the problem is that the

8   memorandum pursuant to which the exchange offer, the whole

9   point is that offering memorandum.  A public document issued by

10  the company and remember the issuer has the burden under U.S.

11  securities laws to get it right.  We don't operate under a

12  buyer beware situation where you have to try to ferret out from

13  an offering document whether a company has violated certain

14  indentures or whether they're concealing that the nature of

15  their transaction is false.

16          Here, your Honor, we -- you know the other problem is

17  a pending exchange offer, even though we've tendered other

18  junior shares, you know bond holders like us are faced with a

19  Hobson's choice how to deal with it because if you don't, the

20  way the exchange offer is structured, it's designed to be

21  coercive.  And if you don't tender your shares at a steep

22  discount by the way, they are saying for you to tender at 30 or

23  40 cents on the dollar you could miss out all together as even

24  being pari-passu.

25          THE COURT:  But there is an alternative.  You can

K93AAWHIC                    Conference

1  always tender your shares under protest and file suit at the

2  same time.  And I assume that that's what you decided to do.

3  Why would you tender shares?  You say that, you know, if you

4  decide -- you didn't say I'm not going to tender my shares.

5  You said, OK.  Well, let's tender our shares and we think that

6  this is a bad deal and we want a correct disclosure.  I am

7  not -- if there's a corrective disclosure, explain to me what

8  is it -- we have -- I don't know and you may not know.  I'll

9  ask the other side, but I don't know how many people who've

10  already tendered their shares.  Even your clients have tendered

11  shares up to this point, right?

12        MS. APPS:  Can I clarify one thing?  We are in three

13  or four different sets of bonds.  The three senior bonds, the

14  three senior ones, we have not tendered those bonds.

15        THE COURT:  OK.

16        MS. APPS:  We've only tendered the junior ones,

17  because the junior ones as I said, we were faced with a Hobson

18  choice, what do you do with it?  But we have not tendered the

19  senior ones.  We have a claim, even if you concluded we

20  shouldn't have tendered or we should withdraw or something like

21  that, we hadn't tendered the senior existing notes, your Honor.

22  If we start with that, we are still left with this problem that

23  if we don't tender the company is going to claim that we have

24  been subordinated.  So, we're left with this Hobson's choice of

25  whether we tender under a false offering memorandum or don't

K93AAWHIC                    Conference

1    tender.  I do want to emphasize, your Honor, the question,

2    respectfully, that says that if we've tendered or we know about

3    it, it puts the onus, the burden on us when the securities laws

4    clearly put --

5           THE COURT:  No.  The only burden that's on you is to

6    make a timely request for TRO or preliminary injunction.

7    That's the only context that I've had --

8           MS. APPS:  That's fair.

9           THE COURT:  That's your version.  I am trying to

10   figure out why you say two days before this deal is supposed to

11   close, this is the first time that you are in court asking me

12   not to maintain the status quo but to change the status quo.

13          MS. APPS:  Well, it's really only maintaining the

14   status quo.  And to be fair, your Honor --

15          THE COURT:  How does that maintain the status quo?

16   The status quo is that there's a bond offering and people have

17   tendered their shares.  It's supposed to close in two days.

18   And the deal and whoever is going to tender their shares has

19   either tendered them or they have two more days to do so.  How

20   is putting out a corrective disclosure, ordering them to put

21   out collective disclosure with regard to information that I am

22   not sure yet that they agree with.  And I am go say that they

23   don't agree that the corrective disclose that you want is an

24   accurate statement and what they have out now is an inaccurate

25   statement.  But you want me to tell them that they have to one,

1  use corrective disclosure end keep the offer open for an

2  additional period of time.  That's not maintaining the status

3  quo.  That's an affirmative injunction that changes the status

4  of what is otherwise the situation that you find yourself in

5  two days before the bond offer is supposed to close.

6        MS. APPS:  Let me address a couple of points, your

7  Honor, if I may.

8        First of all, the first time we had learned they had

9  not issued a guarantee to the lower tiered subsidiary that I

10  talked about.  Remember they put the asset transfer down.  The

11  problem is not doing the guarantee.  The first day we learned

12  that is what happened was the past Monday, August 31.  So, we

13  did the best we could in getting this to the Court as fast as

14  we could.  I respectfully submit, your Honor, that the fault

15  does not lie just at our hands in bringing this but the fact

16  that there are disclosures about the series transactions that

17  led to the exchange offer were not fully disclosed and it was

18  OK.  The company, I would say, has deliberately done this in a

19  way to not be transparent about the transactions which caused

20  the breach of the indenture.

21        THE COURT:  I take your word for that.  But I'm not

22  sure I understand if you are entitled to a guarantee, I am not

23  sure why it would the not have been obvious to you when this

24  deal was offered whether or not they were honoring that

25  guarantee or changing that guarantee in the offer.

K93AAWHIC                    Conference

1          MS. APPS:  Well, your Honor.

2          THE COURT:  Is there something secret about that part

3     of the offer and how did you come about to find that

4     information later as opposed to early?

5          MS. APPS:  Well, your Honor we wrote a letter on

6     Saturday.

7          THE COURT:  You're concerned -- you obviously knew

8     before Saturday when you wrote the letter that this was in

9     conflict with your guarantee.

10          MS. APPS:  Yes, your Honor.  But the standard for

11    company disclosure is not for them to hide the ball and hope

12    that clever enough bond holders don't figure out --

13          THE COURT:  Well, I'm not sure what "hiding the ball"

14    you are referring to.  You haven't explained to me how this was

15    secret information that is not available to you prior to

16    Saturday.

17          MS. APPS:  Because the exchange offer simply announces

18    "Tender your bonds and if you do so, you will be senior to

19    other bond holders."

20          THE COURT:  Well, that's clearly in conflict with your

21    bond holders, right?

22          MS. APPS:  Right.

23          THE COURT:  So, you knew right away you had a concern

24    right away that that was in conflict with (inaudible).  Even

25    when you tendered whatever shares you tendered you had a

K93AAWHIC                    Conference

 1   concern that that was in conflict with your bond holders,

 2   right?

 3          MS. APPS:  Well, your Honor, look.  Look.  Our view

 4   is -- well, the only thing I would say is the obligation always

 5   lies with the company to be clear about what it's doing.  The

 6   fact that we have to, it took some time for bond holders to

 7   sort of derive through the opaque disclosures the nature of the

 8   underlying transaction, again, the underlying transaction is

 9   not directly part of the exchange offer.  The underlying

10   transaction that violates the indenture is not directly part of

11   the exchange offer.  You have to sort of infer it and derive

12   that that's what they've done from the language of the offering

13   memorandum.

