KASAWHIOps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   WHITEBOX RELATIVE VALUE
    PARTNERS, LP, et al.,
4
                    Plaintiffs,
5
                v.                          20-cv-7143 (GBD)
6
    TRANSOCEAN LTD., et al.,
7
                    Defendants.             Oral Argument
8
    ------------------------------x
9
                                            New York, N.Y.
10                                          **(via telephone)**

11                                          October 28, 2020
                                            10:40 a.m.
12

13  Before:

14                  HON. GEORGE B. DANIELS

15                                          District Judge

16
                            APPEARANCES
17
    MILBANK LLP
18       Attorneys for Plaintiffs
    BY:  ANDREW M. LEBLANC
19       BRETT P. LOWE
         ANTONIA M. APPS
20       JED M. SCHWARTZ

21  WHITE & CASE LLP
         Attorneys for Defendants
22  BY:  GLENN M. KURTZ
         GREGORY M. STARNER
23       JENNIFER THOMAS
         JOSHUA D. WEEDMAN
24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

KASAWHIOps

```
 1              (Via telephone)

 2              THE COURT:  Good morning.

 3              Why don't I hear from the defense first on their

 4    motion.  Mr. Kurtz and Mr. Weedman, who is going to talk?

 5              MR. KURTZ:  It will be me, your Honor.  Glenn Kurtz.

 6              THE COURT:  All right.  Go ahead, Mr. Kurtz.

 7              MR. KURTZ:  Good morning.  Thank you.  Glenn Kurtz on

 8    behalf of Transocean.  I want to start by thanking the Court

 9    for setting and keeping this hearing date.  We have a slide

10    deck that I will be putting up, but as we set forth in our

11    papers, although we believe that the default notice here at

12    issue is baseless and invalid, it is creating problems for the

13    company -- and maybe you could pull up the first slide --

14    because it could cause Transocean to lose access to its $1.3

15    billion revolving credit facility; it could impact the ability

16    to qualify for new drilling contracts or even to maintain the

17    existing drilling contracts; it can adversely affect the

18    company's credit rating and accelerate debt and depress the

19    price of its notes -- which is why we have moved expeditiously

20    in this case for summary judgment.

21              And it's not clear, both parties agree, that the

22    issues that we are presenting can be resolved as a matter of

23    law under the undisputed facts and the unambiguous contract

24    provisions.  We do not have an agreement obviously on who

25    should win.  And we do have an agreement that summary judgment
```

KASAWHIOps

```
 1   is appropriate at this time.  And so I would move, for the

 2   reasons that it is Transocean that is entitled to summary

 3   judgment.

 4           And just for a little bit of background -- and we can

 5   move to slide 2 -- Transocean is the world's leading

 6   international provider of offshore contract drilling services

 7   for oil and gas wells.

 8           The industry is distressed, as are many other

 9   industries, given the pandemic.  And Transocean took advantage

10   of an opportunity to improve its leverage, interest expense,

11   and extend its maturity dates to better position itself for

12   long-term success.

13           Transocean took these steps through exchange

14   transactions that resulted in a substantial reduction in debt

15   through the issuance of about $925 million of new structurally

16   senior debt, reducing the face value on previous existing debt.

17           Whitebox is an existing prior noteholder and, along

18   with a group other distressed investors, has been pushing for

19   bankruptcy.  We don't believe that bankruptcy is anywhere near

20   warranted or appropriate.  There has been a public campaign and

21   a beating-the-bush campaign to get people to join.  There was

22   an effort to restrain the exchange offer.  That was

23   unacceptable.  Where they've gone to now is to issue a notice

24   of an event of default.

25           And specifically, what Whitebox complains about is
```

KASAWHIOps

1    that Transocean has raised the $925 million in debt in a way

2    that is structurally senior to the 2027 notes.

3           Transocean is entitled to summary judgment, for a

4    number of reasons, but I'm going to start with because the

5    amount of debt is well within the senior debt basket included

6    in the indenture at issue.

7           A senior debt basket is an exception to a restriction

8    on raising debt.  And the ability to raise senior debt and the

9    amount of such debt is a highly negotiated, bespoke, and key

10   term for an indenture.  If you look at slide 6, it is well

11   recognized that these types of baskets that are allowing the

12   company to raise the financing that it needs to be able to

13   operate are one of the two most important covenants in a

14   high-yield indenture like the ones here at issue.

15          Going to the next slide, Whitebox's counsel in this

16   case, Milbank, has actually published on the need, the issuer's

17   need for flexibility, and sometimes significant flexibility, to

18   incur additional debt in that basket, and exceptions or

19   carve-outs as to the limitation on debt covenants are

20   negotiated based on the particular needs of the debtor.

21          Here, what the negotiation was —— and also I ought to

22   note on the next slide, which is slide 8, that one of the

23   underlying premises here for Whitebox is that their seniority,

24   where they stand in terms of claims, is a key feature of the

25   note, that their structural seniority is a key feature, so even

KASAWHIOps

1    Whitebox concedes, indeed advocates, that these types of

2    structural seniority debt baskets are the key terms of an

3    indenture.

4            And here, if we move to the next slide, 9, what the

5    parties agreed to in Section 4.04(a)(12) is a senior debt

6    basket of up to, as is relevant here, $2.4 billion.  And what

7    Transocean raised, at 925 million, is significantly left than

8    half of what they're entitled to raise under the terms, the

9    unambiguous terms of the indenture, which is simply dispositive

10   of their claim that there was a violation or a default based on

11   the raising of the senior debt.

12           Faced with that, Whitebox has now come back and argued

13   for the first time that Transocean cannot raise senior debt,

14   which frankly is frivolous.  And it not only contradicts the

15   indenture, and I'm about to go through that, but it also

16   contradicts Whitebox's own prior admission to this Court,

17   where, on September 3rd at the TRO hearing, they specifically

18   said, we don't dispute that they can take on additional senior

19   debt.  And that was correct when made and that is correct

20   today.

21           The way this works is -- well, actually, let me start

22   with Whitebox's position.  Their position now is that the

23   senior debt basket section, which is 4.04(a)(12), does not

24   actually use the word "senior."  And in making an argument that

25   that means it's not senior, they sort of have it backwards,

KASAWHIOps

because -- and by the way, they say that it can be used pari passu, and as I will get to, there's a specific provision, subsection 11, that deals with pari passu debt.

But they have it backwards.  Transocean and every other issuer in America is entitled to raise as much financing as it chooses to raise, and can raise it in any way it seeks to raise it, senior or otherwise, subject only to whatever limitations are set forth in the indenture, which is Milbank's writing we talked about.  And so it's not up to Transocean to demonstrate some explicit right to raise senior debt.  It is up to Whitebox to demonstrate that there is a restriction on the indenture that would disallow Transocean from raising any debt it wants to raise at any point in time.  Whitebox doesn't claim that there is any such restriction, and there is no such restriction.  So that's really dispositive.  It's up to them to show that there is a bar on raising senior debt, not on Transocean to show there is a specific provision that allows it.

But in any case, there is a specific provision that allows it, and I want to walk through it.  That's Section 4.04.  And this contains a number of debt baskets, and I chose three that are important to understanding the mechanism.  And if you start with 9, subsection 9, subsection 9 is the subordinated debt basket and that allows the subsidiary guarantors to raise any amount of debt.  There's no limitation whatsoever.  That's

KASAWHIOps

1    because the subsidiary guarantors don't care how much that is

2    below them.

3            Subsection 11 is the pari passu section.  Subsection

4    11 is a restriction of $2.25 billion on debt that can be raised

5    by the subsidiary guarantor that is pari passu, because the

6    debt here at issue, the 2027 debt, is as a subsidiary

7    guarantor.  So every dime that the subsidiary guarantor raises

8    is pari passu with the 2027 notes and every note that sits at

9    that level.  Structurally, the subsidiary guarantor, everything

10   there has to be pari passu by definition.  That amount is $2.25

11   billion.

12           And then you get to the senior debt basket.  That's

13   12.  12 applies to the indebtedness can be raised by any

14   subsidiary, not limited to the subsidiary guarantors and

15   therefore not limited to the pari passu.  And that is the $2.4

16   billion number that I mentioned, and that is because it is

17   raised pursuant to the credit facilities.

18           And if we turn to the definition of the credit

19   facilities, we can see that the credit facility allows the

20   debtor to raise debt, including the revolving credit facility,

21   and that's important because that is viewed as structurally

22   senior debt.  The revolver is up at a parent company.  So

23   that's telling you right there that we're talking about being

24   raise able to raise structurally senior debt because the debt

25   facilities, including the revolving credit facility, which is

KASAWHIOps

1    structurally senior, or other financing arrangements,

2    including, as we've highlighted, indentures, that provide for

3    long-term indebtedness, including notes and guarantees of any

4    such indentures, here any indentures, that replace -- and the

5    exchange here did replace -- the notes for other credit

6    facilities, including any replacement or facility under an

7    indenture that increases the amount permitted to be borrowed

8    under there or alters the maturity dates in here -- there was

9    an extension in the maturity dates as well -- or adds

10   subsidiaries, which of course was done here.  That's the whole

11   crux of the dispute, that there was a subsidiary that was

12   introduced.

13           So that's how debt baskets work.  You have different

14   categories.  You have the junior one, you have the pari passu

15   one, and you have the senior one.  And so it's permitted.  The

16   notion that you would be limited under subsection 12 to pari

17   passu debt has a number of violations of contract law.  As

18   everybody knows, it's well established that a provision in a

19   contract, especially one that's so critical, a bespoke

20   provision like debt baskets, can't be read out.  They have to

21   have meaning.  And if they were intended to address only pari

22   passu debt, then Section 12 has no meaning whatsoever because

23   Section 11 already addresses pari passu debt.  And if Section

24   12 was supposed to deal with pari passu debt, then Section 11

25   would be rendered superfluous because you would need a Section

KASAWHIOps

1    11 provision that addresses only pari passu debt.

2            And then the baskets themselves would be conflicting

3    because the basket under 11 for a pari passu debt is $2.25

4    billion and the basket for senior debt is $2.4 billion.  So

5    those would conflict as well if they were forced to be the same

6    thing, but they don't refer to the same thing.

7            So the senior debt basket provides Transocean with an

8    explicit right to raise the structurally senior debt at issue.

9    Whitebox ignored that in its public campaign.  It ignored it in

10   its notice of default.  What it's tried to focus on instead, as

11   the Court knows, is a boilerplate, which normally is called a

12   successor obligor clause or an ASA, "all or substantially all"

13   provision, that's included in the indenture.  And specifically,

14   what Whitebox argues is that the implementation of the senior

15   debt basket violates the successor obligor clause.  It doesn't.

16           And I want to start initially by noting -- and we can

17   go to slide 14 -- the successor obligor provision has to be

18   strictly interpreted; it's not interpreted expansively, because

19   it places limitations on the economic freedom of the issuer.

20   And there is just a number of cases that are very clear about

21   that.  So there is already a rule of construction that applies

22   here that makes their lift harder than it would be if it wasn't

23   a successor obligor clause.

24           And the Whitebox expansive construction of the

25   indenture, of the successor obligor clause, is wrong for three

KASAWHIOps

1    reasons.  The first reason relates to what I just covered,

2    which is, because Transocean has a right to raise structurally

3    senior debt, by definition it has a right to implement the

4    structure that's necessary to do so.  Otherwise the right would

5    be illusory and meaningless, in violation of established rules

6    of contract construction.  And we've reproduced those in slide

7    12 of those cases.

8         And this is key:  But the mechanism for raising

9    structurally senior debt by definition is to put the debt in a

10   structurally senior subsidiary.  That's what "structural

11   seniority" means.  You look at the organizational structure and

12   it's a senior subsidiary.  So once there is a right to

13   structurally senior debt, there is by definition a right to put

14   in place a structurally senior subsidiary, because otherwise

15   you would have a right that you couldn't actually take

16   advantage of, which violates accepted rules of construction.

17   That's why subsection 12, as a harmonizing provision, provides

18   for the ability to raise debt in any of the companies and at

19   any subsidiary as opposed to only as the subsidiary guarantors.

20        And that is exactly how the structural seniority that

21   Whitebox is complaining about was created for the 2027

22   noteholders.  A senior subsidiary was created, just as it was

23   created here, to guarantee the notes.  And so not only is it

24   exactly the required structure and the appropriate structure,

25   but it was the contemplated structure, because the parties to

KASAWHIOps

1    the indenture have used exactly the same structure to protect

2    the interests that they're trying to advance here, which are

3    fully protected.

