USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: DEC 16 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WHITEBOX RELATIVE VALUE PARTNERS,      :
LP et al.,                             :
                                       :
                      Plaintiff,       :
                                       :
           -against-                   :
                                       :
TRANSOCEAN LTD. et al.,                :
                                       :
                      Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM DECISION
AND ORDER

20 Civ. 7143 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiffs Whitebox Relative Value Partners, LP, Whitebox GT Fund, LP, Whitebox Multi-Strategy Partners, LP, and Pandora Select Partners, LP (together, "Whitebox") bring this securities action against Defendants Transocean Ltd. ("Transocean Parent") and Transocean Inc. ("TINC," and together, "Transocean"). Plaintiffs are holders of debt issued by TINC in January 2020 that is due in 2027 ("2027 Existing Notes"). On August 10, 2020, Transocean announced an exchange offer of new senior guaranteed notes ("New Guaranteed Notes") for certain existing debt securities, including the 2027 Existing Notes (the "Exchange Offer"). The Exchange Offer was set to expire on September 4, 2020. On September 2, 2020, Whitebox filed the instant lawsuit alleging that Transocean made material misstatements and omissions regarding the Exchange Offer, in violation of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934. (Compl., ECF No. 3.) Whitebox primarily alleges that the offering memorandum issued in connection with the Exchange Offer (the "Offering Memorandum") falsely claims that the New Guaranteed Notes will be "structurally senior" to the 2027 Existing Notes. (Compl. ¶ 9.) Whitebox contends that the structural subordination of the 2027 Existing Notes is a breach of the indenture covenants of

such notes, because the newly-formed guarantors of the New Guaranteed Notes were required to, but did not, also guarantee the 2027 Existing Notes.

Also on September 2, holders of more than 25% of the principal amount of the 2027 Existing Notes, including Whitebox, delivered to TINC a notice of default under the indenture governing the 2027 Existing Notes (the "Indenture," and such notice of default, the "Notice"). (Decl. of Joshua D. Weedman in Supp. of Transocean Ltd. and Transocean Inc. Mot. for Summ. J. ("Weedman Decl."), Ex. 7 (Notice of Default), ECF No. 28-7.)  The Notice alleges that the internal reorganization leading to the subordination of the 2027 Existing Notes constitutes a default under the Indenture.  The Notice further asserts that, in accordance with the terms of the Indenture, if the purported default is not cured within 90 days, the 2027 Existing Notes will be accelerated such that the principal amount of the notes then outstanding, and any accrued and unpaid interest thereon, will be immediately due and payable.

Whitebox filed a motion in this action for a temporary restraining order and preliminary injunction, seeking an order directing Transocean to issue a corrective disclosure to the Offering Memorandum, allow noteholders who had tendered their notes to withdraw that tender, and hold the Exchange Offer open for an additional two weeks.  After holding a hearing on Whitebox's motion on September 3, 2020, this Court denied the motion.  (Order, ECF No. 14.)

Subsequently, on September 23, Transocean filed counterclaims against Whitebox seeking, *inter alia*, a judgment declaring that the Notice is invalid, there has been no default under the Indenture, the internal reorganization and Exchange Offer do not violate the Indenture, and there is no basis to accelerate the 2027 Existing Notes, and directing Whitebox to withdraw the Notice. (Answer and Countercl., ECF No. 22, at 32–34.)  Pending before this Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Transocean's

counterclaims. (Transocean Ltd. and Transocean Inc. Notice of Mot. for Summ. J, ECF No. 24; Pls.' Notice of Cross-Mot. for Summ. J., ECF No. 38.) For the reasons stated below, Transocean's motion for summary judgment is GRANTED. Whitebox's cross-motion is DENIED.