14          THE COURT:  I understand what you are saying but I

15   don't get that from the facts that you are giving me because

16   either there is a guarantee or there isn't a guarantee.  Either

17   this offering affects that guarantee or doesn't affect that

18   guarantee.  We keep referring to it as "opaque".  I don't have

19   any idea what you mean by that.  I don't know what way this was

20   opaque.

21          MS. APPS:  No where does the offering memorandum

22   explicitly say "leading up to this exchange offer we

23   transferred the assets to a subsidiary and we did not, as

24   required, give a guarantee to 1.5 billion of outstanding debt."

25   It doesn't say that anywhere.  That would have put headlights

1    and sunlight, as the securities laws require, on the illegal

2    transaction that they've engaged in.  They didn't say that.

3    They simply said if the junior bonds tendered their bonds, they

4    will have a guarantee over assets at the so-called lower tiered

5    guarantors and bond holders who don't tender will have no

6    access to that guarantee as the bond holder.  It's extremely

7    complicated and the offering memorandum was opaque.  We wrote

8    to the bond holders, to the company on Saturday as soon as we

9    deciphered what it was that they were doing in the transactions

10   leading up to the exchange offer.

11         And all we're asking for, your Honor, is if the

12   penalty is going, the penalty shouldn't going go to the bond

13   holders who failed in sufficient time to figure out the

14   deception that's occurring when the remedy that we are seeking

15   is simply to hold it over by a week or two so that the company

16   can have time to make corrective disclosure and the bond

17   holders who've already tendered can have the opportunity to

18   decide whether to keep their bonds in there or withdraw them.

19         THE COURT:  Why is it then insufficient, if this is

20   resolved quickly why isn't it sufficient for them to simply

21   reopen the bond offering.  Those people who want to tender

22   further can tender further and those people who want to

23   withdraw their tender, can withdraw their tender.

24         MS. APPS:  That's the relief we're asking you.

25         THE COURT:  That's the relief your asking for upfront.

1   You can't get a preliminary injunction with regard to the

2   ultimate relief before you've proven your case by simply

3   saying, yeah, the preliminary injunctive relief is the relief

4   that we are entitled to if we prove our case.  You are entitled

5   to maintain the status quo.  You are not entitled to the relief

6   now that without having proven anything (inaudible) sure that

7   they dispute at least some of what you are arguing without

8   moving anything that you are entitled to the ultimate relief

9   that you say that you would get if you proved your case and

10  don't really explain how it is that relief is inadequate --

11           MS. APPS:  Let me just address the reopening point.

12           THE COURT:  -- as opposed to before you get a chance

13  to prove your case and they get a chance to defend.

14           MS. APPS:  Let me address a few points.  Once the deal

15  closes, as I understand it, the old notes are rendered

16  deficient or defunction.  They go away.  Then the new notes are

17  issued.  They're all held by BTC.  You can't trace back the new

18  note holders to the old note holders because you don't know who

19  put in what tranche of bonds.  Once that deal closes you can't

20  unscramble the egg.  All we're asking for is enough time to

21  have our claim heard.

22           THE COURT:  You keep saying "unscramble the egg", but

23  what I understand you being entitled to is you are entitled to

24  the value of bond as of today.  Is that a fair way to put it?

25           MS. APPS:  I would disagree with that a little bit.

K93AAWHIC                    Conference

1           THE COURT:  You're not entitled to anything other than

2   cash.  By this agreement, what are you entitled to other than

3   the cash that's represented by the bond?

4           MS. APPS:  No.  I get that, your Honor.  You're

5   entitled to cash.  The problem is cash today versus what cash

6   is worth tomorrow --

7           THE COURT:  That's called "interest".

8           MS. APPS:  No.  If the company goes into the

9   bankruptcy it may be cents on the dollar.  It's about security

10  and how much cash you have.

11          THE COURT:  Quite frankly, the way you've describe it

12  I can only (inaudible).  You've given me no indication that

13  they are on the verge of bankruptcy.

14          MS. APPS:  Well, your Honor --

15          THE COURT:  But I assume that your clients made a

16  decision that this was a decent investment.  So, they didn't

17  invest in what they thought was a company that was on the verge

18  of bankruptcy.  And to say that oh, we're just afraid they

19  might declare bankruptcy still doesn't tell me they don't have

20  the right to declare bankruptcy.

21          MS. APPS:  But the benefit of the bargain they got,

22  the investment they got was for a certain amount of seniority

23  and security.  They got a guarantee.  They paid the (inaudible.

24  One of the tranches was in January 2020.  They paid money for a

25  guarantee to keep them at a certain level.

1          THE COURT:  Right.  And if you can prove that, they're

2     still entitled to that, right?  They're entitled to their money

3     and they're even entitled to a priority in terms of who gets

4     paid first, right?

5          MS. APPS:  They're entitled to the priority.  The

6     problem with the exchange offer, your Honor, is that what

7     happens to their priority is it gets diluted because other

8     holders are duped into putting forward their bonds when they

9     otherwise wouldn't have if they had known the truth about the

10    economic reality of the company and --

11         THE COURT:  But that's dependent on your speculation

12    that there's going to be a --

13         MS. APPS:  That's actually not, I wouldn't say that,

14    your Honor, at all because --

15         THE COURT:  How is that going to happen?  If there's

16    no bankruptcy, how are the (inaudible) they were entitled to as

17    bond holders if there is no bankruptcy?

18         MS. APPS:  I hear you.

19         THE COURT:  Is that correct?

20         MS. APPS:  That's right.  But let me just say -- and

21    we've submitted by the way an expert declaration about this

22    issue, your Honor.  The company is one of the biggest -- it's a

23    behemoth.  It's like the Titanic.  When you are sailing the

24    Titanic you don't say move left or starboard or whatever when

25    the Titanic is right next to you because it's too late.  You

K93AAWHIC                      Conference

1   look at the iceberg a mile away and you steer it --

2              THE COURT:  But you don't buy a ticket on the Titanic

3   if you think it's going to hit an iceberg.

4              MS. APPS:  Well, when these people were buying

5   tickets, they were buying tickets for something they didn't

6   necessarily think was going to hit an iceberg.  If they thought

7   there was an iceberg then they bought tickets with a guarantee

8   to the life rafts.  Again, we're taking this --

9              THE COURT:  It wasn't my analogy.

10             MS. APPS:  It's my fault.  I apologize, judge.

11             THE COURT:  So, I am just try trying to understand the

12   analogy here.  I can only take that so far.

13             MS. APPS:  You can.  You've totally showed that one

14   can only take that so far.

15             The other thing that's really important, if you ask

16   just as another evidence of harm, the market of the price of

17   the bonds have materially declined because of this deal.  This

18   is what it shows you.