4          That's the first reason the successor obligor

5    provision is not violated here.

6          The second and related point, before I get to maybe

7    the real issue on what it even means to transfer all or

8    substantially all your assets, but the second issue is, if you

9    just accepted that somehow Whitebox was right about this, then

10   you would have conflicting provisions.  We don't have

11   conflicting provisions.  The way these work is that Transocean

12   gets to raise senior debt exactly as allowed in Section

13   4.04(a)(12), but Transocean can't transfer all of its assets

14   away, as that phrase is interpreted under the controlling test

15   in the Second Circuit and everywhere else.  And so both of

16   these provisions are given meaning, to reconcile, to harmonize,

17   and they work together.

18          Under Whitebox's interpretation, however, there is no

19   meaning to the bespoke senior debt basket, because they claim

20   that you can't utilize it.  That not only violates the rule of

21   construction about not rendering the provision meaningless, but

22   also it drops you into another black letter rule of

23   construction, which is when you have two conflicting

24   provisions, and we don't really have that, but if you do have

25   it, under their theory, then the specific provision governs

KASAWHIOps

1    over the general provision, which we actually reproduce on

2    slide 31, if it's worth going to.

3         There's no dispute about that.  Whitebox agrees with

4    that.  The issue then is, which is the more specific provision.

5    And as I already covered, the senior debt basket is a bespoke,

6    highly negotiated provision designed exactly for the needs, as

7    Milbank has said, exactly for the needs, the capital needs, of

8    the issuer.  It is recognized as one of the two most important

9    provisions in an indenture, and it is plainly the specific

10   provision.

11        The successor obligor provision, on the other hand, is

12   merely boilerplate.  Whitebox argues that it's not boilerplate,

13   it's somehow bespoke, but in doing so, if we can go to slide

14   26, it not only ignores that this is a provision that's been

15   around for decades but also ignores controlling Second Circuit

16   authority.  The *Sharon Steel* case from the Second Circuit in

17   1982 is the seminal case on these issues, and it's still being

18   cited more or less every time one of these cases comes up.  And

19   the Second Circuit was unequivocal in holding that successor

20   obligor clauses, unlike what Whitebox says, is boilerplate.

21        And not only is it boilerplate and therefore is to be

22   uniformly interpreted, but this one needs to be uniformly

23   interpreted even more so because of the consequences that it

24   can have on the commercial market, and specifically that it

25   must be given a consistent, uniform interpretation because

KASAWHIOps

     1    failing to do so would greatly impair the efficient workings of

     2    the capital markets, where people rely on the way the courts

     3    have interpreted the terms over the last few decades.

     4            The court also said it was important -- we didn't

     5    manage to get this one onto the slide but it's in the case --

     6    because government authorities and bodies have to review these,

     7    and they can't be reviewing them wondering from place to place

     8    and case to case how it needs to be interpreted, so for that

     9    reason as well there's got to be uniform interpretation.

    10            And there is a uniform interpretation.  Because, and

    11    this is third point, the third point is, there is no prohibited

    12    transfer under the governing controlling test.  And the

    13    governing controlling test has been applied consistently since

    14    it was developed approximately 40 years ago, as I'll get to.

    15    Whitebox does not and cannot cite a single case rejecting the

    16    test that's been applied for the last four decades.

    17            And it starts with -- and if we can move to slide 15,

    18    please -- the recognized test for determining whether a

    19    transaction violates a successor obligor provision is whether

    20    the transaction strikes at the heart of the corporate existence

    21    and purpose of the issuer.  Courts look to see whether the sale

    22    substantially changed the nature or character of the entity's

    23    business, whether the sale involved primarily the entity's

    24    operating assets, which are of course the only

    25    income-generating assets one has.  If we go to the next page.

KASAWHIOps

1          And *Gimbel*, just to pause on the prior page, *Gimbel* is

2     sort of the lead case.  Two lead cases.  *Gimbel* is a Delaware

3     court.  They deal with this a lot, primarily in stockholder

4     vote cases because the same language is included in sales of

5     all or substantially all the assets of a corporation.

6          If we go to the next slide.  Courts look to whether

7     the transaction fundamentally alters the company's existence

8     and purpose and leaves it unable to conduct the business it was

9     formed to conduct.  Courts look to whether the transaction

10    represents a radical departure from a historically successful

11    line of business.  Courts look to whether the transaction

12    constituted a watershed event that fundamentally altered the

13    company's business and mission.

14         The courts look to see whether the transaction

15    resulted in a liquidation of the business.  And interestingly,

16    on that *Resnick* case, they addressed the formation of two new

17    subsidiaries that were wholly owned, and confirmed that it

18    didn't change the business.  They look to whether the

19    transaction results in a liquidation.  These are the types of

20    actions that would logically of course involve a sale of all or

21    substantially all the assets, because if you did sell all your

22    assets you would no longer have the business, you would be in

23    liquidation.

24         If we move to the next paragraph, the next slide, what

25    they do is they apply -- this was formulated by *Gimbel*, decades

KASAWHIOps

1    ago -- is they apply a test that looks quantitatively and

2    qualitatively at the transaction, in an effort to determine how

3    it affected the purpose of the corporation.  And that's been

4    applied uniformly by all the cases.

5          And if we go to the next slide, what does all that

6    mean?  And what it always comes down to is the economic

7    substance of the transaction and the impact that the

8    transaction has on the economic vitality of the corporation.

9    So they look at the economic value of the assets that were

10   transferred.  They look to see whether the company continues to

11   have economic vitality after the transaction was completed.

12   And courts look to the economic substance.

13         I included *Oaktree* because Whitebox relies heavily on

14   that case, claiming it did not adopt the qualitative and

15   quantitative test.  The court in that case issued a decision on

16   a TRO on very, very little notice, actually said "based on the

17   little time I've had," and they never mentioned any test.  But

18   what the court did do is say you look at the economic

19   substance, that you don't look at the form, which is what

20   Whitebox advocates here, you look at the economic substance.

21   And in that case there was an economic substance.  In this case

22   there is no economic substance.

23         I'm going to the next test.

24         And what you're trying to evaluate in an indenture is

25   whether there has been some impact on the ability to repay the

KASAWHIOps

loans.  And I'm going to come back to *Sharon Steel* because it

governs very clearly on Whitebox's incorrect position that the

Court should reject the same test that's been adopted and

applied uniformly for the last 40 years, without any authority

supporting that.  But what *Sharon Steel* goes to -- and *Sharon*

*Steel* is an indenture case.  And I'm going to come back to the

teaching that you're look at what you're trying to accomplish.

For an indenture case, what you're trying to accomplish is a

degree of continuity of assets.  The purpose of the clause, as

found by the Second Circuit, was to ensure that the principal

operating assets, which are the assets that produce value, of a

borrower are available for satisfaction of the debt, and cited,

positively, the commentary, the American Bar Foundation

commentaries on indentures, which have been cited by a volume

of courts.  It's well accepted that the decision to vest in a

debt obligation of a corporation is based on the repayment

potential of the business enterprise possessing specific

financial characteristics, and -- hopefully it's on the next

page -- the court -- well, we'll come back to that.  So that's

what you're looking to see: the transaction made it so that

you're not going to get repaid.  And here, the transaction

doesn't strike at the heart of the guarantor's corporate

existence and purpose.  It's not a watershed event.  It's not a

liquidation, stripping the company of its economic vitality and

ability to pay.  To the contrary, there's been no change

KASAWHIOps

 1    whatsoever in the economics, no change whatsoever in the

 2    holdings, no change whatsoever in the value of the subsidiary

 3    guarantors, and no change whatsoever in the their ability to

 4    repay debt.

 5         THE COURT:  You don't have any disagreement with them

 6    on the question of whether or not the agreement provides that a

 7    transfer of all assets or substantially all assets can only be

 8    done under certain conditions to protect the guarantee.  You

 9    don't disagree with that, first of all.  The area of contention

10    between you two is whether or not this transaction is a

11    transfer of all or substantially all of the assets.

12         MR. KURTZ:  That's exactly correct, your Honor.  We

13    have these defined tests that I just covered that are intended

14    to tell you, under the successor obligor provision, what is a

15    transfer of all or substantially all.  And that means, have you

16    compromised the ability to repay the debt, have you stripped

17    the company, liquidated the company, left it with nothing that

18    it could use to repay the debt.  You can't do that.  We haven't

19    done that, because all we've done is a corporate

20    reorganization.

21         And if we pull up what we've done.  So before the

22    internal reorganization, yes, the upper note guarantors or

23    subsidiary guarantors were merely holding companies.  And the

24    only value they had is they indirectly 100 percent owned the

25    operating entities, which have all the value.  And there's no

KASAWHIOps

1   dispute, that's where all the value is.  Everything else is

2   just share certificates.

3           Following the internal reorganization, the upper tier

4   note guarantors continue to be the same mere holding companies,

5   and they continue to hold indirectly 100 percent of the same

6   operating entities.  There has been no leakage whatsoever.

7   There is no impact on their ability to repay the debt, because

8   the identical assets that existed to repay the debt are still

9   owned, to the same extent that they were owned before the

10  internal reorganization.  And if there was a default and the

11  noteholders obtained judgment and wanted to execute against the

12  judgment, they would execute against the identical assets that

13  were held pre the organization and post the organization.

14  There's been no leakage of assets whatsoever.  And I submit

15  that as a logical practical legal matter, that conclusively

16  proves that there has been no transfer of all or substantially

17  all the assets, because the same assets are still there to

18  repay the debt.

19          THE COURT:  Well, their argument, if I understand it

20  correctly, is that that makes it not more likely that they

21  would get paid, it makes it less likely that they would get

22  paid, because you have now an entity in between that controls

23  all of the assets, and they have other debt which may be senior

24  to this.

25          MR. KURTZ:  Right.  So there's no doubt that all the

KASAWHIOps

assets are still 100 percent owned.  But you're also right,

your Honor, that by reason of Section 4.04(a)(12), the senior

debt basket, there has been some senior debt that was raised,

$925 million, and therefore, while the same exact assets are

available and haven't moved, there are some senior claims

exactly as permitted.

      The amount of that leakage, so to speak, which is

permitted, and therefore can't be a breach, but the amount of

that is $925 million against $22 billion of consolidated book

value, meaning it's less than 5 percent of the outstanding

assets.  So if for some reason, that leakage that you're

identifying was the transfers themselves, there's still 100

percent ownership but there's new claims.  So there has not

been a transfer of assets.  There's been an allowance of

structurally senior claims.  But if that was characterized as

some kind of transfer, even though technically it's not, it's

just senior claims, the amount of that transfer is less than 5

percent of the consolidated assets of the entities.  And

therefore it's not even close to all or substantially all.

It's not even material.

      But I would highlight that there is a provision that

addresses structural seniority, and that's 4.04.  The

boilerplate successor obligor clause doesn't address structural

seniority, it addresses the movement of assets.  And there

hasn't been a movement of assets because the same exact assets

KASAWHIOps

```
1    are still available.  True, if they went to execute, there
2    would be other claims, but that's permitted.  And I would say
3    that it's simply impossible to say that the guarantor's assets
4    have been transferred.  Every single one of them has been
5    transferred, but every single one of them is still available to
6    be used to repay the debt, not only this debt, all the debt,
7    but *the* debt, and the assets are still available to satisfy any
8    other judgment.  So if you look at what was done here, it's
9    purely an internal reorganization because all that has happened
10   is there has been the introduction of an additional
11   intermediate hold company.  And that doesn't affect anything
12   except an internal reorganization.  It's just another piece of
13   paper.
14        THE COURT:  It could possibly adversely affect their
15   recovery if there is a circumstance where they're standing in
16   line with other creditors, and there's a limited pot of money
17   left, and those new creditors have a priority over them that
18   they didn't have at the time the agreement was entered into.
19   So there is, at least theoretically, the possibility that they
20   may not get fully paid.
21        MR. KURTZ:  Right.  I agree with your Honor that by
22   definition when you're evaluating the transfer you're looking
23   at the economics, and specifically you're looking at the
24   ability to be repaid.  You will take into account of course the
25   ability to be repaid, which takes into account, I guess claim
```

KASAWHIOps

priority, except the two responses I offer is, one, 4.04(a)(12)
specifically allows exactly for not just the $925 million to be
used to prime them but $2.4 billion.  So you can't put them in
violation for exercising that right.  And even now, even now
Whitebox would say, sure, you can raise $2.4 billion of senior
debt at the revolver, which is at the parent company, which is
structurally senior debt.  That would stand in front of them.
So they're not in any different position than they would be in
without the reorganization.  The reorganization is just a way
to enforce the right to raise senior debt under the senior debt
basket.