## I.    FACTUAL BACKGROUND

Transocean Parent is a leading international provider of offshore contract drilling services for oil and gas wells, specializing in ultra-deepwater and harsh environment drilling services. (Pls.' (1) Resp. to Defs.' Local Rule 56.1 Statement and (2) Further Statement of Undisputed Material Facts in Opp'n to Defs.' Mot. for Summ. J. and in Supp. of Pls.' Cross-Mot. for Summ. J. ("Rule 56.1 Statement"), ECF No. 40, ¶¶ 1, 2.) TINC is a wholly-owned subsidiary of Transocean Parent. (*Id.* ¶ 1.)

Among other outstanding debt, TINC issued $750 million principal amount of the 2027 Existing Notes in January 2020. (*Id.* ¶ 4.) The terms of the 2027 Existing Notes are governed by the Indenture dated January 17, 2020. (*Id.* ¶ 6.) Under the terms of the Indenture, the 2027 Existing Notes are guaranteed by Transocean Parent and three wholly-owned subsidiaries of TINC: Transocean Holdings 1 Limited, Transocean Holdings 2 Limited, and Transocean Holdings 3 Limited (together, the "Upper Tier Guarantors"). (*Id.* ¶ 5.) At the time the 2027 Existing Notes were issued, the Upper Tier Guarantors owned direct equity interests in asset holding companies that, in turn, owned Transocean's operating assets. (*Id.* ¶¶ 26, 30.) This structure provided the 2027 Existing Notes with seniority over legacy unsecured debt issued by TINC and only guaranteed by Transocean Parent. (*Id.* ¶ 31.) Because the Upper Tier Guarantors had a closer claim on the operating assets of the company, the guarantee provided by such entities for the 2027 Existing Notes ensured their structural seniority over the legacy unsecured debt. (*Id.*)

3

On August 10, 2020, Transocean announced the Exchange Offer, through which TINC offered to exchange existing debt, including the 2027 Existing Notes, for the New Guaranteed Notes. (*Id.* ¶ 17.) In connection with the Exchange Offer, Transocean also created three indirect holding company subsidiaries of TINC: Transocean Mid Holdings 1 Limited, Transocean Mid Holdings 2 Limited, and Transocean Mid Holdings 3 Limited[1] (together, the "Lower Tier Guarantors"). (*Id.* ¶ 22.) The Lower Tier Guarantors were collectively wholly-owned by the Upper Tier Guarantors. (*Id.* ¶ 23.) That is, the Upper Tier Guarantors owned equity interests in the Lower Tier Guarantors, which owned equity interests in the asset holding companies that, in turn, owned Transocean's operating assets. (*Id.* ¶ 27.) The New Guaranteed Notes were guaranteed by Transocean Parent and the newly-created Lower Tier Guarantors. (*Id.* ¶ 22.) Accordingly, just as the holders of the 2027 Existing Notes had structural seniority over the legacy unsecured debt, the holders of the New Guaranteed Notes had structural seniority over the 2027 Existing Notes.

Whitebox alleges that this internal reorganization violated the Indenture, specifically Section 11.03 labeled "Successors and Assigns." Section 11.03 provides, in relevant part:

> A Subsidiary Guarantor may . . . dispose of all or substantially all of its assets to any Person . . . provided however, that in the case of the . . . disposal of all or substantially all of the assets of such Subsidiary Guarantor . . . if such other Person is not [Transocean Parent], [TINC] or another Subsidiary Guarantor, such Subsidiary Guarantor's obligations under its Securities Guarantee must be expressly assumed by such other Person, except in connection with a transaction in which the Securities Guarantee of such Subsidiary Guarantor would be released as provided in Section 11.06.

(Weedman Decl., Ex. 1 (Indenture), ECF No. 28-1, § 11.03.) In substance, Section 11.03 provides that, subject to certain exceptions, the Upper Tier Guarantors cannot transfer all or substantially all of their assets to another entity, unless such transferee assumes the guarantee provided by the

---

[1] Transocean also created these entities in connection with various private bond exchanges. (*Id.* ¶15.)