19             THE COURT:  How is that going to change if there's a

20   corrective disclosure, the offer is held open for another ten

21   days and then it happens any way?  How is it --

22             MS. APPS:  I am not saying bankruptcy is going to --

23   well, what happens anyway, because our belief is if you hold

24   the offer open ten days, you give corrective disclosure, our

25   belief is those other holders won't submit.  If we're wrong and

1    the other bond holders do submit regardless, there's nothing we

2    can do about that.  But the point is that we don't think we're

3    wrong.  We think other bond holders economically will look at

4    this deal.  When they know the truth they went be submitting

5    and that affects our rights and our position.

6            (Speaking at the same time)

7            MS. APPS:  If that's true, if they really, if the

8    defendants were really to believe that the bond holders would

9    submit regardless, then they really should just leave the offer

10   open for two weeks. What's the harm?  They've already changed

11   one deadline internally throughout the offer.  If they're

12   saying there's no imminent bankruptcy, there's absolutely zero

13   harm to them to extending this by another two weeks.  And that

14   begs the question, we won't they do that?  Give the Court time

15   to analyze the contractual remedy here, I mean the provisions

16   that we claim is breached and so that the Court can weigh in on

17   whether or not the offering memorandum is true or false, why

18   wouldn't the company give the Court enough time to do that and

19   correct the false disclosure when there's absolutely no harm to

20   opening that exchange offer for two weeks?

21           THE COURT:  All right.  Well, let me pose that

22   question to, let me hear from the other side.

23           MS. APPS:  Thank you, your Honor, for bearing with me

24   on this.

25           THE COURT:  Sure.

K93AAWHIC                    Conference

1              MR. KURTZ:  Good afternoon, your Honor.

2              Can you hear me?

3              THE COURT:  Yes, sir.

4              MR. KURTZ:  So, your Honor, plaintiffs characterize

5    the application as routine.  There's absolutely nothing routine

6    about any TRO.  There is especially nothing routine about a TRO

7    where a tiny minority note holder seeks to prevent a series of

8    exchange offers for the benefit of both the stakeholders and

9    the company.

10              Your Honor started with irreparable harm.  This is all

11   money.  That's all it's about.  Plaintiff says 80 million.  I

12   think it's actually 70 million.  I think that's a wounding

13   error in the context of this case.  And that's strictly

14   monetary and therefore, by definition neither reparable.

15   Plaintiffs are trying to turn it into irreparable harm by

16   claiming that they won't be able to get paid because there'll

17   be a bankruptcy.  There is no proof of that, whatsoever.  It's

18   totally unfounded.  There were statements made without any

19   evidentiary basis that the company is no where close to that.

20   The company has $2.8 billion of total liquidity, $1.5 billion

21   in cash, $1.3 billion in a revolver, none of which has been

22   drawn down and a backlog of contract revenues of approximately

23   $8.9 billion.  The company's total assets are 23 billion

24   compared to short term and long term liabilities of less than

25   $12 billion.

1       It is unfounded to suggest a company is teetering on

2   bankruptcy and it is also a little ironic because the backdrop

3   for this is that the company is very responsibly going through

4   an exercise to ensure that it is able to best withstand the

5   world industry and country conditions now with the global

6   pandemic by reducing the face amount of their debt and

7   extending their maturity and to work with the Titanic.

8   Hypothetical there.

9       This is a company that is two miles from an iceberg an

10  it says turn port.  And have you a plaintiff here saying, Don't

11  let him do it.  Grab the wheel.  Don't let my him to it.

12  Because they want a bankruptcy.  They're distressed investors.

13  They think they'll do better.  That's what they've been pushing

14  us for.  So, the issue with it though is the company had

15  responsibilities, all stakeholders to itself, a bankruptcy not

16  the way to go right now.  It's totally unnecessary.  It's

17  potentially very disruptive and the plaintiff belonged between

18  1.7 percent and 5.7 percent of the bonds at issue.  So, it's 70

19  million at its face, 3.25 billion and hijack the process.  And

20  they can't drag along what is now $1.1 billion of sophisticated

21  investors that have already tendered.  They're all used but

22  they are not entitled to dictate the actions of the company or

23  the other sophisticated bidders of upset, the holders of up to

24  98.3 percent of the bonds here at issue.

25       THE COURT:  Does this deal and the information

1   provided about this deal infringe upon their contractually

2   paying guarantee?

3          MR. KURTZ:  It absolutely does not, your Honor.  Let

4   me address that three ways.  One, in terms of timing of the

5   claim.  Two, in terms of what the disclosure claim is.  Three,

6   in terms of the contract positions that they're taking as being

7   the subject of the disclosure claims.

8          In terms of the delay, as your Honor knows, you can't

9   create your own contingencies to support emergency relief --

10  and I think the record got a little muddy there.  The structure

11  here at issue was an outside audit done nearly a month ago.

12  The exchange offer itself was announced August 10, more than

13  three weeks ago, and that exchange offer unambiguously

14  discloses that these notes are going to be senior and they are

15  going to be new subsidiaries that will support them.  There was

16  an orb chart attached.  Every piece of information that is

17  relied on in this complaint was release on August 10.

18         The plaintiffs also wrote to the company on August 10

19  to raise issues.  The response came on the 11th and with full

20  knowledge of the structure and with issue joined the plaintiffs

21  then waited until September, signed and enjoined the exchange

22  offer.

23         Your Honor sort of a number of times said I don't

24  really understand the relationship between the relief sought

25  because ultimately, all you are getting is the delay and a

K93AAWHIC                    Conference

1   quote, disclosure and an opportunity to change your

2   (inaudible).  That's because this is all part of a design to

3   prevent the exchange from occurring, not because of anything

4   related to the underlying claims which are being served by the

5   remedies.

6        The disclosure is actually nothing close to being

7   corrective.  It's exactly the opposite.  The disclosure here at

8   issue is that these notes have been set.  They have been

9   senior.  And they are senior.  That was exactly how they have

10   been described.  That is how they have been structured by

11   leading investment banks and by law firms and by executives.

12   It is no dispute that the disclosure about the structure is

13   completely accurate.

14        What the plaintiffs want to say is they are not senior

15   as structure.  They are not senior as described.  And their

16   basis for saying that is that if somebody brings a lawsuit --

17   and they can't bring a lawsuit and I'll come back to that and

18   they haven't bought a lawsuit on the construct.  (inaudible)

19   the plaintiffs that there could be a lawsuit, that the lawsuit

20   could be successful that if there is a lawsuit that is

21   successful years down the line and that remedy might change

22   seniority of debt.  But that's not what the debt is today.  The

23   debt is senior unless and until somebody successfully sues and

24   makes it not receive senior.  And so the disclosure that the

25   plaintiffs seeks and that they're characterizing as corrective

K93AAWHIC                    Conference

1    would be to say they are notwithstanding exactly how these were

2    structured that they are not senior, which would be a

3    completely false and misleading disclosure prohibited by the

4    Securities Law.

5          THE COURT:  You don't think that the seniority of this

6    debt is in conflict with their guarantee of priority?