          And the second response is, but even if you sort of
avoid all of that, you'd still be talking about allowing a
transfer, so to speak, in that circumstance, of less than 5
percent of the total assets that are owned directly and
indirectly by the subsidiary guarantors.  And that's nowhere
near a successor obligor.  People don't argue in the 90s, 90
percent about that.  People start to argue in the 70s,
sometimes in the 60s.  It gets a little complicated.  They
start to evaluate qualitatively and quantitatively how this
works.  But there is no way anything under 60 or 50 percent
could ever violate a successor obligor.  And here, if your
Honor says you're going to look through the structure, you're
going to set aside the market basket, which I think needs to be
harmonized, and say, I find practically speaking you've had a

KASAWHIOps

1   $925 million leakage, you're nowhere near all or substantially

2   all.  If that's a transfer, we win easily, by orders of

3   magnitude.

4          And let me move to *Dynegy*, because *Dynegy* is on point.

5   It's out of the Delaware chancery court.  New York and Delaware

6   are deciding most of these cases in large part because a lot of

7   merger cases are in Delaware, a lot of indenture cases are in

8   New York and Delaware.

9          First, before I move to it, let me stop here.  This is

10  an internal reorganization.  It's nothing more than the

11  introduction of an intermediate subsidiary company.  And we

12  have authority from this court -- not your Honor specifically

13  but Southern District, in the *Tyco* case, which is a very

14  significant Southern District case, that specifically said

15  there is no indication that successor obligor clauses are

16  intended to require a consent from the noteholders for an

17  internal restructuring.  Internal restructurings,

18  reorganizations, are not part of a successor obligor clause.

19  That got discussed in great detail in the *Dynegy* case, with I'd

20  like to move to because it's really on point.

21          And the next slide.  *Dynegy* had an internal

22  restructuring that was similar to the one we have here.  And

23  the Delaware court confirmed that it was looking at New York

24  law and that both New York and Delaware law look to qualitative

25  and quantitative factors.  And applying New York law, the

KASAWHIOps

1    chancery court found that the holder company, it was the same

2    thing here, it was setting up intermediate holding companies.

3    They said, look, the ultimate company liable, the hold company,

4    they generally hold indirect interest, just like the subsidiary

5    guarantors here hold indirect interest, in companies that hold

6    power plants, here in companies that own the operating assets

7    as well.  That continues to own the same interest in different

8    companies under the same corporate umbrella.  They still own

9    the same power companies.  So because the nature of the company

10   doesn't change, before and after that reorganization, the court

11   concluded that from the qualitative standpoint, the plaintiffs

12   aren't showing a likelihood that they can demonstrate a breach

13   of the successor obligor clause.

14            If you go to the next slide, then the court turned to

15   the quantitative analysis and said, look, the transfer at issue

16   is between subsidiaries having the same parent, again as here.

17   It's an internal corporate reorganization.  And the ultimate

18   company, DHI, as here, retains the value, and "value" is the

19   word they used.  Whitebox quarrels with the word "value," but

20   it is obviously a part of the economic analysis.  The value of

21   the plants embedded in the ownership of the entities that

22   directly own those plants is still owned, as it's still owned

23   here today.  The court said that even if the plaintiff had

24   arguably shown that DHI had transferred all or substantially

25   all of its assets to a newly created subsidiary, which is what

KASAWHIOps

Whitebox argues here, it was irrelevant, literally irrelevant,

because the newly created subsidiaries still will be

subsidiaries of DHI, and any assets transferred to them are not

being transferred away from DHI's ultimate ownership.  That's

exactly what's happening here.  Nothing is being transferred

away.  It's the identical type of a transaction.

Now there's really no way to deal with this case for

Whitebox.  What they say is it is dicta.  It's not dicta.  The

court issued two holdings, including the one here at issue.

And the court said, "I find that plaintiffs are unlikely to

succeed in showing that DHI did so 'substantially as an

entirety,'" transfer the assets.  That is a holding.  There

were two issues that got addressed by the court.  The first

issue that got addressed related to a form of successor obligor

that extended to just the parent versus the parent and

subsidiary.  That's not relevant to your Honor's determination.

We don't have that type of an issue here.

The second part of the decision dealt with, what does

it mean to be all or substantially all, and how does an

internal reorganization fit in?  That's what's relevant.

That's what we cited.  Whitebox cites only to the part of the

decision that's irrelevant.  And you can't avoid the decision

and the reasoning by looking at a part of a decision that we're

not raising here and that's not relevant here.

So we have a governing case.  We have a case on point

KASAWHIOps

in *Dynegy*, and we spent frankly the majority of our papers, and

probably close to a majority of my time so far here,

demonstrating that this transaction easily, as evaluated under

the governing test that's been applied uniformly for 40 years,

demonstrates that there is no transfer of all or substantially

all of the assets.

And Whitebox, in its papers, has not disputed that

fact, that when you apply the governing test, there has not

been a transfer of all or substantially all the assets, or in

fact a transfer of any of the assets.  Whitebox instead asks

this Court to reject the test that's been applied in the Second

Circuit and been applied by every other court that's addressed

these issues in the last 40 years.  Whitebox does not and

cannot cite a single case rejecting the test, or even calling

into question the efficacy of the test, which has been applied

uniformly for decades.  That's how meritless the position is,

that to get there, your Honor has to walk away from the Second

Circuit and every other case that's addressed this for the last

40 years.

There's a couple of ways that Whitebox tries to avoid

the test.  The first way, they say, hey, it's undisputed that

there's been a transfer of all of the assets; let's say that

repeatedly, say that with italics and bold throughout the

briefing.  That's just not true.  It's fully disputed, and in

fact we think we've proven exactly the opposite, that when you

KASAWHIOps

apply the test, there hasn't been a transfer of any of the

assets; there certainly hasn't been a transfer of all of the

assets.  And you can't avoid the test for determining whether

there's been a transfer of all the assets or substantially all

the assets by claiming incorrectly and repeatedly that the

parties agree to the matter.  We don't.

        The second way that Whitebox tries to avoid the test

is by arguing that the provision is unambiguous.  And as your

Honor pointed out, there has been a transfer of the stock of

one of the intermediate hold companies.  And so the Court

shouldn't follow the established test that's been established

for determining whether that violates the successor obligor

clause because they say it's clear that it does.  A literal

interpretation of "all" includes the stock certificates, even

though it's only an intermediate holding company and somehow

you ignore the economic substance, which is it continues to

hold exactly the same assets, your Honor points out subject to

some structurally senior claims, as allowed, of about 4, 5

percent of the total assets, but nonetheless only of the assets

that have been transferred.  So that's this literal

interpretation that not a single court has ever adopted.

Whitebox wants you to be the first.

        The problem they run into when they simply ignore this

is that the Second Circuit has already considered and has

already rejected exactly this approach when adopting, in a

KASAWHIOps

seminal case, the way you're supposed to evaluate this.  And

that's *Sharon Steel* again.  If we pull up slide 6, *Sharon Steel*

addressed exactly this argument: just look at what was

transferred without looking at the economics and so on.  And

the court rejected that literalist approach as a, quote,

masterpiece of simplicity.  And you'll note, I think I saw it

in the slides you're going to see from Whitebox, they say this

is really simple, you just go, you can't transfer it all, the

certificates are all, and we ignore all the economics, all the

qualitative factors, all the quantitative factors, and so on.

In interpreting a successor obligor provision, the Second

Circuit, controlling authority, says a literalist approach, a

literalist approach proves to be too much.  The court held that

"all or substantially all" is the phrase used in a variety of

contractual provisions and therefore must be read in light of

the particular context and the evident purpose for the

provision.  The court said you don't look at the literal, you

don't look at the masterpiece of simplicity; you look at the

context and its purpose.

            And then the court said, and we went over this, that

the purpose of the provision, as used in an indenture, is to

ensure continuity of assets, to provide for the repayment

potential, and to make sure that -- it says one purpose of the

clause is to ensure the principal operating assets of the

borrower are available for satisfaction of the debt.

KASAWHIOps

1          By the way, the court never found another purpose.

2    That really is the purpose.  And as I've already covered, the

3    ability to repay the debt has not been impacted at all by the

4    reorganization.

5          Your Honor did raise the senior claims, which I've

6    responded to.  But let me break this up.  The internal

7    reorganization would be allowed up to $2.4 billion irrespective

8    of whether anyone agreed to participate in the exchange offer.

9    But the assets itself haven't changed.  The only thing that's

10   changed is claim seniority.  And claim seniority is not

11   addressed in a successor obligor clause.  Claim seniority is

12   addressed in the 4.04(a) basket, subsections (9), (11), and

13   (12).  Successor obligors don't apply to claim priority.  The

14   open way it becomes relevant is the successor obligor provision

15   does have a purpose of ensuring repayment.  So I guess I'm not

16   necessarily quarreling with your Honor's view that therefore

17   repayment is relevant.  but the assets haven't actually

18   changed.  And if you're looking at the impact that they have,

19   in addition to having been allowed under the senior debt

20   basket, it is again less than 5 percent, so not all or

21   substantially all.

22         So *Sharon Steel* is controlling.  It rejects exactly

23   the position that's being advanced by Whitebox.  It's been

24   ignored by Whitebox.  It can't be ignored because it's Second

25   Circuit.  And I want to note also that another notion here that

KASAWHIOps

Whitebox relies on is the idea of how the percentages really

are controlling in all of this.  If they are, by the way, 5

percent is not getting you there.  They rely on *Hollinger*,

which was a decision from then Vice Chancellor Strine in the

Delaware chancery court, who then ultimately ended up on the

Delaware supreme court.  He actually specifically said you

don't look at percentages if there's no necessary qualifying

percentage.  And the reason for that, that Vice Chancellor

Strine noted, is because the words "substantially all" and

"all" mean the same thing.  They all mean the same thing.  "All

and substantially all" is just a lawyerly way and a legislative

way to pick up effectively the same thing.  And so whatever

works for "all" works for "substantially all," and whatever

works for "substantially all" works for "all."

And it's worth noting here, again to move to something

very practical and obvious and logical, is, if you have a test,

as you do, that's been applied for decades, because it

evaluates whether or not a transaction is a transfer of all or

substantially all the assets, by definition, if your

transaction was all, it would be picked up in the test.  A test

is supposed to pick up exactly that, and maybe even a little

less than that.  So if you're at the top end of the test, as

they say they are, where it's all, then you would easily and by

definition satisfy the test.  Yet they can't satisfy the test

because that's not right.

KASAWHIOps

1              And I also note some of the illogic of their position

2      that somehow, because they allege it's all, you don't apply the

3      test.  That means that if you apply the test to a transfer of

4      99 percent of all the assets, which is plainly all or

5      substantially all, the test would evaluate it and tell you that

6      that's transfer, that violates.  But if you transfer a hundred

7      percent, somehow the test blows up, the test that's been

8      applied somehow stops working.  There's no algorithmic formula

9      or other issue in the application of the test, which is only

10      focusing on economic factors, that would cause it to stop

11      working, to have some sort of bug when you flip from 99 percent

12      to 100 percent.

13              So, again, by definition, if this was a transfer of

14      all or substantially all, it would satisfy the test and it

15      would satisfy the test the easiest of any other test.

16              THE COURT:  I don't understand the dispute to be over

17      the percent of the transfer.  The dispute is over the nature of

18      the transfer.