Upper Tier Guarantors to the 2027 Existing Notes. Whitebox argues that, in connection with the Exchange Offer, the Upper Tier Guarantors transferred the entirety of their assets to the Lower Tier Guarantors in exchange for an equity interest in each of the Lower Tier Guarantors. (*See* Compl. ¶ 8; Weedman Decl., Ex. 7 (Notice of Default), at 2–3.) The Lower Tier Guarantors, however, did not provide a guarantee for the 2027 Existing Notes. (*Id.*) Instead, by the terms of the Exchange Offer, the Lower Tier Guarantors only guaranteed the New Guaranteed Notes.[2] (Rule 56.1 Statement ¶¶ 22, 27.) Whitebox, therefore, maintains that Transocean breached Section 11.03 of the Indenture. (*See* Weedman Decl., Ex. 7 (Notice of Default), at 2–3.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.*

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.

---

[2] On December 1, 2020, Transocean notified this Court that it had "elected to implement certain internal reorganization transactions to resolve the allegations in the Notice." (Letter dated December 1, 2020, ECF No. 57.) Specifically, Transocean eliminated the Lower Tier Guarantors. As a result, the Upper Tier Guarantors "will continue to directly hold the equity interests of the [asset holding companies], exactly as they did prior to the [Exchange Offer]." (*Id.*) While Transocean still maintains that no breach of the Indenture occurred, it asserts that Whitebox's claim has now been cured. Though Transocean's actions appear to have remedied any alleged harm to Whitebox, Whitebox has provided no indication that the Notice has been withdrawn or waived, or that the filers intend to do so. Accordingly, this Court sees no reason not to resolve the pending motions, especially considering their direct relevance to Whitebox's unresolved securities claims. Moreover, for a variety of reasons, all parties request that this Court still render a decision. (*See id.*; Letter dated December 2, 2020, ECF No. 58.)

2002).  In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact.  *See Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002).  To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  Rather, the opposing party must produce admissible evidence that supports its pleadings.  *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968).  In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment."  *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's favor.  *See id.*  However, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact."  *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation omitted).  Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  *Marvel*, 310 F.3d at 286.

The standard for cross-motions for summary judgment is the same: a court will "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quoting *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).

### III.   SUMMARY JUDGMENT IS GRANTED FOR TRANSOCEAN

Both parties contend that the Indenture is unambiguous.  "The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment."  *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002).  Here, the parties' dispute can be reduced to a disagreement over the meaning of Section 11.03 of the Indenture and its application to the company's restructuring and Exchange Offer.  While Whitebox argues that the Upper Tier Guarantors transferred all of their assets to the Lower Tier Guarantors, Transocean maintains that these transactions were part of an internal reorganization that does not constitute a transfer of all or substantially all of the assets of the Upper Tier Guarantors, for purposes of Section 11.03.

"It is a well-established rule in this Circuit that the interpretation of [i]ndenture provisions is a matter of basic contract law."  *Jamie Sec. Co. v. The Ltd., Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989) (alterations and citation omitted).  Under New York contract law,[3] "a court may grant summary judgment in a contract dispute 'only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning.'"  *Wilmington Sav. Fund Soc'y, FSB v. Cash Am. Int'l, Inc.*, No. 15 Civ. 5027 (JMF), 2016 WL 5092594, at *3 (S.D.N.Y. Sept. 19, 2016) (quoting *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)).

Provisions, such as Section 11.03, that prohibit the sale, transfer, or disposal of all or substantially all of an entity's assets unless the successor assumes the transferor's obligations are referred to as "successor obligor" provisions.  *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1044–45 (2d Cir. 1982); *Bank of New York Mellon Tr. Co. v. Liberty Media*

---

[3] The Indenture is governed by New York law.  (Rule 56.1 Statement ¶ 7.)