7          MR. KURTZ:  It absolutely is not and I'll move to that

8    in just a moment, your Honor.

9          At the moment what they're asking for is for the

10   company to adopt their position which is incorrect irrespective

11   of whether it was (inaudible) and described the notes in a way

12   that is indisputably inconsistent with the way they have been

13   documented and the rights that have been created absent a

14   lawsuit down the line being successful and eliminating

15   structure that's been put in place.  That would violate the

16   Securities Laws.

17         Disclosure cases under the Securities Laws

18   traditionally involve an agreed upon fact and then an argument

19   about whether they're material.  They don't involve arguments.

20   You don't make disclosures.  You're not required under the

21   Securities Laws to recuse yourself of breaching a contract.

22         Moreover, your Honor asked counsel a number of times,

23   how are you duped in any way or misled in any way?  You have

24   all the facts.  You're arguing the facts.  And counsel kept

25   saying, well, other people are duped.  Other people are duped.

K93AAWHIC                    Conference

1   This is not a class action.  And she is not here able to

2   represent the interests of us.  The securities violation

3   requires two other factors.  One is scienter and there is

4   actually no particularized allegations as required of fact that

5   would support any finding of scienter.

6           It also requires reliance.  There is no reliance on

7   any false misrepresentation.  Not only because there's no false

8   misrepresentation but also because these plaintiffs say they

9   know exactly what the facts are.  They are not being misled in

10  any way, shape or form.  So, they have no disclosure claim.

11  So, they can't show a likelihood of success on the merits.  As

12  to the contract premise because their disclosure claim is that

13  the company is supposed to say that what the company is doing a

14  barred by contract is also completely defective.  One, as I

15  mentioned, they can't establish a likelihood of success on the

16  merits with respect to a breach of contract claim because they

17  haven't even pled the claim in their complaint.  Two, they

18  can't sue for breach of contract because there's a number on

19  condition precedent on the indentures under which they hold

20  their notes.  The indentures required the participation of at

21  least 25 percent of the note holders that first issue a notice

22  of an event of default.  And there's a 90-day period to cure

23  before the allegations could ripen into a potential breach.

24  Then a trustee has 60 days to consider whether to sue.  And

25  then if the trustee doesn't sue in that 60 days then

1   (inaudible) has 25 percent of the outstanding issuance that

2   wants to sue, they'll first be able to do that.  So, there is

3   no claim here and no standing.

4           Now, as to the merits of the claim, they suggest the

5   liability of the provision has nothing to with what's going on

6   here and what plaintiffs utterly ignore is that the indenture

7   explicitly provides that the company has allowed this issue up

8   to $2.4 billion of debt senior through the notes at issue.

9   That is the deal.

10          Counsel mentioned how bonds are priced.  They're

11  priced to include where they go in the seniority.  And here

12  they're an allowed basket of $2.4 billion that is senior to

13  that.  The revolver uses although it actually hasn't been

14  involved, but the revolver is in the one/two billion dollar

15  range, maybe a little more, that's being totally preserved even

16  though it hasn't been drawn on and that leaves about 1.1

17  billion or so left in the basket that the company is permitted

18  to use to raise senior debt.  And that is where and how this

19  issuance is capped.

20          So, it works exactly within the explicit allowance

21  provisions in pricing of existing indentures.  And the way that

22  the company is doing this, the way the company creates the

23  structurally seniority which is provided for in the contract is

24  through some midlevel subsidiaries.  That mechanism is exactly

25  how you effectuate the right to put in place structurally

1   senior debt within a basket of $2.4 billion.  And this exactly

2   the structure that was put in place and understood by the

3   parties because the plaintiffs have some structural seniority

4   over other debt holders and it was done in exactly the same

5   way.

6           So, there's no potential claim here.  They tried to

7   evade without ever discussing the fact that they're allowed to

8   fine them up to $2.4 billion which is all that has happened by

9   claiming that somehow this is a sale of all or substantially

10  all the assets of company.  It's not.  It's nothing but an

11  internal reorganization with no impact, whatsoever, on the

12  plaintiffs.

13          The way this works now is that today the value of the

14  enterprise resides in the income generating operating assets.

15  The defendants are mere a holding company.  All the value of

16  the defendant holding company is indirect ownership of those

17  operating companies.  Prior to the new structure, the

18  defendant's value was in indirect ownership of those operating

19  assets and after the new structure, the defendant's value and

20  indirect interest in the identical operating assets.

21  Defendants haven't sold or otherwise lost any of those assets

22  which are the operating company.  There's nothing but a paper

23  difference.  It is no change in position.  There is no change

24  in economics or the introduction of another intermediate level

25  holding subsidiary other and based on the implementation of the

K93AAWHIC                    Conference

1    agreement that allows the senior debt.  In short the stock of a

2    company that holds the stock of a company that holds the stock

3    of a company that operates, is the same thing as owning the

4    stock of a company has the same identical structural

5    description (inaudible).  Knowing your of that in this entire

6    deal economically and you've heard only complaints about this

7    is that there will be claims senior to the existing notes up to

8    about a billion dollars which is exactly what is permitted and

9    provided for under the contract.

10          And there is a case, but pretty much on point is the

11   Dinagee case (inaudible) the plaintiffs spent a lot of time

12   focusing on a variety of things that happened in that decision

13   in an effort to distinguished it.  What did he do is to cite to

14   the part of the decision that actually governs here.  It's on

15   pages 53 to 56.  They're actually quite short because it's a

16   Westlaw cite.  But it says, quote, at the present time DHI is a

17   holding company that generally holds indirect interests in

18   companies that own (inaudible).  After the transaction is

19   consummated DHI will be a holding company that owns interest in

20   different companies under the same corporate umbrella that owns

21   the same power plants.

22          From a qualitative standpoint plaintiffs have not

23   shown they are likely to succeed and proving that DHI

24   transferred its assets substantially as an entirety un the

25   section of the contract they are at issue.  Then moved on to

1    the quantitative analysis that also gets looked at in the

2    successor liability, substantially all cases, and said that

3    because they will continue, because the operating assets will

4    continue to be subsidiaries of DHI, any assets transferred to

5    them are not being transferred away from the issuer's ownership

6    which is exactly what's going on here.

7         And if you are really wanted to consider that the

8    allowance of senior claims precisely as provided for under the

9    governing indenture would somehow transfer the assets because

10   is permitted it would be a transfer of assets of $1 million as

11   against assets of $22 million and therefore, would only

12   complies of less than five percent of the total value which is

13   no where near all or substantially all of the assets.  In fact

14   it's quite nominal in contrast.