19              MR. KURTZ:  Right.  I think that's right, your Honor.

20      What I was probably trying to respond to is, there's an

21      argument being raised by Whitebox that somehow all the cases

22      that we've gone over, all the cases that have been applied

23      uniformly for four decades, don't apply because they're

24      claiming the transfer was all, meaning 100 percent.  I put that

25      into a percentage.  All because it was a transfer of the

KASAWHIOps

1    intermediate stock certificates from other intermediate stock

2    certificates.  And so in a sense they're going to percentages

3    because they're saying, hey, once you did, quote, all, somehow

4    that now is a violation, even though it has no impact

5    economically, and even though it's not all or substantially

6    all, how the tests have been applied.  And so what I said is,

7    well, if you take that argument, tell me why it is that if

8    they -- let's say the transfer was 99 percent of the stock

9    instead of 100 percent of the stock of a mere hold company

10   intermediate in the capital structure.  Now you're saying the

11   test applies.  And now when you apply the qualitative and

12   quantitative factors that have to be evaluated under the Second

13   Circuit and every other case, it's not a transfer, but if that

14   last 1 percent goes, it is a transfer?  I'm just saying it

15   doesn't make sense.  It's another reason that it doesn't hold

16   up, because if you were right that just because there's been a

17   transfer of all of the intermediate hold company's stock, you

18   don't look at the test, the test would actually pick that up.

19   The test would say, that's everything.  But it's not

20   everything.

21        And here's the last piece I think I have on this

22   issue, which is that it's not "all or substantially all" under

23   the test that applies.  It doesn't have any impact on the

24   ability to repay, certainly not in "all or substantially all."

25   But the words also don't support this literalist approach,

KASAWHIOps

```
1    this, what was the word, the masterpiece of simplicity

2    approach.  It also doesn't work because the words are "assets."

3    And an asset is a broad term.  And an asset includes not only

4    what you own directly but what do you own indirectly.  So when

5    you have some remote subsidiary with all the value in the

6    world, and you still own it, to the same extent, then you

7    haven't gotten rid of all your assets.

8              And so we have this illustration here, where if you

9    had a holdco that owned 100 percent of another holdco, which

10   owned 100 percent of the operating assets with value, then the

11   holdco at the top, holdco A, owns 100 percent of the value.

12   The value of holdco A is the value of the bottom box.  That's

13   worth a billion dollars.  Then holdco Z is worth a billion

14   dollars and holdco A is worth a billion dollars.

15             And that holds true whether it's owning the equity of

16   a holdco that owns the equity of a holdco, or owning the equity

17   of a holdco that owns the equity of a holdco that owns the

18   equity of a holdco, all the way down, because if you maintain

19   100 percent interest, 100 percent all the way through, it has

20   no economic impact.  So if you're still worth a billion dollars

21   in that last box, 100 percent of a billion dollars up through

22   Z, to B, to C, to B, to A is still 1 billion dollars.  And so

23   unless you put a non-wholly owned sub in there, it doesn't

24   matter whether you've organized yourself with one, two, or 77

25   intermediate holdcos; as long as you 100 percent own the bottom
```

KASAWHIOps

assets, that's your value.  So if you move again, practically

speaking, for a sale, execution purposes, foreclosure, or just

to sell, when you move to a sale, the value that you will

achieve is the same pre reorganization, post reorganization.

The value of that bottom box of operating assets that have all

the value is going to be the purchase price regardless of

whether you have one, two, three, or five or more holdcos

sitting in the middle, operating as nothing other than a stock

certificate, without operations, without additional assets.

It's all pass-through.  And when you include a longer tunnel of

pass-through, you don't transfer everything you own.  By

definition, if you could get the same price post reorganization

as you got pre reorganization, based on the identical assets,

which is what you have here, you couldn't have transferred them

away.  Because if you transferred them away, you would have

nothing left.  You'd have no value.  You'd have no purchase

price.

          So these are just sort of common-sense checks on the

law, that not only is the law correct, but it's obvious from

any economic or logical or practical standpoint as well.

          The last point I think I would address with your Honor

is -- it's going to become obvious, I think, after Whitebox

starts to present, that they have a very hypertechnical

argument, where you don't look at qualitative factors or

quantitative factors, or the impact on the business, or whether

KASAWHIOps

1    it's a liquidation, or the economic vitality, or any of those

2    matters.  They just say it's "all."  And, again, the Second

3    Circuit has already rejected that approach, and nobody has even

4    tried it since as far as I know.  But if we were going to

5    ignore the Second Circuit and the senior debt basket and four

6    decades of law and logic and economics and fairness and common

7    sense in favor of this hypertechnical reading, there's still no

8    violation, because 11.03 applies to a person, of all or

9    substantially all the assets.  And there was no transfer to a

10   person because the way it worked, if we flip, is, there was

11   thirds.  Thirds went.  So you're not ending up with a single

12   person.

13         Notably, if we go to the next slide, *Sharon Steel*

14   actually mentioned these work when there's transfer to a single

15   purchaser.  And if we go to the next slide, it's interesting,

16   there is a form of successor obligor clause that talks about,

17   in fact one even in our indenture, that talks about a

18   transaction that's in one or a series of related transactions.

19   We flipped a slide that was actually the form used in the

20   *Dynegy* case, and that was a form used in the *Wilmington Trust*

21   case.  That was not a form used here.  So you're not allowed to

22   collapse.  And so then you only have a transfer of a third.

23         THE COURT:  Well, I'm not sure I understand your

24   "person" argument.  There's a definition of "person" that is in

25   the agreement, and I don't see why that definition excludes the

KASAWHIOps

1   subsidiary.

2           MR. KURTZ:  Right.  It doesn't.  It doesn't.  I don't

3   think there's a dispute on what the word "person" means, and it

4   can be singular, and it can be plural, depending upon how

5   you're using it.  I'm not saying that if you transfer to a

6   single person, versus a number of people, that you would be

7   barred.  What I'm saying is that each of the persons, because

8   they are separate entities, only got a third.  And so if -- and

9   I don't think we need to get to this.  I guess what I'm trying

10  to say is, if we go practical and under the governing law, it's

11  really easy.  If you tried to be hypertechnical, well then, you

12  don't get to be half hypertechnical.  So the way it's working

13  now from Whitebox's standpoint is they say, well, I know you

14  still own everything and so you're really on a quasi

15  consolidated basis, you have everything you used to have,

16  you've just kind of moved a subsidiary in, and so, but I'm not

17  going to do that, I'm going to be hypertechnical and tell you

18  that I'm going to view you as standalone.  But then when you

19  get to the point where you say, OK, but now there's only a

20  third to each new company, there's not all or substantially all

21  to any person, it's a whole new company, they say, well, now I

22  think you ought to treat them all as one, and now each

23  individually created subsidiary is now one entity -- when it's

24  not.  They all have their own certificates.

25          THE COURT:  I didn't understand it to be that it

KASAWHIOps

depended on how many people you transferred the assets to.  It

depends on whether or not you have transferred all of the

assets.  So what they are considering is whether you

transferred it to one company, two companies, or a hundred

companies, if you transferred substantially all or all of your

assets.

          MR. KURTZ:  Right.  Your Honor, I don't really

disagree with you at all.  I think the test accommodates an

intelligent economic analysis exactly as you're advancing, or

commenting on.  I guess all I'm saying is, if you don't do

that, if you do what Whitebox does, then I think from a

hypertechnical standpoint they would be wrong, because each

individual would only give away a third to a third.  I don't

think that matters.  I think what matters is that there's been

no transfer whatsoever, because they still own their indirect

ownership interest in a hundred percent of the assets, and they

haven't affected in any way their ability to repay, and that

under every governing law it's an internal reorganization, that

internal reorganizations don't violate the successor obligor

clause.  And what they've done, while introducing some

seniority, is exactly what was allowed, and even they agree it

is allowed at least with regard to the revolver, which is

structurally senior.

          So I don't see the need to get here.  I was just

suggesting that they can't be hypertechnical when it benefits

KASAWHIOps

1    them and then not be hypertechnical when it doesn't benefit

2    them.

3            The last very brief point I'll make is, the notice of

4    default here is defective.  There's a 90-day cure period before

5    there can be an event of default.  They suggested there's

6    already an event of default.  They have said they're

7    accelerating.  You can't accelerate until you're past the

8    90-day cure period.  You enter into a new period.  And then the

9    then-holders have to consider whether they have a right to take

10   action and then to determine what action to take.  It can't be

11   done now months in advance of when it can be done.  We made

12   these points.  There was no opposition at all, other than a

13   statement about, they don't agree with us, or no further

14   discussion is warranted.  It's a motion for summary judgment.

15   The only time for a discussion is now.  It's warranted.  They

16   didn't oppose it.  So the notice of default is invalid in any

17   case.

18           There was an issue on your Honor's ability to grant

19   relief that's effective that we covered in our brief.  I didn't

20   see it in the slides, so maybe it doesn't come up today.  If it

21   does, I'll comment in reply.  But I thank your Honor for what I

22   know was a very lengthy initial presentation.  Unless you have

23   questions, in which case I'd be delighted to answer them.

24           THE COURT:  No.  Thank you.

25           (Discussion held off the record)

KASAWHIOps

1          THE COURT:  So is it Mr. Leblanc?

2          MR. LEBLANC:  Yes, your Honor.  Good morning.  I'm

3    just going to take a second to put our PowerPoint slides up on

4    the screen.

5          THE COURT:  That's fine.

6          (Discussion held off the record)

7          MR. LEBLANC:  Hopefully your Honor can see the slide

8    deck that I've also put up.

9          THE COURT:  Yes.  I have the PowerPoint in front of me

10   anyway.

11         MR. LEBLANC:  Thank you, your Honor.

12         Again, for the record, this is Andrew Leblanc of

13   Milbank on behalf of Whitebox Relative Value Partners and the

14   other plaintiffs in the action.

15         Your Honor, let me begin by first thanking the Court

16   for accommodating me on Skype.  When the order came out I was

17   actually quite excited to actually have an in-person argument.

18   I've realized that the Commonwealth of Virginia has been placed

19   on New York's list.  But we appreciate your accommodation, and

20   I would love to be referring to your Honor's chambers again and

21   arguing as soon as we can.

22         We did cross-move, your Honor, for summary judgment,

23   but I would like to reserve just a couple minutes after Mr.

24   Kurtz's reply.

25         Your Honor, let me just begin with what I think is an

KASAWHIOps

1    interesting commentary about this argument.  We believe this is

2    a simple breach of contract case.  If you look at the terms of

3    our notice of events of default, we identify one provision that

4    we contend has been breached in our indemnity, the indenture

5    for the 2027s.  That one provision is Section 11.03.  And if

6    your Honor would like the cite for that, ECF no. 28-7 is the

7    events of default.

8            THE COURT:  Yes.  I have the agreement in front of me

9    and Section 11.03.

10           MR. LEBLANC:  Right.  Your Honor, what's remarkable

11   is, Mr. Kurtz by my calculation spoke for 54 minutes before he

12   even showed you and put up on the screen the words of 11.03.

13           Let me be crystal clear about this.  We do not contest

14   that Transocean violated the indenture by raising some assets

15   under Section 4.04(a)(12).  We do not believe there was a

16   breach.  We have never alleged that.  We didn't try to enjoin

17   them from doing that.  They engaged in another transaction,

18   namely, the transfer of assets from our guarantors, the

19   subsidiary guarantors, as that's defined in the indenture, to

20   another entity, which itself, again, we don't contend was

21   impermissible.  Section 11.03 doesn't prevent them from doing

22   that transfer.  What Section 11.03 says, and if your Honor

23   looked at our slide deck before today, you'll notice that we

24   cited many cases, but it actually says that if they engage in

25   that transfer of all of the assets of the subsidiary, then the

KASAWHIOps

1    obligation is on them to have a guarantee issued by this new

2    entity.  And that, the failure to issue the guarantee by the

3    new entity, that is the breach that is alleged, nothing more,

4    nothing less.  All of the talk of their compliance with Section

5    4.04 is not in issue here.

6            And one other comment, your Honor, before I get into

7    the substance of my argument, is the following.  If they go

8    through the transcript and count the number of times that

9    Mr. Kurtz said "boilerplate," "boilerplate," "boilerplate,"

10   suggesting that the Section 11.03 is a boilerplate provision of

11   the indenture and that therefore your Honor should just defer

12   to other cases that have interpreted what he terms is

13   boilerplate, the facts are quite the opposite of that.  This

14   provision, 11.03, sits in a different section of this indenture

15   from the common subsidiary guarantor provision that I will

16   agree is a boilerplate one.  That provision is Section 5.01 of

17   this agreement, and frankly of any agreement.  That is the

18   boilerplate successor liability obligation provision.  That is

19   what is interpreted in *Dynegy*, in *Sharon Steel*, every other

20   case that they talk about.  And the failure by Transocean to

21   recognize that our provision is not that boilerplate provision

22   is a fatal flaw of their argument.  It is not dispositive to

23   what other courts have said about a different provision that

24   has fundamentally different terms.  And I will walk your Honor

25   through that as I go through.  But what's critical to recognize

KASAWHIOps

1   is that when you realize that this is not a boilerplate

2   provision, you actually have to look at the words of this

3   provision and see what was designed to be protected and what it

4   does.  Then I think your Honor will agree with us that the

5   transaction they engaged in here, and here, what I mean by that

6   is the transfer of all of the assets of our guarantors to a

7   subsidiary that was then not obligated on our debt, and then

8   the decision by those not to grant a guarantee to us, that is a

9   breach of the very purpose of the section that was put into

10  this agreement.  This is not a boilerplate provision.