*Corp.*, 29 A.3d 225, 229 (Del. 2011); *In re AOG Entm't, Inc.*, 569 B.R. 563, 569 (Bankr. S.D.N.Y. 2017); *Bank of New York v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312, 314 (S.D.N.Y. 2008). They are a common feature of indenture agreements and the Second Circuit has, in no uncertain terms, deemed them to be "boilerplate" provisions. *Sharon Steel*, 691 F.2d 1048. Accordingly, they are "not the consequence of the relationship of particular borrowers and lenders" and their meaning does "not depend upon particularized intentions of the parties to an indenture." *Id.*

The language of the contract is "the starting point in the search for meaning" of successor obligor clauses. *Id.* at 1049. Section 11.03's requirement to pass on the guarantee obligations of the Upper Tier Guarantors is limited to "sale[s], lease[s], conveyance[s], transfer[s] or disposal[s] of all or substantially all of the assets" of the Upper Tier Guarantors. (Weedman Decl., Ex. 1 (Indenture), § 11.03.) Determining whether a transaction constitutes a disposal of all or substantially all of an entity's assets "requires an inquiry into both the quantitative and qualitative aspects" of the transaction in question. *HFTP Investments, L.L.C. v. Grupo TMM, S.A.*, 2004 WL 5641710 (N.Y. Sup. Ct. June 04, 2004); *see also Roseton OL, LLC v. Dynegy Holdings Inc.*, 2011 WL 3275965, at *13 n.95 (Del. Ch. July 29, 2011) (collecting cases). A quantitative analysis "may focus on the economic value and number of assets to be transferred in comparison to the assets retained." *Dynegy*, 2011 WL 3275965, at *13. Relevant qualitative factors include "the overall effect of the transaction on the company," *id.*, whether "the sale substantially changed the nature or character of the entity's business," and whether "the sale was one not in the normal and regular course of the entity's business." *HFTP Investments*, 2004 WL 5641710.

Here, there was no substantive change to the fundamental purpose of the Upper Tier Guarantors. Prior to the restructuring and Exchange Offer, the Upper Tier Guarantors were holding companies with indirect interests in Transocean's operating assets. After the transactions,

the Upper Tier Guarantors continued to own indirect interests in such assets.[4]  Moreover, the

addition of a layer of holding companies between TINC and the operating assets to serve as

guarantors of issued debt was not a novel transaction for Transocean.  In fact, such a restructuring

was similarly executed in connection with the issuance of the 2027 Existing Notes, so as to ensure

their structural seniority over the legacy unsecured debt.  Thus, qualitatively, there was no disposal

of all or substantially all of the assets of the Upper Tier Guarantors.  *See Dynegy*, 2011 WL

3275965, at *13 (finding no transfer of the entity's assets from a qualitative perspective when,

before and after the transaction, the entity was a holding company that indirectly owned the same

underlying assets).  Similarly, from a quantitative perspective, there was no change in the

economic value of the assets of the Upper Tier Guarantors.  The Upper Tier Guarantors' equity

interest in the Lower Tier Guarantors was tied to the same operating assets as the Upper Tier

Guarantors' previous equity interest in the asset holding companies.  The transactions did not

involve the sale of any of Transocean's operating assets.  Because the operating assets that

remained available to satisfy the Upper Tier Guarantors' debt were identical to those prior to the

restructuring, the economic value of the Upper Tier Guarantors' assets was unchanged.  *See*

*Dynegy*, 2011 WL 3275965, at *13 (finding no transfer of the entity's assets from a quantitative

---

[4] Whitebox argues that this Court should not analyze the Upper Tier Guarantors' assets on a consolidated basis with those of their subsidiaries.  In support, Whitebox contrasts the language of Section 11.03 with Section 5.01, which is also a successor obligor provision, but applies to TINC.  Of the two provisions, only Section 5.01 makes clear that the term "all or substantially all of its assets" should be computed on a consolidated basis.  (Weedman Decl., Ex. 1 (Indenture), § 5.01.)  Whitebox contends this was intentional, because Section 11.03 serves to protect the priority of the holders of the 2027 Existing Notes over other debtholders.  Yet, as discussed below, Whitebox provides no support for its purported purpose and concedes that TINC is entitled to raise debt senior to the 2027 Existing Notes.  Accordingly, without a credible explanation, there is little reason to assign significant meaning to the difference in language between these provisions.  *Cf. Sharon Steel*, 691 F.2d at 1048 ("[U]niformity in interpretation [of successor obligor provisions] is important to the efficiency of capital markets.").  Moreover, the directive to consolidate assets in Section 5.01 is set off by the phrase "for the avoidance of doubt," indicating that it is merely a clarification of what the language "all or substantially all of its assets" already conveys.

perspective when, before and after the transaction, the entity "retain[ed] the value of the [power plants] embedded in its ownership of the entities that directly own[ed] those plants").