15        Following up on some of the things that your Honor was

16   talking about, the relief sought has nothing to do with the

17   claim that they're trying to make even though it's not a part

18   of their complaint because the intermediate subsidiaries have

19   already been created.  So, if there was some sort of transfer

20   of assets by adopting the very stricture that is contemplated

21   by the contract to allow structurally senior debt, then it's

22   already happened and nothing about the relief here is actually

23   directed to remedy anything that's supposed to be wrong.  So,

24   what you really under end up having here is, I think what

25   really were deals, what the plaintiffs are really right to do

1    here is we know they're complaining about the structure of the

2    guarantors but they don't seek any relief relating to that.

3    The relief they seek is, one, to make a disclosure that the

4    company is breaching the contract.  That would be false

5    misleading and impermissible.  But that would allow them to

6    chill the exchange by saying that this is a breach.  They want

7    two weeks.  Just to give them an opportunity to run out and try

8    to generate some interests against the exchange and they want

9    this ripe for people that they don't represent, nonparties here

10   who have made elections to be able to withdraw their own

11   (inaudible) even though they don't represent their interests

12   and have no (inaudible).  They want that so if they're

13   successful in convincing people not to participate in the

14   restructuring that there is a mechanism, an unprecedented one

15   as far as.  I know of no cases cited for this that would allow

16   them to interfere with the exchange.

17          So, the reason is there's really no relationship

18   between the claims they're making and the relief they're

19   seeking is because this is out of the play book of people that

20   are trying to stop (inaudible).  Decisively in favor of the

21   company, the plaintiffs aren't damaged at all for $70 million

22   dollar.  And they maintain that they will be fully reimbursed

23   or be entitled to be reimbursed any where outside of bankruptcy

24   which is a completely unfounded argument that they're making.

25          What they have today (inaudible) to stay exactly where

K93AAWHIC                    Conference

1    they are.  This isn't one of those coercive tender offers where

2    people get dragged or they can go into the new paper as they've

3    chosen to do.  They have a floor.  So, they can stay on their

4    floor or they can buy new shares but either way, they are not

5    harmed.  The company on the other hand loses the opportunity to

6    increase its outstanding debt by over a million dollars.  To

7    start making some of those directional changes before the

8    iceberg shows up it extends its maturities to 2027 giving them

9    more runway to deal with what's going on in our time based on

10   COVID and related issues.  And it also harms the investors that

11   want to participate in this exchange, the large number of

12   investors and I don't have the number handy but I think it's

13   closing the three figures that it exchanged the base amount of

14   $1.1 billion into this exchange because that's what they want

15   to do and they don't want to be dragged around the holder of

16   1.1 (inaudible) where sophisticated investors can make their

17   own decision on whether to maintain notes or to exchange their

18   investments into other notes.  And it is not served by having

19   very small stressed investors make decisions for them.

20            THE COURT:  What would you say, what's going to be the

21   status of this deal as of Monday or Tuesday?

22            MS. APPS:  Well, the way it's set up today the

23   exchange offer closes on Friday.  One of the problems, one of

24   the reasons that this show up two days before it ends play back

25   book exists is because they tend to get a lot of the exercises,

1    the exchanges in the last day or two but really primarily on

2    the last day as people are finding out.  And having the

3    litigation filed that makes pretty inflammatory allegations,

4    allegations of fraud and the like that are completely unfounded

5    tend to have a chilling effect.  So, I guess the bankers and

6    the company will get together and figure out whether they still

7    want to close on Friday or whether they want to leave it open

8    for a couple days pending the resolution that happens here

9    today, assuming the resolution does happen here today to clear

10   up the overhang that is produced by bringing this litigation.

11            THE COURT:  What are you saying would possibly happen

12   in that timeframe?

13            MR. KURTZ:  No, I'm not saying anything happens other

14   than the market is spooked by any suggestion that there's a

15   likelihood of success on the merits that there's a fraudulent

16   transaction that breaches contracts when it's not a proposal of

17   transaction there a breach of no contract.  Where the

18   plaintiffs have a burden and they haven't discharged that

19   burden on demonstrating any of the elements for injunctive

20   relief either a likelihood of success on the merits and either

21   irreparable harm, not a balance in the equities in their favor

22   and not a public interest.

23            THE COURT:  But you're not suggesting that the

24   defendants are either contemplating or pending this offer or

25   taking some other action at this point with regard to in

1   response to this claim?

2           MR. KURTZ:  Right.  They're certainly not pulling the

3   offer, changing the terms.  It is conceivable that it will be

4   extended for another day or two or more, whatever our banker

5   thinks is appropriate to make sure that (inaudible) has been

6   generated by having a litigation filed is clear in time for

7   investors to make an informed decision to exchange or not

8   before it closes.  Maybe that is not a concern.  Maybe I'll get

9   enough exchanges because their capped on this.  As I mentioned,

10  basket is 2.4.  The company is leaving open the full revolver.

11  So, they can only allow about 1.1 billion or so of new notes.

12  And so, I guess if they get the full amount then, it'll close

13  and then a few days later it'll close officially but the

14  exchange period will close and if the full basket isn't filled

15  up then maybe it'll be extended for a day or two.  That's very

16  commonplace.

17          THE COURT:  What is the status that you can say --

18          MR. KURTZ:  So, as of I think earlier in the week -- I

19  might have the date wrong.  It was either last week or early

20  this week it was publicly disclosed that investors had

21  exchanged up to a face amount in excess of $1.1 billion.  It is

22  not public since that time and how many exchanges there have

23  been.  So, I don't think I in this venue could speak to that.

24  But it's recent -- of 1.1 billion.

25          THE COURT:  Of what total amount?

1      MR. KURTZ:  Of the 3.25 billion.

2      THE COURT:  OK.  And if the plaintiffs are right, in

3   what way can they get adequate relief if there's no injunction?

4      MR. KURTZ:  I'm having a difficult time connecting

5   their injunction to their relief.  If they're right, they have

6   a 70 million dollar claim.  I think it's 70 that they'll

7   pursue.  And just like every other litigator in the world, if

8   they can win and we don't think they can, they'll chase a

9   judgment.  The only way they've tried to characterize this is

10  something different than a normal claim for damages is by

11  speculating.  It would no basis, whatsoever.  Probably every

12  company that has anything to do with the economy is going to be

13  bankrupt at some point. I've already gone through the billions

14  of dollars of liquidity here.  There is no pending bankruptcy.

15  The company has substantial equity value.  Any company, you can

16  make any damage claim in the world against anybody and you

17  can't transform that into a claim for injunctive relief by

18  claiming you won't collect.  But they'll have whatever remedies

19  they are entitled to including for a guarantee, I suppose in

20  any ways case that they can bring and they so far have no

21  standing to bring a case so far.  They have don't have merely

22  enough holdings and no grounds to prove their claim.