11  Mr. Kurtz refers to fact that in 2015 the company had issued a

12  series of what we call PGNs, or priority guaranteed notes.  The

13  2027s, which are at issue here, where we issued a notice of

14  default, my client, they have this Section 11.03.  Other issues

15  of the priority guaranteed notes do not have it, they do not

16  have Section 11.03 in their indenture.  Apart from being

17  boilerplate, it's not even consistent across all of the

18  priority guaranteed notes.  This provision appears in two

19  different Transocean priority guarantee notes.  It appears in

20  regard to the 2027s and it has been breached with respect to

21  both of them.  But it has not been breached with respect to,

22  for example, the 2026s, which are a different series of notes

23  that do not have this provision.

24          All of them have Section 5.01, the boilerplate

25  language, but not all of them have Section 11.03, which is the

KASAWHIOps

provision that has been breached here.

          And so, your Honor, let me now turn to our argument,
and I think you will see how quickly we turn to the factual
contract language that we're asking that is at issue here in
the alleged breach and what we're asking you to look at.  But
first let me respond to -- and I think your Honor has discussed
this with Mr. Kurtz.  Mr. Kurtz has put up a number of slides
at the beginning to suggest that all they've been doing was,
you know, liability management exercises.  And he refers to
something, in Mr. Kurtz's slide no. 3, he references the fact
that Transocean decided to improve its capital structure, and
it says "to take advantage of opportunity to improve their
leverage and other things."  They're actually more explicit in
their pleadings before the Court.  In their opening brief they
said, "In light of the opportunity resulting in 2020 from debt
market turmoil," and skipping an intermediate clause, "spurred
in part by the COVID-19 pandemic."  So what they actually put
in their papers is that what they wanted to do here was take
advantage of the pandemic in a way that reduced their value by
over a billion dollars, and then allow that value ultimately in
their view hopefully to be available with shareholders if the
value was there.

          But they're not coming into this court wearing the
white hat, your Honor.  They are trying to take advantage of
the pandemic.  And the issue that they have is, they could do

KASAWHIOps

it to an extent, but they just have to comply with the terms of

our indenture, including Section 11.03.  But what we show on

this slide, your Honor -- the ECF numbers are there -- is just

how devastating these events are for the holders of the 2027

notes that are at issue here.  Before the transaction, these

notes in the summer, even after the turmoil caused by the

pandemic, were trading at something around 50 cents, 49 cents.

Today, your Honor, these are trading at 27 cents, if your Honor

can see that.  I actually think, your Honor, I may have pulled

a different, or a slightly different version.  In the paper

version they look a little bit different than this one.  This

was an earlier version of the slide, I think, that I have up on

the screen, but it's the same information we just described to

make it a little bit more readable.

       But the point is, our clients have lost half of the

value of our investment subsequent to the breach of the

indenture by Transocean.  This has had a devastating effect,

and your Honor had alluded to it earlier, and it really is

because they breached an express provision of our agreement in

engaging in the transaction that they engaged in.

       So let me turn -- as I said, your Honor, I am going to

throughout the day refer you to the words in Section 11.03.

And I want to talk through it repeatedly, and we're going to

come back to a slide that looks an awful lot like this, because

this is the foundation of the entirety of our case.

KASAWHIOps

1          Section 11.03 is in an article within the indenture

2     that governs only issues related to the guarantee.  That is,

3     Section 11 as a whole governs the guarantee.

4          Section 11.03, by its terms, says that it is

5     permissive in the sense that it says that a subsidiary

6     guarantor may engage in the activities that are there,

7     including a transfer of all or substantially all of its assets

8     to any person, "provided, however," and this is where our

9     highlighting begins, "that in the case of the sale, lease,

10    conveyance, transfer, or disposal of all or substantially all

11    of the assets of such subsidiary guarantor, if such other

12    person," meaning the person who received it, "is not the

13    parent, issuer, or another subsidiary guarantor, such

14    subsidiary guarantor's obligations under its subsidiary

15    guarantee must be expressly assumed by such other person," and

16    then it has an exception.  It says "except in connection with a

17    transaction in which the securities guarantee of such

18    subsidiary guarantor would be released as provided in Section

19    11.06."

20         Now, I'm going to talk about each and every element of

21    this as we go through our argument, your Honor.  What it makes

22    clear is that, one, this provision is based almost exclusively

23    on one set of entities.  And those are subsidiary guarantors.

24    It is only focused on them.  And it is only focused on their

25    assets.

KASAWHIOps

1          It is clear that it applies when that subsidiary

2     guarantor transfers all of its assets.  And it is contemplated

3     in this provision that that transfer could be for value.  So,

4     in other words, it could transfer its assets, meaning its

5     stock, in the asset holding companies, to another entity and

6     get something back from that entity, because that is a sale.

7     It doesn't have to be a gratuitous transfer.  But it could be

8     any type of transfer, including a sale.

9          And then the consequence of that is that the other

10    party must become obligated on the guarantee, even the same way

11    that the subsidiary guarantor is.

12         And let me just talk about the exceptions, because I

13    think these exceptions show the import of it.  It says "if such

14    person is not the parent, issuer, or another subsidiary

15    guarantor."  What that means, your Honor, is if that party that

16    receives all of our assets is not otherwise obligated on the

17    debt, then this exists, because the parent, the issuer, and the

18    subsidiary guarantors are already obligated on our debt.  So

19    you don't have to issue a new guarantee in that instance.

20         And then the last exception is the exception relating

21    to transactions.  It says "except in connection with a

22    transaction in which the securities guarantee of such

23    subsidiary guarantor would be released as provided in Section

24    11.06."  Your Honor, what that refers to is, Section 11.06

25    provides that if the assets are sold to an entity that is not

KASAWHIOps

```
1   an affiliate of the parent, meaning not an entity that is

2   affiliated with Transocean, so not an internal entity, then

3   Section 11.06 governs, and under 11.06 there is a release of

4   the guarantee.  So by its very words, this provision applies

5   exclusively to internal transactions.  That is the import of

6   that last clause.  It excludes from its application

7   transactions that are governed by the third-party provision,

8   11.06, and includes only affiliated transactions.  So when

9   Mr. Kurtz talks about things like other courts interpreting

10  other provisions, applying only to internal reorganization,

11  this language expressly excludes that interpretation.  That is

12  the purpose of this.

13       Now, your Honor, we would submit that when you go

14  through this, the transaction that they engaged in here, the

15  transfer of the assets to the newly created lower tier holding

16  guarantors, is exactly what people would have had in mind to

17  protect against when they wrote this language, exactly the

18  transaction.

19       Now, let me just walk through each of those points,

20  your Honor.  If I look at slide 4 -- let me actually go to

21  slide 5.  Slide 5 has the most relevant pages.  And this is

22  exactly the same thing Mr. Kurtz showed you.  On the left side,

23  this is the structure before the exchange.  Where there's a

24  green circled box, your Honor, that is the upper tier notes

25  guarantors.  Those are the subsidiary guarantors.  Their assets
```

KASAWHIOps

1   are defined by those lines below to the asset holding

2   companies.  The entirety of their assets are their stock

3   investments in the assets of the company.  That's it.  That's

4   all they have.  Those assets have a value.  They have economic

5   interest.  Those are their assets.  If you look at a balance

6   sheet for those entities taken alone, their assets would be, we

7   hold stock in our subsidiaries, nothing more, nothing else.

8           If you look at the right side of our slide 5, which is

9   the structure after the exchange transactions, your Honor, what

10  you see is, they no longer have the assets that they had,

11  because that asset, 100 percent of the interest in the asset

12  holding companies, was transferred to what is now defined as

13  the lower tier notes guarantors.  Those entities own 100

14  percent of the assets that just the day before the transaction

15  were held by the subsidiary guarantors.  And our guarantors no

16  longer hold it.  Instead, we hold something very different.

17  And that is a stock investment in the lower tier notes

18  guarantors.

19          And, again, and I said at the outset, all of this

20  would be fine.  Our indenture doesn't prevent them from taking

21  this test.  It simply says, if you choose to take this test,

22  you are then obligated to give us the guarantee against the

23  lower tier notes guarantors.  That's the obligation they have.

24  That is the breach that we allege.  And nothing, your Honor, in

25  our indenture stops them today from simply issuing the

KASAWHIOps

1    guarantee.  If they're really concerned about the effects of

2    the defaults that we've noticed and that will mature in

3    December, if they're concerned about it, if they contend that

4    that's hurting their ratings, that that's hurting their ability

5    to conduct business, they can issue the guarantee today, and

6    then they would be in compliance with the terms of Section

7    11.03.

8            There may be other reasons they don't want to do that,

9    to be sure.  And if they get back, they may have issues with

10   the people that they just sold those notes to, the lower tier

11   notes guarantors, from their exposure to them, but that's not

12   our issue, your Honor.  To be in compliance with our indenture,

13   all they need to do is issue those guarantees, because if there

14   is any dispute, those entities today have all of the assets

15   that we had before this transaction happened, and that's the

16   crux, your Honor, of our argument with respect to the contract.

17           THE COURT:  So where do I look in the agreement itself

18   or in case law that defines this kind of transaction as a

19   disposal of all of the assets?

20           MR. LEBLANC:  Your Honor, I think we address that on

21   the next slide.  The next slide just walks through each of the

22   elements.  But, your Honor, I don't think you will find it in

23   case law.  And the reason for that is -- I do think that there

24   are a couple of cases that I will point your Honor to in a

25   couple of seconds.  The fact is that this provision -- and I

KASAWHIOps

1   think to answer the question I need to tell you why the cases

2   that they cite aren't relevant, and let me try to do that.

3          We think it's as simple as the following proposition,

4   your Honor.  "All" means "all."  And all of what, is the

5   question.  The answer to that is it's all of the assets held by

6   the conveying subsidiaries.

7          And, your Honor, let me just jump you ahead to page

8   18.  And I'll show you why I'm going there, your Honor.  Page

9   18, this is a little bit of an eye chart.  On the right side,

10  your Honor, there are two provisions.  At the top is Section

11  5.01.

12          THE COURT:  Yes.

13          MR. LEBLANC:  That is the boilerplate language that

14  exists in every one of the company's indentures and all of the

15  ones that are at issue in each of those cases.  Section 11.03

16  at the bottom, that is our individual guarantee provision

17  relating to the particular series of notes.  And the

18  fundamental difference actually, your Honor, among the

19  fundamental differences in this, is that at the very bottom of

20  the Section 5.01, it says with respect to that provision -- and

21  I don't know if your Honor can read it.  It's also on page 23,

22  where we have the same provision.  I'm not sure if that is

23  easier to read for your Honor.

24          THE COURT:  Yes.

25          MR. LEBLANC:  OK.  It's a similar concept.  These are

KASAWHIOps

1   two examples.  This is Section 5.01 on the right side from our

2   indenture and Section 5.01 on the left side from the 2026

3   indenture, which, again, that is the PGN indenture that does

4   not have 11.03 but it does have Section 5.01.  At the bottom,

5   it says, "for the avoidance of doubt, unless otherwise provided

6   in a supplemental indenture or board resolution, the term

7   'merger' includes an amalgamation under Cayman Islands law, and

8   the term 'all or substantially all of its assets,' with respect

9   to the company, shall be computed on a consolidated basis."