Whitebox does not dispute that these factors demonstrate there was no disposal of the Upper Tier Guarantors' assets. Rather, Whitebox argues that such an analysis does not apply because the Upper Tier Guarantors transferred *all* of their equity interests in the asset holding companies to the Lower Tier Guarantors. Whitebox contends that when the transferor disposes of everything it owns, there is no need for a court to conduct a close analysis of the effect of the transaction to determine if the successor obligor provision applies. Or as Whitebox's counsel explained at oral argument: "We think it's as simple as the following proposition, your Honor. 'All' means 'all.'" (Tr. of Oral Arg., ECF No. 54, 49:3–4.) While attractively categorical, such a reductive view of successor obligor provisions has been rejected by the Second Circuit. *See Sharon Steel*, 691 F.2d at 1049 (rejecting a "literalist" approach to successor obligor provisions as a "masterpiece of simplicity"). Whitebox cannot avoid an inquiry into whether all of the assets of the Upper Tier Guarantors were transferred by simply claiming that all of the assets were transferred. Rather, it is the articulated test that determines whether such a sale occurred, in substance and without regard as to form. Moreover, there is no reason why a disposal of all of an entity's assets is any less likely to satisfy the quantitative and qualitative analysis than a disposal of substantially all of its assets. The analysis is equally appropriate for both.

The purpose of successor obligor provisions further confirms the inapplicability of Section 11.03 to Transocean's internal reorganization. Such provisions protect both borrowers and lenders in two respects. *See Sharon Steel*, 691 F.2d at 1051. Specifically, successor obligor clauses (1) "leave the borrower free to merge, liquidate or to sell its assets in order to enter a wholly new business free of public debt" and (2) "assure the lender a degree of continuity of assets." *Tyco*,

545 F. Supp. 2d at 322 (citation omitted). Here, Whitebox's interest, as a lender, was not compromised. The operating assets were not transferred away from the Upper Tier Guarantors' ultimate ownership. Accordingly, the reorganization posed no risk to the Upper Tier Guarantors' ability to satisfy outstanding debt. In contrast, if Transocean had created a subsidiary of TINC operating independently outside of the ownership chain of the Upper Tier Guarantors, and transferred the Upper Tier Guarantors' interest in the asset holding companies to such entity, Whitebox likely could have invoked Section 11.03 to preserve the guarantee owed to the holders of the 2027 Existing Notes.

Whitebox, however, maintains that Section 11.03 is not a common successor obligor provision, but is, instead, related to the priority of the 2027 Existing Notes. Whitebox does not go so far as to argue that Section 11.03 provides an absolute guarantee as to the seniority of the 2027 Existing Notes. Indeed, at oral argument, Whitebox did not dispute that Transocean can raise debt senior to the 2027 Existing Notes in several different ways.[5] (*See* Tr. of Oral Arg. at 57:6–10.) Instead, Whitebox argues that the purpose of Section 11.03 is to prevent Transocean from executing the particular transactions at issue (i.e., creating a new set of guarantors between the Upper Tier Guarantors and the operating assets and burdening those entities with new debt). (*See* Tr. of Oral Arg. at 58–59.) In essence, Whitebox's claim is that the purpose of Section 11.03 is to protect the priority of the 2027 Existing Notes, but only against a certain method of subordination. Whitebox provides no evidence in support of this precisely tailored purpose. In the absence of any such evidence, the more likely reason for the inclusion of Section 11.03 in the Indenture is that

---

[5] Transocean also maintains that Section 4.04(a)(12) of the Indenture permits the incurrence of debt that is senior to the 2027 Existing Notes.