23      THE COURT:  But what do you think is the claim that

24  they're attempting to bring?

25      MR. KURTZ:  Well, they've brought, here is what

1   they've brought.  Disclosure claims that are absolutely

2   frivolous and I don't say that lightly.  There's no such

3   thing -- and the cases recognize it -- disclosure requirement

4   to say you are breaching a contract.  There is no disputing we

5   take the transactional documents today and those governing it,

6   they provide structure seniority to the new notes.  The

7   plaintiffs are saying, no, they don't because you are not

8   allowed to do it.  That's untrue.  If somebody files a lawsuit

9   and proves that, then they'll have whatever remedy they have.

10  But you can't describe, it would be fraudulent to describe

11  these notes in anything but senior structurally because that's

12  exactly how they have been structured, created and documented.

13  But you can't have that.

14          In addition, the only way you have a Securities Law

15  violation is if you are alive.  This is for people who rely on

16  false statements.  These plaintiffs are relying on any

17  statements.  They are taking truthful statements,

18  characterizing them as false and demonstrating they are not

19  relaying on them because they say they know what can happen and

20  what can't happen.  And the only underlying claims for this is

21  that somehow you are not allowed to raise senior debt to them

22  when there's literally no way in the world one can dispute

23  there's express contract rights to raise up at $2.4 billion

24  debt senior them in a basket which is all that is happening.

25  So, then they're trying to find a way you can do that.  But the

1    way you are doing it violates the ownership substantial

2    (inaudible) it does not.  It's exactly the way you effectuate

3    this type of structural seniority.  The reason it's

4    structurally senior is because it's parked in a different

5    subsidiary.  That is exactly how the plaintiffs' structural

6    seniority was created.  So, it was exactly contemplated and

7    it's exactly how it goes forward today.

8           And as I mentioned, as Dinagee found on all fours,

9    there's nothing leaving.  It's like you have an asset and you

10   have it in your living room, your Honor, and then you decide, I

11   am going to put it in my dining room.  It's your asset.

12   Nothing has left the system.  The company's started with an

13   indirect interest in operating assets through directly holdings

14   in a variety, a whole series of holding companies.  And that's

15   exactly what they have today without any leakage, whatsoever,

16   as to any of the assets dealt.

17          So, economically, it's not right.  Legally, it's not

18   right.  As a matter of Securities Law it's not right.  It's

19   nothing but a distressed investor that's trying to muck up an

20   exchange offer so that they can leverage the company into

21   something they want to do more comprehensively.  They said they

22   want a comprehensive restructuring.  And lots of people believe

23   that that's code for equalizing debt so that you end up with

24   ownership interest.  And then as people climb out of these

25   market conditions or precipitated by a global pandemic, you

K93AAWHIC                    Conference

1    capture a lot of extra value.

2            And I'll note that the team here, not Ms. Apps as far

3    as I know but lots of other names are bankruptcy.  This is a

4    play book play to muck up an exchange offer.  They're fully

5    protected but there's no claim.  They have a pretty high burden

6    to get provisional emergency relief.  They've delayed to long.

7    They can't, they have to show irreparable harm.  It's all

8    muddy.  There's no bouncing of equity helps them.  To the

9    contrary.  It is the company that is protecting all the

10   stakeholders by steering the ship miles in advance of an

11   iceberg for as much runway as balance to strengthen its balance

12   sheet because these projects, this is the leading offshore

13   drilling company, these projects are capital intensive and

14   they're long term and those were the strong balance sheets, get

15   the business.

16           And the public's interest is clearly not a having a

17   small distracting investor (inaudible) of outstanding debt so

18   they can force people to make the decisions that they want to

19   make.  They get to stay in the debt.  They get to convert and

20   exchange into something that's different that's structurally

21   senior but at lower face amount and do that as well.  What they

22   can't do is make decisions for everyone else.  And I heard

23   probably dozens of times but other investors are being duped

24   but other investors might make decisions.  Those other security

25   team investors now know exactly what they are doing.  They

1    speak to the company.  They know how to make investments and

2    they should not be, they're decision shouldn't be impacted

3    about having an injunction that there's absolutely no basis

4    for.

5              THE COURT:  All right.

6              MS. APPS:  Your Honor, may I address a few of those

7    points if my colleague for the defense has concluded his

8    remarks.

9              THE COURT:  Yes.

10             MR. KURTZ:  I have.

11             MS. APPS:  Thank you.  Sorry.  It's hard to see on the

12   virtual.  Thank you.

13             Your honor, if I may appreciate addressing a few

14   points.

15             First, your Honor asked me what harm to the company by

16   keeping the offer opening.  And you said it's a question for

17   the company.  What defense counsel just ask did was identify

18   absolutely no harm to the company in keeping the offer open by

19   two weeks.  On the contrary, he said they were considering

20   extending the offer in any event.  So, there's no harm on the

21   side of granting the relief to keep the offer open for two

22   weeks.

23             On the issue of a corrective disclosure out of initial

24   matter, they've received a notice of default.  I think it was

25   today or yesterday from more than 25 percent of the holders of

K93AAWHIC                     Conference

1   bonds that we're complaining about, not just the 80 million but

2   25 percent of holders of the bonds we're complaining about have

3   received a notice of default.

4        The corrective disclosure we're asking from them is

5   not, would have to include I should say at this point at least

6   a notice of default, but they don't have to recuse themselves

7   as counsel suggested of wrongdoing.  They just need to disclose

8   the fact that this particular provision that we've identified,

9   Section 11 requires them to give a guarantee or some disclosure

10  about.  The relief we're seeking is relatively modest in

11  comparison to the harm here to the bond holders.

12       And I want to identify the harm.  We've talked a

13  little bit about it.  When the exchange offer was announced,

14  the equity of the company drops 50 percent.  All of the trading

15  prices of the bonds significantly fell.  One of the deals that

16  preceded the exchange offer with the transaction that benefited

17  the company insider, I mentioned that a board director who was

18  a significant stake holder who benefits ultimately because what

19  the company is doing by this exchange is subordinating more

20  senior debt which helps the equity holder.

21       And I mention that in particular, counsel mentioned

22  that there's no allegations with respect to the seniority but

23  we did include that allegation with respect to scienter.

24       THE COURT:  I am not clear.  What is the claim or

25  claims, legal claim or claims that you intend to pursue?

1            MS. APPS:  This action, your Honor, is about a false

2      offering memorandum.

3            THE COURT:  So, what's the legal claim that you intend

4      to pursue?