10          That is what Section 5.01 says, your Honor.  That

11   provision is not in Section 11.03, and very specifically not,

12   because Section 11.03 is not a consolidated analysis.  It is

13   not a whole-company analysis.  Section 11.03, by its words,

14   looks only at the assets held by the subsidiary guarantor.  And

15   when you recognize that, that that's a fundamental distinction,

16   you can then conclude, whether it's *Sharon Steel*, *Dynegy*,

17   *Gimbel*, any other one of those cases, that that's what's at

18   issue here.  That's why they exclude, for example, internal

19   restructuring, because when you consider it on a consolidated

20   basis, the fact that one entity may have transferred assets but

21   they stayed within the family, in the words of Mr. Kurtz,

22   there's a continuity of assets, that can be relevant if you're

23   considering it on a consolidated basis.  But in our view,

24   11.03, by its very words, is absolutely clear that this only

25   applies to this one set of entities, this one or more entities

KASAWHIOps

1   that convey the subsidiary guarantor.

2           Your Honor, that's why I would say your Honor should

3   begin the analysis of contractual interpretation by looking at

4   the words of the contract.  That's why we started our argument

5   showing you the words of the contract that we allege to be

6   breached.  And no amount of case law, your Honor, is going to

7   modify the words of this contract, because they simply don't

8   address these issues.

9           I also would note, your Honor, Mr. Kurtz had an

10  argument and said -- I was going to get to this later.  Let me

11  just jump to it now, just to be responsive to your Honor's

12  question.  Then I'll go back.  There's an argument that, in

13  citing to the *Hollinger* decision, that suggests that "all"

14  means "substantially all."  And that is literally the words

15  that the court used, but it's important to put that statement

16  and that quote into context.  And I've got the same quote

17  because we thought it was relevant too.  What the court is

18  saying is that, even in the prior iteration of the Delaware

19  statute that governs when a shareholder has a vote on a sale of

20  all the assets, the statutory regime did not include the words

21  "or substantially all."  It only said "all."  And courts were

22  interpreting "all" to be inclusive of "substantially all," for

23  the reasons that are said at the bottom of the statute.  It

24  says, the quote that we have, the word "all" meant

25  "substantially all" because the statute could not be resisted

KASAWHIOps

1    by retaining a small amount of property not vital to the

2    operation of the business."  The Delaware legislature codified

3    the concept of "all or substantially all" in 1973.  But it's

4    not to suggest that "all" would ever not be satisfied when all

5    the assets are transferred.  That's just wrong.

6         And in fact on the very next page of the decision,

7    what the Delaware chancery court does -- and I'm going to read

8    the book because we didn't -- we saw this in their argument and

9    were sort of blown away.  They actually say, on slide 29 of

10   their deck, that "all means substantially all," they suggest

11   that that somehow helps them.  And what the court actually

12   said, and I quote, "'all' means 'all.'"  Or, if that's not

13   clear, "'All,' when used before a plural noun such as 'assets,'

14   means the entire or unabated amount or quantity of the whole

15   extent, substance, or compass of the whole," period.

16        Then the court goes on to decide, what does

17   "substantially" mean, because the issue in that case, as it is

18   frankly in every case that they cited, is a circumstance where

19   less than all of the assets have been transferred.  And the

20   question the court has to decide is, Does that transfer

21   constitute "all" or "substantially all"?  Is that "less than

22   all" transfer enough?  Even in *Sharon Steel*.  What was at issue

23   in *Sharon Steel*, it's a completely inapposite situation, but in

24   *Sharon Steel* what was at issue was, the company, over the

25   course of a nine-month period, had sold all of its assets, and

KASAWHIOps

 1   had given dividends to shareholders, and then had a very small
 2   amount of assets left at the end that it showed to *Sharon*
 3   *Steel*, with a pile of cash.  And *Sharon Steel* wanted to keep
 4   the indenture in place.  It wanted to have the indenture stay
 5   outstanding because that indenture had favorable terms.  And so
 6   it wanted to take the cash, pay the interest, and then
 7   ultimately pay the principal.  The borrower lost in that case.
 8   Sharon Steel lost.  And what the court said is:  No, you don't
 9   have the right to assume that indenture, because, over time,
10   this, the last sale, wasn't the sale of substantially all or
11   all or substantially all of the assets.  You have to look at
12   this over the nine-month period.  And over that nine-month
13   period, you sold all of the assets previously, so you actually
14   have to redeem the notes, you can't keep them outstanding.  So
15   it really doesn't bear on the question that we're addressing
16   here.  But more fundamentally, your Honor, these courts are
17   grappling with the question of, how do we define if "all" was
18   enough.  That is not the question they decided.
19          THE COURT:  That's not the question for me either.
20   The question is not whether or not "all" is enough.  The
21   question is not a quantitative question before me.  It's a
22   qualifying question.  The question is whether or not this type
23   of transaction falls under that definition or whether or not
24   you need a transaction that demonstrates that the subsidiary
25   guarantor no longer has ownership or control over the assets.

1   Isn't that the first, fundamental question?

2           MR. LEBLANC:  Your Honor, it is.  I agree with you

3   that the issue that your Honor has to decide is, when the

4   subsidiary transferred every share that it owned of its assets,

5   did that constitute all of its assets.

6           THE COURT:  Well, the question is a little different

7   than that.  The question is whether, when they transfer all of

8   those to the subsidiary and they still own all of the assets of

9   the subsidiary, is that a transfer of all or substantially all

10  of their assets.

11          MR. LEBLANC:  Yes.  Your Honor, I think that is a fair

12  question.  I think that's the way to articulate it.  And I

13  think I've talked about this, and I'll talk about it more.  We

14  don't think there's any ambiguity in this contract, because

15  what's offered -- and I think if I take you back, your Honor,

16  to slide 6, just because I think what's critical here is to

17  look at the contract language at all times, what's covered by a

18  transaction is anything that includes the sale, lease,

19  conveyance, transfer, or disposal of all or substantially all

20  of the assets of such subsidiary.  There is no dispute that

21  sale can have, coming back to it, it can be an exchange of

22  value.  We don't dispute that.  They don't dispute that.  It

23  doesn't mean it no longer is a transfer.  So even if this had

24  been sold for cash to an affiliated entity, that still would

25  constitute a transfer.  The fact that, in return for

KASAWHIOps

1    transferring away all of the assets that the entity has, it got

2    nothing back in return, cannot excuse the application of this

3    provision.  That's what they need you to believe, that the fact

4    that it was an exchange for -- that we no longer have the very

5    thing that the entity we guaranteed from has.

6         And, your Honor, I do think it's critical to recognize

7    that this is sui generis to this type of guarantee note.

8    Mr. Kurtz alluded to it earlier, that in 2015 this is the

9    structure that they used to create the priority guarantee note,

10   because the unsecured notes that were issued above, at a level

11   above and therefore prior to this exchange, were structurally

12   junior to us, did not have this protection.  They have a

13   Section 5.01, but because they engaged in an internal

14   restructuring, those noteholders didn't have the ability to

15   stop the company or to require the company to grant them a

16   guarantee when they created the upper tier holdings guarantors,

17   our subsidiary guarantors.  The holders of these notes

18   specifically negotiated for this exact protection, this exact

19   protection.

20        THE COURT:  Well, when you say "this exact

21   protection," I'm not sure what it is you're referring to.  And

22   I'm not sure what it is you're asking me to rely upon for this

23   summary judgment motion, because I don't have that evidence.

24        MR. LEBLANC:  Well, let me tell your Honor, what you

25   do have is the following:  You have this indenture, with the

KASAWHIOps

1    words that are here.  You have the other indenture, that lacks

2    these very words, your Honor.  And you also have the rest of

3    this indenture.  And what I mean by that is, you can see, your

4    Honor, that Section 5.01 does not have this protection, because

5    it treats it on a consolidated basis, which, that implicates

6    the other cases that are cited by Transocean.  This language

7    was written -- what I'm telling your Honor is, you can take

8    note of the fact that this is not boilerplate because it

9    doesn't even appear in each of the Transocean indentures.

10   Therefore it can't be considered boilerplate.  And it's

11   different.  And what I would urge the Court to take account of

12   is the fact that, unlike the other provisions, it is limited to

13   this particular entity, this guarantor entity, because this

14   falls in the section that governs only the guarantors.  Unlike

15   the other section, it has the clause that it specifically

16   excludes external transactions, so transactions with entities

17   other than affiliates.  That's not in the successor guarantor

18   provision of Section 5.01.  So those differences your Honor can

19   look at and take note of.  And I do want to walk through their

20   arguments because I think that "transaction" comes up in a

21   bunch of different arguments as to what it should mean for each

22   of them, and I can do that quite quickly.  But the point is

23   that when you go through the language of this, when you parse

24   this language, when you actually look at the language, I think

25   your Honor will conclude that this is exactly what someone in

KASAWHIOps

1    the shoes of the PGNs would have sought to protect themselves

2    from.  And Mr. Kurtz says it.  It's what they did already

3    through a notice of default, and it's what creates an advantage

4    for this particular holder or set of holders to have a

5    guarantee that is greater than just the same claim that the

6    unsecured creditors have.  To be clear, we are not saying that

7    we are entitled at all times to be senior.  We concede, they

8    could raise senior debt in a number of different ways.  They

9    just have to do it in a way that is consistent with Section

10   11.03, with our indenture.

11           THE COURT:  But I'm not sure I understand, if you said

12   that they're entitled to have other debt senior to your debt,

13   I'm not sure why this kind of transaction is so unique that I'm

14   supposed to assume that somehow it adds some special protection

15   that you didn't otherwise have.

16           MR. LEBLANC:  Your Honor, I think there is a

17   straightforward answer to that.  This company is a party to

18   something like 20 different credit facilities.  And those

19   credit facilities allow it to do certain things.  Each of those

20   credit facilities have their own restrictions imposed upon

21   them.

22           THE COURT REPORTER:  I'm sorry.  When you say "this

23   company," what are you're referring to?

24           MR. LEBLANC:  Transocean, your Honor.  They've got

25   innumerable credit facilities.  That's why it's so hard to

KASAWHIOps

parse through what was happening and to compare it to the

rights that each of the indenture holders had to get to the

point.

        But what's relevant about that, your Honor, is, there

are protections in those other indentures, in those other

credit facilities.  So, for example, there's nothing in our

indenture that stops them from raising additional revolver

indebtedness.  We argue that affirmatively, that they can do

that.  And that revolver indebtedness is structurally senior to

us.  The problem for them is, they have to get somebody to lend

them that money.  And if their intent was to lend them that

money and to use it to repay unsecured indebtedness of the

parent, we don't think they would be able to borrow that money.

That's the economic reality of it.  So we don't have to protect

ourselves against everything that they could do.

        And I think that *Sharon Steel*, Second Circuit Judge

Winter's decision in *Sharon Steel*, it's crystal clear on this.

Because in *Sharon Steel* the court noted that the company could

have merged in that instance and that wouldn't have been a

violation of its terms of the indenture, but what Judge Winter

goes on to say is, the lenders here are relying on the economic

rationality of the shareholders.  And I would add to that the

economic rationality of everybody else, because what we got

protection from, in Section 11.03, is their creating a new set

of obligors between us and the assets and then levering those

KASAWHIOps

1   entities up with new debt.  That is exactly the protection we

2   get by the very plain terms of these words.  What we didn't

3   need is protection from the revolvers lending additional money

4   because we know that revolver lenders are always going to be

5   constrained by what they choose to lend based on the value of

6   the assets.  And so we're relying on economic rationality.

7          But all that really matters for today & purposes, your

8   Honor, is the very thing that this provision prevents -- or, it

9   doesn't really prevent because it allows this but then requires

10  them to grant us the guarantee -- is exactly what they did.

11  And so the fact that they could have done other things but

12  chose not to is of no moment.  It's the fact that they didn't

13  do what they were required to under their indenture.  And

14  there's nothing, nothing that prevents them from doing now that

15  we're aware of, nothing in our indenture, we don't believe,

16  would say to them, we can't issue you a guarantee today.  They

17  could do that.  But they've chosen not to and instead chosen to

18  be at breach.  And so if your Honor concludes, as we think you

19  must, you think they breached the terms of the indenture by

20  transferring all of the assets of the subsidiaries, of our

21  guarantors, then they could just issue us the guarantee.  That

22  is their choice.  But there's no limitation on that protection

23  for us, your Honor.