which is common to all successor obligor clauses: to prevent the unrestricted transfer away from the obligor of assets expected to be used to service outstanding debt.[6]

## IV.    DECLARATORY JUDGMENT IS APPROPRIATE

Declaratory judgment is appropriate on Transocean's counterclaims.  The Declaratory Judgment Act vests a district court with authority to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  In deciding whether to exercise such jurisdiction, courts in this Circuit consider five factors:

> (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved[,] . . . (2) whether a judgment would finalize the controversy and offer relief from uncertainty[,] . . . (3) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata,' (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court, and (5) whether there is a better or more effective remedy.

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 105 (2d Cir. 2012) (internal quotation marks omitted) (citing *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir. 2003)).  A declaratory judgment here would resolve a central issue in the overall securities action—namely, whether the Lower Tier Guarantors not assuming the Upper Tier Guarantors' obligations to the holders of the 2027 Existing Notes constituted a breach of the Indenture.  Such a declaration will directly impact the resolution of Whitebox's claims that the Offering Memorandum falsely stated that the 2027 Existing Notes would not benefit from guarantees from the Lower Tier Guarantors, when they were required to do so.

---

[6] Whitebox also contends that Section 11.03 cannot be a boilerplate provision, because indenture agreements for debt issued prior to the 2027 Existing Notes did not contain a provision comparable to Section 11.03.  While this may indicate that a successor obligor clause applicable to the Upper Tier Guarantors was specifically bargained for in drafting the Indenture, it is not probative of the meaning of the provision.

A judgment in Transocean's favor would also offer the company significant relief from uncertainty. Transocean maintains that, absent such a judgment, it will be exposed to a number of collateral consequences associated with an unresolved notice of default, including loss of access to capital critical to its continued operations, loss of business opportunities, and a negative impact on its credit rating. Whitebox, however, argues that a declaratory judgment invalidating the Notice would not finalize the underlying controversy, because it would not bind the noteholders who filed the Notice but are absent from this litigation. Transocean disagrees. In any event, this Court need not decide the collateral estoppel effect of declaratory relief. By issuing the relief outlined herein, this Court is affording Transocean final relief at least with respect to Whitebox and is not directing any non-party to act.[7]

Finally, there is no indication that Transocean is motivated by a "race to res judicata" or is otherwise acting improperly in bringing its counterclaims. In fact, this Court is not aware of any other pending lawsuits addressing the same controversy at issue here. Moreover, issuing declaratory judgment on Transocean's counterclaims would not increase friction with or inappropriately encroach on the domain of a state court. Federal courts in New York routinely resolve contract disputes governed by New York law. Thus, considering all factors in concert, declaratory relief is warranted.

## V.   CONCLUSION

Transocean's motion for summary judgment, (ECF No. 24), is GRANTED. Whitebox's cross-motion for summary judgment, (ECF No. 38), is DENIED. Declaratory judgment is entered in favor of Transocean. The internal reorganization executed in connection with the Exchange

---

[7] This Court's judgment is limited to declaratory relief and does not include a specific directive that Whitebox and the other noteholders withdraw the Notice. To be sure, the practical effect of such a declaratory judgment may be that the Notice is invalidated.

Offer did not violate Section 11.03 of the Indenture.  Accordingly, the purported events of default

described in the Notice do not, in fact, constitute an actual default under the Indenture, and any

associated rights or remedies for Whitebox, including acceleration of the 2027 Existing Notes, are

unavailable.[8]

       The Clerk of Court is directed to close the motions accordingly.


Dated: New York, New York
      December 16, 2020

                           SO ORDERED.

                           *George B. Daniels*

                           GEORGE B. DANIELS
                           United States District Judge

---

[8] Transocean also argues that the notice of acceleration of the 2027 Existing Notes did not comply with procedural requirements set forth in the Indenture.  Because the absence of any default under the Indenture moots such notice of acceleration, this Court need not determine whether the asserted procedural requirements were followed.