5            MS. APPS:  It's a securities claim, a violation of

6      Section 14-8 which my clients are entitled to damages.

7            THE COURT:  A securities fraud claim?

8            MS. APPS:  Yes.

9            THE COURT:  As opposed to breach of contract claim?

10           MS. APPS:  Yes, that's right.  The breach of contract

11     claim is a separate claim.  To be clear, your Honor --

12           THE COURT:  I am trying to understand what claim or

13     claims you say that the injunctive relief is in support of, in

14     support of a contract claim, in support of a securities fraud

15     claim, in support of both, in support of additional claims?

16     What is the nature of the claims that you are pursuing?

17           MS. APPS:  Securities fraud claim, your Honor,

18     Sections 14-E of the Exchange Act and 20-A of the Exchange Act.

19     They have false statements because three have lied about the

20     fact that they have subordinated our debt improperly.  They've

21     lied about the fact that actions they took prior to the

22     exchange offer view violated indentures.  And if they complied

23     with their indentures, there would be an additional 1.5 billion

24     guarantee over assets that the new shares are going to get

25     access to.

K93AAWHIC                      Conference

1          THE COURT:  Well, I just don't understand how your

2    plaintiffs are the victims of the securities fraud claim.

3          MS. APPS:  Because --

4          THE COURT:  They have not been defrauded.

5          MS. APPS:  Well, that's not true.

6          THE COURT:  OK.  Considering the elements of

7    securities fraud, in what way do they constitute the victim of

8    securities fraud?

9          MS. APPS:  Your Honor, they're harmed because -- first

10   of all -- and I've said this -- first of all, there's a false

11   offering memorandum out there, right?  And even if you, the

12   arguments --

13         THE COURT:  But that wouldn't make them the victim of

14   securities fraud claim.

15         MS. APPS:  Well --

16         THE COURT:  They have to -- anybody who thinks that

17   there's securities fraud being perpetrated against some

18   innocent unknown victims can't file a lawsuit.  So, I am trying

19   to figure out what's their spanning with regard to the

20   securities fraud claim.

21         MS. APPS:  They own securities and the value of which

22   has dropped precipitously as a result of that fraudulent

23   exchange offer.  The value of the securities senior bonds were

24   49 cents on the dollar when this exchange offer was announced

25   and it dropped to 40 cents.  So, the exchange offer itself has

1    directly cause them harm through the drop in the trading price.

2          But moreover, the more important thing is, your Honor,

3    the fraudulent exchange offer is going to harm them because,

4    you know, defense counsel incorrectly say we're complaining

5    about other people being duped.  No.  That's not the point.

6    When other bond holders are duped it dilutes the value of our

7    guarantee.  We --

8          THE COURT:  Your claim is not that your clients had

9    been duped.

10         MS. APPS:  No, no.  I actually, the point is, your

11   Honor, that the company's lie in the offering memorandum is

12   impacting us.  It's caused other bond holders to exchange which

13   hurts the value of our assets of things that we own.

14         The other thing is too I want to say, your Honor,

15   we've also tendered -- don't forget we've relied on, we've

16   tendered the lower tiered bond.  So, if this company issues a

17   false disclosure we want the opportunity -- excuse me.  If the

18   company issues a corrective disclosure we would also request

19   the opportunity for all bond holders including ourselves to

20   withdraw the tenders that we've previously made.

21         You know, your Honor, one of the things that the

22   defense counsel keeps coming back to is that we should somehow

23   work out that there's deceptive offering memorandum which it

24   was false and defective.  But again, that flips the burden on

25   issuers to publicly disclose truthful and accurate offering

1   memorandums and securities document.  All we're asking, again,

2   the minimum relief we're asking for is that they fix the

3   problem.  Even if they are not willing to agree that we're

4   right and we absolutely are.  I thoroughly disagree with the

5   arguments made by counsel with respect to the underlying issue

6   here.  There's no harm that, they have identified no harm by

7   just issuing a very limited corrective disclosure to say that

8   the notion they could view this series of transactions without

9   violating their existing indentures has been challenged and the

10  company faces at least the risk of having to increase the debt

11  or the guarantee of one and a half billion dollars and hold the

12  offer open for two weeks.

13          They're considering holding the offer open in any

14  event.  So, what harm is there in doing that taking that very

15  limited step to protect all the investors and allow them all to

16  make (inaudible).

17          And there's two points I really want to make if I may,

18  your Honor.  The plain language of the indenture that we say

19  has been breached, could not be clearer.  It is unambiguous on

20  its terms.  We've cited plenty of authority in support of our

21  position.  But I bring the Court back to the plain language of

22  that indenture.  It prohibits a transfer of the assets to a

23  lower tiered entity without that entity also assuming the

24  guarantee.  They did precisely that.  They absolutely did it.

25  This is plain on its face.  They had to know it.  The case they

1   cite is completely different.  In that case there was an

2   entity, a parent level.  It had in that case the, what happened

3   was it was the loan apparent level.  There was no transfer of

4   assets from the parent level to the lower organization.

5          And in the indenture at issue they had this relevant

6   provision at the parent level but they didn't also have the

7   relevant provision at the subsidiary level.  Our indenture is

8   fundamentally different.  We have both provisions.  We have the

9   provisions preventing this kind of action taking place at the

10  parent level and we have a provision which expressly prohibits

11  this action taking place at the subsidiary level.  It is the

12  violation of the subsidiary provision that we are relying on

13  and it says nothing relevant about that given that difference

14  in our indenture.

15         It was a bargain for right as part of our indenture.

16  What you are buying when they buy these bonds is a priority in

17  bankruptcy, a guarantee that makes you senior to other holders.

18  And they are diluting that guarantee, diluting that value by

19  engaging in the series of transactions including the exchange

20  offer.  And they could fix it.  They could fix the problem with

21  very limited relief, which is to hold the offer open and give

22  it corrective disclosure in the very limited form in which

23  we've requested it.

24         If I could just have one moment?

25         The other point I want to mention is counsel keeps

1    referencing 2.4 million in indebtedness.  That's a complete red

2    herring.  We don't dispute that they can take on additional

3    senior debt.  The real issue is they can't do this transaction

4    which basically strips the value of our guarantee.

5         We are not saying they are going to go bankrupt

6    tomorrow.  But what you heard counsel say in his argument was

7    if a lawsuit is successful it will be years down the road.  I

8    think I wrote that down correctly.  He said it would be years

9    down the road before we recover.  Our point is a money damages

10   award years down the road is useless to us if this company goes

11   into bankruptcy.  We have submitted (inaudible) from an expert

12   that said that by June 2 of year this company is going to have

13   a liquidity problem that a may force it into bankruptcy.  In

14   contrast to our irreparable harm, our inability to recover on

15   damages, we are asking for somewhat most limited relief which

16   the company hasn't said will harm it at all.

17        MR. KURTZ:  Your Honor, could I just have two minutes

18   maybe?