24         Now, your Honor, let me just go sort of quickly

25  because I think it's useful, in answering your Honor's

KASAWHIOps

question, I think it's useful to actually hit most of the
arguments that they raise, and I've talked about most of these,
but on slide 7, your Honor, there's an argument that originally
ran through their response that says, and I think even today
Mr. Kurtz alluded to it, the notion that this type of provision
doesn't apply to internal transactions.  I thought they had
gotten around that because in their response they conceded that
11.03 does apply to affiliate transactions.  I think, as we
walked through it a few minutes ago, it *only* applies to them.
And so to suggest that this provision doesn't apply to internal
restructuring, because the *Dynegy* provision that was at issue
there didn't apply to internal restructuring, is just wrong.
It's arguing a different contract provision that we do not
contend this implicates.

I didn't hear the argument today, now looking at our
slide 8.  There was an argument made in our papers that Article
11.03 only applied to an upward or lateral transfer.  There's
no surprise that they wouldn't show the indenture language on
this because there's literally no set of words that you could
read in the terms of 11.03, or the indenture in full, that
would suggest it's limited to upward or lateral transfers.  The
words just don't exist.  As your Honor noted, and this is in
our slide 9, "person" is broadly defined, and Mr. Kurtz agrees,
your Honor, that "person" would include the lower tier notes
guarantors that they created and then transferred all of the

KASAWHIOps

assets to.

So, your Honor, the only way that their reading of limiting it to upward or lateral transfers could have meaning is if you literally read it into the provision, and it's another exception.  Because, remember, as I said, there are exceptions in our Section 11.03 for where the other person who received all of the assets is not the parent, the issuer, or another subsidiary guarantor.  Those exceptions exist because those entities are already obligated on our debt to us.  But they would have you read "or" -- they would have you read into it another exclusion that we put here in red, "or a subsidiary of a subsidiary guarantor."  And that's just not in the provision that's at issue.

I'll address quickly because I know your Honor addressed it quickly, Mr. Kurtz did, you saw what I would describe as -- you saw the effort that they made to try to make an argument under Section 11.03 by the way that they engaged in the transfer.  In fact this is the only time you actually saw, from Mr. Kurtz, the contract language, which is on slides 32 and 33 of their deck.  Slide 33 shows this exceedingly complicated scheme where they say no entity transferred the assets.  But, your Honor, what they don't even cite anywhere there is a rule of construction in the indenture itself that says the singular means a plural.  And so if you go back to the language of the indenture, the fact that they engaged in the

KASAWHIOps

```
1    game that they did to not transfer all of the assets to a

2    person, as opposed to three persons or to a person, is totally

3    irrelevant.  And I think your Honor hit the nail on the head

4    when you said, the focus, as we read the provision, the focus

5    is on, did the subsidiary guarantor transfer all of its assets.

6    If the answer to that is yes, then the person or persons,

7    because of the rule of interpretation, must grant the

8    guarantee.  the fact that they did it to three different, you

9    know, split it up in three ways, all that suggests to us, your

10   Honor, is that they probably knew that they had a problem and

11   were trying to avoid it, just to create an argument where no

12   one entity got more than half of the assets.  Otherwise they

13   could have just done it on a straight line.  But even the way

14   they did it, just based on the basic structural interpretation

15   of the rule, the rules of interpretation, does not work, your

16   Honor.  So that result doesn't apply.

17            Another argument that they make, and they cite to the

18   cases that talk about value that was transferred, and this is

19   Mr. Kurtz's suggestion that this should be quantitative, and

20   his argument that we've only lost 5 percent of the value.  One

21   issue, your Honor, obviously your Honor knows -- book value and

22   share market value are two very different things.  I will just

23   say to the Court, in evidence before your Honor already is the

24   fact that our notes are trading at 27 cents on the dollar.  If

25   the company had $22 billion worth of assets, if that was the
```

KASAWHIOps

value of their assets, our notes would not be trading at 27

cents on the dollar.

And your Honor, to be clear, there are provisions of

the indenture -- and we show this on page 14, that reference

value when the parties intended to reference value.  Here we

don't do that.  Here in the contract provision that is relevant

to this issue, your Honor, it refers to the transfer of these

assets.  The assets, as we talked about, are just the share

certificates.  That's why, your Honor, this quantitive and

qualitative test that we talked about at length, it doesn't

make any sense in the context of this case, where literally all

of the assets were transferred.

I don't want to belabor that because we've done a

number of slides that talk about this.  Let me cover *Dynegy*,

and then I think it's important for me to talk for a minute

about their arguments with respect to 4.04.

With respect to *Dynegy*, your Honor, the holding in

*Dynegy* was that the provision that was at issue actually only

controls the holding company, DHI.  And DHI didn't actually

transfer any assets.  It was transferred at a level below the

DHI level.  There was one asset that was transferred at the DHI

level, but that was immaterial relative to all of the other

assets that were transferred.  And so the court there actually

held that the provision was not implicated for that reason.

And when you look at their slide, it couldn't be more

KASAWHIOps

```
1    clear that the next holding is dicta.  But, again, it doesn't
2    matter, for the reasons I talked about, because, your Honor,
3    having held already that it didn't apply because DHI was not
4    governed by it, they're looking at it on a consolidated basis,
5    looking at it on the overall effect on the company.  And I
6    think even their slides with respect to *Dynegy* have made this
7    point.  Yes.  Where they talk about, they said, on their slide
8    24, "the transfer at issue was between subsidiaries having the
9    same parent, i.e., an internal corporate reorganization."  For
10   the reasons we talked about, that's not our case.  And "DHI
11   retains the value of the plants embedded in its ownership of
12   the entities that directly own those plants."  And that's
13   because they're considering the transfer at issue on a
14   consolidated basis and not being transferred away from DHI's
15   ultimate ownership, again, on a consolidated basis.  If we were
16   here, your Honor, arguing that Section 5.01, that successor
17   obligor provision, had been breached, then their argument would
18   have some merit.  But we are not.  We are here arguing that
19   Section 11.03 has been breached.  And that's a fundamentally
20   different provision, for all the reasons we talked about.
21           So let me talk for a second, your Honor, about Section
22   4.04.  So Section 4.04 is defined, Section 4.04 itself is
23   defined as a limitation on subsidiary indebtedness.  It's not a
24   permission of any sort.  Instead, it imposes a fixed limit on
25   the amount of indebtedness of the subsidiaries of the issuer.
```

KASAWHIOps

And that's what it does.  4.04(a)(12) doesn't say one word
about whether that indebtedness can be junior, senior, pari
passu.  It's silent as to the ranking of that.  And the reason
for that, your Honor, is, it talks about it on a consolidated
basis.  And I think if you compare -- and I'm now on our slide
20 -- if you compare Section 11 to Section 12, you can see the
difference.  Section 11 is a limit on the amount of
indebtedness that can be incurred by any of the guarantors
themselves.  Section 12 is a limit on the amount of
indebtedness can be incurred by all subsidiaries together.
They're talking about two fundamentally different things.

           But critically, your Honor, the entire discussion is a
red herring in the sense that we are not saying that Section
4.04(a)(12) was breached.  What we are saying is that
Transocean can raise senior debt but they have to raise it in a
way that's consistent with all provisions of the indenture.
And they could even do that here, today, by simply complying
with 11.03 and granting us the guarantee.  There is no
prohibition on doing that.  Our argument is not that they
breached it by raising debt that was senior to us.  Our
argument is that they failed to grant us the guarantee that's
required, not in connection with the debt raising but in the
transfer of the assets of our subsidiaries.  They have no
response to that, your Honor, whatsoever.  There is no
inconsistency between 4.04(a)(12) and 11.03.  They can do

KASAWHIOps

1    everything they wanted to do.  They just have to grant us the

2    guarantee.

3          And, again, the fact that their main argument is that

4    there's an argument under Section 4.04 just shows how misguided

5    their approach to this is.  That's not the section that says

6    that our notice of default says they breached.  We're not

7    arguing that.  We agreed they could raise the debt.  They're

8    just saying, we can raise the debt and we don't have to comply

9    with the other terms of the indenture.  And that, your Honor,

10   is simply wrong.

11         And as we've noted, the company has in the past raised

12   additional senior debt through their revolving credit facility,

13   and they've had no notice of default from us with respect to

14   that.  That's not what they did here, and for their own

15   reasons, for whatever reason.  And it may well be that they

16   couldn't accomplish it as a business matter.  It may well be

17   that their shareholders wanted -- it wasn't enough advantage

18   taking of the pandemic for them, that they wanted to get more

19   and they did it this way.  But whatever reason they chose to do

20   it doesn't matter, because they were obligated, when they

21   transferred the assets, created those new entities and

22   transferred our assets to them, they were obligated to grant

23   the guarantee.

24         THE COURT:  How is their ownership different,

25   ownership of the assets different, if they owned the asset

KASAWHIOps

1   holding companies that own the asset as opposed to they own the

2   secondary subsidiaries that own the asset?

3           MR. LEBLANC:  When you say "their," your Honor, you're

4   referring to my client?

5           THE COURT:  No, I'm referring to the subsidiary.  You

6   say that they no longer own the asset because they transferred

7   those assets to the second tier subsidiary.  Under your chart,

8   the original setup was they still didn't own the original

9   asset; they owned the asset holding company that owned the

10  asset.  So how is their ownership different now, except that

11  there's another layer of companies?

12          MR. LEBLANC:  Your Honor, I think that exception, that

13  he just said, except that there's another layer, that's exactly

14  the point.  We contracted to not have another layer between us

15  and the asset holding company.

16          THE COURT:  What language are you saying stands for

17  that proposition?

18          MR. LEBLANC:  Because the assets of the subsidiary

19  guarantors at the time it was issued was the equity in the

20  asset holding companies.

21          THE COURT:  Right.

22          MR. LEBLANC:  If those assets were transferred

23  internally to another entity, then that entity was obligated to

24  grant us the guarantee.  That's what I'm saying.  It's the very

25  language.  And, your Honor, that actually, that exception

KASAWHIOps

exactly hits the point.  What that contract provision says, the

way I think your Honor should read it and the way that we read

it is that we contracted to have no one between us and the

assets that we have, which is the interest in the asset holding

companies.

THE COURT:  But that's not the assets.  The asset is

the assets that the asset holding company holds.

MR. LEBLANC:  Those are assets, your Honor, but those

aren't our assets.  The assets that the subsidiary guarantors

have, at the time that this contract is executed, the only

asset they have is the equity in the asset holding company.

And that's what 11.03 protects us from.  And I put up slide 5,

your Honor, which compares the before and after --

THE COURT:  Right.  I have it.

MR. LEBLANC:  -- from the interposition of some

entity.  If I had the technical ability to do it, your Honor, I

would take Mr. Kurtz's chart, at slide 30 -- and I'll hold it

up to the camera.  This is the one you can see, your Honor,

that has, you know, if holdco A holds holdco B and then you

interpose holdco B and then you interpose holdco C, looking at

that, under our contract, every one of those holdcos would have

to become a guarantor.  And that is what those words actually

say, on any plain reading of them.  And that protection was

important.  And your Honor doesn't have to take parole evidence

of it.  The fact that that protection was built into this

KASAWHIOps

particular contract, and this is another contract, your Honor

can conclude that that was necessary or desirable by the people

who agreed to lend money under this, the fact that it is a

bespoke provision for this indenture.  And it's protecting us

from exactly this transaction that occurred.

And it is true, your Honor, that the asset holding

companies themselves could have done things below them, but we

have some measure of protection.  And this is the *Sharon Steel*

language that Judge Winter, what he says, *Sharon Steel*, 691

F.2d at 1050, said, "Lenders can rely, for example, on the

self-interestedness of equity holders for protection against

mergers which result in a firm with a substantially greater

danger of insolvency."  We had the ability, and the lenders

here, who lent -- and remember, your Honor, this loan was just

put in place in January of 2020, so nine months ago, a loan

that's trading in 2027.  The lenders negotiated for a

particular protection.  And it's not economically irrational

that we would permitted, with all of the other credit

facilities that they have, including a revolver, that everyone

knows, revolver lenders, they're not high-yield lenders.  They

put very real restrictions on what a company can and cannot do

how it can and cannot use its money.  So by ensuring that they

could not interpose an entity between us and the asset holding

companies, that is an economically rational decision that we

rely on the self-interestedness of the other lenders to this

KASAWHIOps

```
 1    entire company to ensure that no sort of shenanigans or no
 2    gamesmanship is going to happen at the asset holding company
 3    level or below.
 4            But to be clear, these are high-yield notes, so
 5    they're not a kind of protection.  But we are protected from
 6    that.  And we rely on protections that other people have
 7    ensured that they will have, that the company, borrower is not
 8    going to do something economically irrational to harm their
 9    investments there.
10            And it is exactly, your Honor, I would submit, this is
11    exactly what the words of this contract were designed to
12    prevent, exactly this situation.  And that's what Transocean,
13    the borrower, is saying: you should just ignore those words,
14    ignore them.  If you accept their interpretation, your Honor, I
15    don't know how you're giving any meaning whatsoever to Section
16    11.03 that is not sacrificing this protection to ensure that
17    they get other benefits that they negotiated because, as I
18    said, there is no inconsistency.  And we're not saying that
19    they can't raise their money.  We're not saying that they can't
20    create the lower tier notes guarantors.  We're not saying that
21    they can't transfer the assets of upper tier notes guarantors
22    to those entities.  All we're saying is that when they do that,
23    or I should say if they do that, if that's the transaction that
24    they choose to engage in, then our contract requires them to
25    grant a guarantee by the lower tier note guarantors.  That's
```

1    all we're saying.