19        THE COURT:  All right.  Go ahead.

20        MR. KURTZ:  Counsel keeps saying that the companies

21   haven't identified harm.  In the first instance there's no

22   burden to identify harm.  It's the plaintiffs that have the

23   burden to proving the right to extraordinary relief.  I have

24   identified the harm.  Having the Court impact exchange offers

25   which would require a finding of likelihood of success on the

1  merits with respect to fraud is harmful.  The company is being

2  told publically that there are subject orders is based on fraud

3  is plainly harmful.

4          These aren't corrective disclosures.  These are

5  incorrect.  The company can't say it.  The company would be

6  violating the courts (inaudible) with the change.  Now with the

7  11th hour again.  Just say there's a claim that people believe

8  that you cannot do it.  That's already public.  The plaintiffs

9  wrote letters and they've made those letters public.  This

10 proceeding is public.  The offering memorandum doesn't need to

11 include their allegations and litigation in a public forum.

12         Your Honor, the securities fraud, they are not

13 (inaudible).  No matter what's going on here, they're fully

14 aware of what they're doing.  There's no allegation about a

15 lawsuit in the value of their security.  That's a brand new

16 claim.  That's not in the complain.  What they're claiming is

17 strictly that the description of the structure as new notes

18 being senior is false and misleading when it's not.

19         And counsel said we'll try and flip the burden on the

20 offering memo.  We have no burden.  The offering memo

21 accurately describes the structure here, exactly the new

22 subsidiary and exactly the seniority.  So, they've had that

23 since August 5 or August 10 and it has nothing to do with what

24 they can ferret it out.  All an insurer can do is describe the

25 transaction and then it's up to others to read it and raise

K93AAWHIC                    Conference

1    objections if they want to.

2           And then lastly, they've finally responded to the

3    first time the fact that there's a $2.4 billion basket reserved

4    for senior debt.  That's exactly what's going on here and they

5    can't dispute that.  They don't dispute that.  They just claim

6    the structure somehow isn't right.  To the contrary, this is

7    exactly the structure one uses to take advantage of the

8    structure senior debt basket and it is exactly the structure

9    that was used to create the structure of seniority that the

10   plaintiffs enjoy in their note issuance.

11          So, I appreciate your Honor taking so much time.

12   Unless you have any questions, my (inaudible).

13          THE COURT:  All right.  I am going to deny the motion

14   for preliminary injunction and temporary restraining order.  I

15   don't think the plaintiffs' submissions in this record were

16   able to demonstrate here a likelihood of success on the merits

17   or irreparable injury and I don't think that the balance of

18   equities, particularly, given at this time this late

19   application are in favor of the plaintiff in terms of changing

20   the status quo and an affirmative injunction with regard to

21   this deal.

22          There's a dispute.  It may be a contract dispute.  It

23   maybe securities fraud allegations but there's no reason why

24   plaintiff, any rights that the plaintiff has can't be

25   compensated in dollars.  It's not an argument that while later

1    on they might have the dollars to pay us, that's not a

2    compelling argument to issue injunctive relief.

3            Also, related to securities fraud, in any claims

4    securities fraud is not the appropriate relief in the span of

5    securities fraud case preliminarily.  And preliminary relief is

6    rarely, if ever, that, judge, they should have to say at this

7    stage of the litigation that they made false statements to the

8    public and they should have to correct these false statements

9    and make different statements at the beginning of this

10   litigation.  There is no support for that and that kind of

11   relief.  If there is such a case to be brought by these

12   plaintiffs then that can be articulated and if some corrected

13   statements need to be made and/or some other injunctive relief,

14   primary he injunctive relief is appropriate, then that can be

15   considered at that time.  It is not a strong argument to say if

16   we don't get it today it might not be available to us tomorrow.

17           The balance of equities, people who tendered toward

18   this deal, this deal is closed in two days.  They've shifted

19   the deal by court intervention at this point.  It seems to me

20   that the nature of the dispute between the parties is fairly

21   public and well-known and can be communicated by the parties.

22   I don't think it's appropriate to tell those who've already

23   tendered their shares that it's necessarily going to be

24   different offer later on or different disclosures later on or

25   different obligations later on.

1          With regard to the contractual dispute here, the

2     plaintiff is entitled to what the contract provides for and the

3     plaintiff is entitled to that and it's entitled monetarily to

4     judgments in those amounts if plaintiff can prove the case.

5     But two days before this offer is scheduled to close whether or

6     not it in fact closes in two days and specifically request that

7     the defendant be obligated to make corrective disclosures with

8     regard to issues that they maintain at this stage of the

9     proceeding warrant no corrective disclosures.  It is not

10    appropriate based on this record.  And it appears to me that

11    the plaintiffs if they have a claim in contract or securities

12    fraud against the defendant, given the nature of their

13    relationship, the contractual relationship and otherwise debt

14    holding relationship to the defendant that they are fully

15    entitled to be compensated in the dollar amounts in which they

16    say would have been the reasonable value of the bonds at

17    appropriate stage of this relationship.  And defendant if the

18    case is proven against the defendant, the obligation to honor

19    such a judgment to the extent they're financially able to honor

20    that judgment, this Court, clearly, there's no argument that's

21    been made to this Court is appropriate for this Court to do

22    anything that makes it more likely or less likely that the

23    defendants (inaudible) transactions or even declare bankruptcy

24    given what the current or future state of the company is.

25    Obviously, those individuals who have invested in this company

K93AAWHIC                    Conference

1    to the extent that they've taken a risk, on this risk to the

2    extent that risk was taken based on false representations that

3    could be demonstrated or shown.  But at this point in time it

4    doesn't appear to even be a full contractual breach that is

5    ripe for litigation.  But to the extent that it is, this case

6    can accelerate discovery in this case and can move this case

7    along on an expedited basis, expedited discovery necessary.

8    But at this point it would not be appropriate to affect this

9    deal which is offering that is scheduled to close within two

10   business days based on the allegations that the plaintiffs are

11   making against the defendant and awarding that is not

12   appropriate to award preliminarily relief that the plaintiffs

13   are requesting.

14           So, for those reasons based on those reasons and the

15   standards applied to temporary restraining order injunctive

16   relief, I find the plaintiff has not meant to obtain a relief,

17   the requested relief that they seek and so therefore, I am

18   going to deny that application.

19           MR. KURTZ:  I think we --

20           THE COURT:  If we don't have a date to move to this

21   case forward I will make sure that we have a date and an

22   earlier date necessary so that we can proceed expeditiously

23   with that case.  If it turns out at any point in time that some

24   sort of temporary relief is appropriate, then that application

25   can be renewed.

K93AAWHIC                    Conference

1            MS. APPS:  Thank you, your Honor.

2            THE COURT:  That is the ruling of the Court.

3            MR. KURTZ:  Thank you very much, your Honor.

4            (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25