2            And, your Honor, I have a couple of other pages in the

3    deck but I don't think it's worth going through it.  I think

4    that's probably a better place for me to close.  Your Honor,

5    the way we look at this, we focus, and as your Honor can tell,

6    we focus very much on the language of this contract -- not on

7    other contracts, not on other provisions that are not

8    implicated here -- the language of this correct, and when you

9    read the language of this contract, I don't think there can be

10   any question but that it was breached by their failure to

11   provide the guarantees that are required under it.  And they

12   can't point to a single reason why they can't do that today.

13           Your Honor, what we are asking is for a determination,

14   summary judgment in our favor that the alleged default that we

15   have alleged in the notice of event of default that was issued

16   in early September, a default that they failed to comply with

17   Section 11.03, a determination that that is not invalid and

18   therefore granting summary judgment in our favor.  The effect

19   of that, your Honor, whether they choose to cure by granting us

20   the notes, by granting us the guarantee, or whether they choose

21   not to do that and then we exercise our remedies after it

22   ripens into an event of default, that is an issue for another

23   day.  The only issue before you, your Honor, at this moment is

24   whether or not they're in breach of 11.03, and we would submit,

25   your Honor, there's no question that they are.

KASAWHIOps

1          Unless your Honor has any questions, I'd be happy

2     to --

3          THE COURT:  No.  Thank you.  That's helpful,

4     Mr. Leblanc.

5          Mr. Kurtz, did you have anything further that you

6     wanted to add?

7          MR. KURTZ:  I do, your Honor, and I will try to be

8     brief, here, but there is really a fundamental defect in all of

9     that that I do want to make sure I've addressed.  And

10    basically, just to reset the table, there is an established

11    test for determining whether there has been a breach of the

12    successor obligor clause.  You can't get rid of 40 years of

13    jurisprudence, including controlling authority in the Second

14    Circuit, by trying to distinguish everything factually.  These

15    aren't cases that were always addressing facts.  They were

16    establishing standards of law.  Mr. Leblanc says, well, wait a

17    minute, you know, it's not boilerplate, it's bespoke.  That's

18    not so.  We started off by saying, 5.01 is boilerplate and

19    11.03 is not.  Well, 5.01 is a boilerplate successor obligor

20    provision that is directed to the parent company, and 11.03 is

21    a boilerplate successor obligor position addressed to the

22    subsidiary.  The reason they're different is because they apply

23    to different parties.  Mr. Leblanc has not and cannot identify

24    anything unique about 11.03 that is relevant in any way to four

25    decades of case law, because the four decades of case law

KASAWHIOps

didn't look at particular provisions, which invariably have
some changes in names and in cross-references.  What the cases
interpret is the phrase "all or substantially all."  And
Mr. Leblanc very carefully avoided that exact issue.  He can't
reinvent what it means to be all or substantially all.  And as
your Honor pointed out, the operating assets, the only assets
with value, are still held exactly to the same extent, 100
percent still held.

          The second way that counsel try to distinguish 40
years of authority is by saying -- and also tried to
distinguish the senior debt basket and the law that says you
have to reconcile them -- is to say, sure, you can reconcile
them, you just have to provide a guarantee.  He said that time
and time again, as if that were a unique issue.  Every single
successor obligor clause in the history of successor obligor
clauses provides that you can't transfer all or substantially
all, as determined by a test, unless you give them a guarantee.
You never have to deal with the "all or substantially all" test
if you just issue a guarantee.  Every single case started from
the proposition that there was no guarantee, and moved to
determine whether the transaction did constitute a transfer of
all or substantially all because it destroyed the economic
vitality and changed the corporate purpose and resulted in a
liquidation and eliminated the ability to repay the loan.  So
this idea that, oh, let me distinguish the cases because all

KASAWHIOps

they really had to do was sign a guarantee, that's exactly what was at issue in every case.  You don't have to sign a guarantee unless there's been all or substantially all.  If everybody had signed guarantees we wouldn't have case law on it, because that's what your choice is.

Mr. Leblanc said several times they bargained for this protection.  They bargained for a boilerplate successor obligor provision, and that means exactly what every case has said it meant.  If they wanted a protection, then what they needed to do was to have a provision that said something very different, not a successor obligor provision, or have one that said, provided, however, that the case law does not apply because, here, there will be no ability to transfer assets in an internal reorganization, even if it turns out to be the case that your ultimate ownership of the assets remains unchanged.  Because that's what the cases provide.  And that's what's allowed.  So there was no specific negotiation for some bespoke provision that protected this.  To the contrary, the section of the indenture that addresses claim priority -- and that's all their complaining about.  They're claiming that they have been primed.  That's Section 4.04.  And that has not been breached.

And when Mr. Leblanc says, you can still implement Section 4.04(a)(12), on senior debt, because you can't offer a guarantee, that immediately eliminates subsection 12, because if you give a guarantee, then you're pari passu, which is

KASAWHIOps

covered by Section 11.  So Mr. Leblanc does not account for
Section 12.  He reads it right out of the contract.

     Last couple of comments, your Honor.  The *Hollinger*
case came up.  Mr. Leblanc said he was sort of blown away that
we cited it, because "all or substantially all" means the same
thing.  Whatever the response was to that, I want to highlight
that *Hollinger* applied the same test that we ask get applied
here, which is qualitative and quantitative factors, exactly as
we've argued that they be applied.

     On harm, I think there was some effort to sort of
convince your Honor that somehow they've been harmed because of
the enforcement of a specific right to raise senior debt.  They
gave your Honor, on slide 2 of their deck, these note prices
that kept declining, started at 49, ended up at 31.  What
Mr. Leblanc didn't tell you is, all of that predates the
exchange.  So the implication that the exchange has hurt their
paper is wrong because all this is pre exchange.

     And then when he chose a random date of October 7 to
say that the notes had dropped to 27, that's a random date.
The exchange closed on September 12.  According to the output
that I'm looking at, the trading price on that date was 33,
which is actually higher than what he was showing.  And as of
today, the price is 28.25, which is higher than what he showed
too.

     In any case, the way the paper trades is no causal

KASAWHIOps

1    relationship between the exchange offer or the reorganization

2    and how the paper trades.  The paper trades based on everyday

3    business operations.  And there's not been an effort made or

4    can be an effort made here to suggest that because the trading

5    price moved around, that that has something to do with the

6    exchange offer.  If it had to do with the exchange offer, it

7    would have happened at a point in time and it wouldn't keep

8    bouncing around.

9           The last point that I feel like I have to comment on

10   is this twice talking about somehow trying to take advantage of

11   the pandemic.  Here's what the facts are.  The facts are there

12   is a pandemic.  The facts are the pandemic has made it

13   difficult to operate businesses.  It has an adverse impact on

14   people's ability to hire for drilling and to undertake these

15   kinds of projects.  What that means to a company, which has

16   fiduciary duties to its stockholders, is that it has to take

17   action, is required to take action, to best position itself to

18   withstand what's going on in the world right now.  And the way

19   companies do that is, they try to strengthen their balance

20   sheet by getting consensual agreements, which they've gotten

21   here with everybody but the dissident noteholders here,

22   consensual agreements, extend the maturities, you get a little

23   extra on interest, you exchange it to something that has other

24   attributes.  They choose not to do that.  They continue to have

25   the same rights they've always had.

KASAWHIOps

1          And I'll note that at least once Mr. Leblanc actually

2    used the word "the debtors."  Because what they're trying to do

3    here is force this company into bankruptcy.  In fact,

4    Mr. Leblanc is a bankruptcy lawyer.  And the company doesn't

5    need to be in bankruptcy right now.  The company has

6    strengthened its balance sheet and is in a position to

7    withstand what's going on here.  We don't need to wipe out

8    shareholders, retirees, pensioners and people like that so that

9    the distressed investors that buy it cents on the dollar can

10   have an outsize recovery.

11          Thank you, your Honor.

12          THE COURT:  You're welcome.

13          Mr. Leblanc, did you have anything further before we

14   adjourn?

15          MR. LEBLANC:  Your Honor, I do, in two minutes.  And

16   let me go in inverse order.  I am a bankruptcy lawyer.  I'm

17   also a litigator, your Honor.  So it's a little odd to suggest

18   that I favor bankruptcy as a litigator.  I don't take it as an

19   insult.  But I've seen Mr. Kurtz for many, many years in

20   bankruptcy court right along with me.

21          But, your Honor, if you look at the notice that he's

22   referring to, the letter that I wrote to him in early August

23   doesn't refer to bankruptcy.  We wanted the company, wanted at

24   the time the company engaged in a holistic restructuring

25   discussion, not -- at that time they were just trying to

KASAWHIOps

advantage one member of their board.  We thought that was a bad

idea.  We continue to think that this piecemeal effort, that

picking off some debtholders is a big mistake, and we should be

engaged with the company in a holistic restructuring.  That's

what our clients are looking for and that's what we'd like, not

a bankruptcy here.

Your Honor, there's a reference to the prices of the

debtor securities.  I used what I used to present the evidence

in the record, your Honor, not what Mr. Kurtz just read off of

a screen.  If there was an issue with that they certainly could

have responded when those documents were put in the docket.

And the relevant date is not the date that the

transaction closes.  The point is, trading 39 cents on the

dollar before the exchange, the series of exchange

transactions, including the first one when a director of the

company was announced, that's what's relevant.  That's why

we're using 49 cents as the amount that we've lost.

Mr. Kurtz still has no response to the fact that they

can raise senior debt, they just can't do it in the way that

they did it here.  That is a fact.  He can't respond to that.

He suggested that 11.03 is boilerplate.  But, your Honor, we

walked through, in two critical ways, why the words of 11.03 is

fundamentally different than the boilerplate provisions of

Section 5.01.  And that make it fundamentally different in

interpretation.  One, it does not treat the assets of the

KASAWHIOps

debtor on a consolidated basis.  It doesn't speak to their

values.  And most significantly, it expressly excludes, and

they conceded this point in their pleadings, it expressly

excludes internal reorganization.  It expressly excludes that.

The boilerplate provisions don't do that.

         And then lastly, your Honor, just the more fundamental

point is, the notes that our clients bought in January of this

year were issued as priority guaranteed notes that have this

level of structural seniority, that have this additional

protection.  In return for that, the debtors get to pay less in

interest.  If Mr. Kurtz is right that the PGN, as issued, that

you can just ignore that structural seniority and the

protections that we have to protect that structural seniority

by preserving our assets or giving us a guarantee if they're

transferred, if you could just ignore that, your Honor, then

these notes should have no advantage over any other note.  And

that just ignores the entirety of Section 11 of the contract.

That would be an incorrect interpretation, your Honor.  And

contrary to 40 years of precedent interpreting prior guarantee

note provisions and the successor guarantor provision for those

particular contracts, that's what's at issue.  You have a

straightforward basic contract interpretation question in front

of you, and you don't have to look at anything other than the

words on the page.  That's why we showed them to you

previously.  This contract has been breached, your Honor, and

KASAWHIOps

1     we believe summary judgment is appropriate in our favor.

2             Thank you.

3             THE COURT:  Thank you, gentlemen.

4             I know you have a critical date coming up in the next

5     few weeks, so we'll get you a decision before that date.

6             All right.

7             MR. KURTZ:  Thank you very much, your Honor.

8             THE COURT:  Thank you, Jim.

9             MR. LEBLANC:  Thanks much.

10            (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25